**RECORD NO. 21-50191**

In The

## United States Court of Appeals

For The Ninth Circuit

# IN RE JASON FONG

*Petitioner.*

**PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA IN *UNITED STATES V. FONG*, SACR 20-00146-DOC**

## PETITION FOR WRIT OF MANDAMUS
## ON BEHALF OF JASON FONG

Karren Kenney,
Kenney Legal Defense
2900 Bristol Street, Suite C204
Costa Mesa, CA, 92626
Telephone: (855) 505-5588
Email: Karren.Kenney@gmail.com

*Counsel for Petitioner*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................i

INTRODUCTION ............................................................................1

RELIEF SOUGHT ...........................................................................5

ISSUE PRESENTED .........................................................................5

FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED BY THE
PETITION...................................................................................6

    I.    The government is seeking to prosecute Petitioner for allegedly
        providing material support in furtherance of terroristic activities ........6

    II.   The parties discover at the April 2, 2021 bail hearing Judge Carter's
        bias against Petitioner and his extrajudicial knowledge about
        counterterrorism efforts around the globe.............................................6

    III.  The defense moved for recusal as the lower court's conduct at the bail
        hearing disqualified the district judge's service under 28 U.S.C. § 455.
        This motion was denied without a hearing and without allowing a
        reply to the government's response.........................................................9

REASONS WHY THE WRIT SHOULD ISSUE ..................................................10

    A. The standard of review ..........................................................10

       i.   Disqualification is required because an objective member of the
          public could reasonably question the impartiality of the district
          judge and the extrajudicial source of his knowledge used to make
          rulings in the case under 28 U.S.C. § 455(a). ...............................14

       ii.  Disqualification is required because the district judge has "personal
          knowledge of disputed evidentiary facts concerning the
          proceeding" from his extrajudicial consulting and working for the
          U.S. government prohibited by § 455(b)(1)……………....……16

iii.    The motion to dismiss the appeal of the recusal motion should be denied ................................................................................................

B. This Court should exercise its discretion to issue the writ in this case....23

CONCLUSION.....................................................................................23

CERTIFICATE OF COMPLIANCE.........................................................26

CERTIFICATE OF FILING AND SERVICE ...........................................27

ATTACHMENTS ................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004) .................................... 11, 15

*Hathcock v. Navistar International Transportation Corp.*, 53 F.3d 36, 41 (4th Cir. 1995) ........................................................................................................20

*In re Chevron U.S.A., Inc.*, 121 F.3d 163 (5th Cir. 1997)………………………..…18

*In re Hatcher*, 150 F.3d 631 (7th Cir. 1998)..........................................................22

*King v. U.S. Dist. Ct. for Cent. Dist. Of California*, 16 F.3d 992 (9th Cir. 1994)...11

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) ...................15

*Liteky v. United States*, 510 U.S. 540, 554-55, 114 S.Ct. 1147 (1994) ........ 4, 16, 18

*Mangini v. U.S.*, 314 F.3d 1158, 1161 (9th Cir. 2003) ...........................................11

*Mann v. Thacker*, 246 F.3d 1092 (8th Cir. 2001) ...................................................21

*Republican Party of Minn. v. White*, 836 U.S. 765 U.S. 865 (2002)......................19

*U.S. v. Wolff*, 263 F. Appx. 612, 615-616 (9th Cir. 2008)......................................12

*United States v. Alabama*, 828 F.2d 1532 (11th Cir. 1987) ...................................21

*United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000)..................................15

*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993).............................................19

*United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966) ...................................16

*United States v. Mikhel*, 889 F.3d 1003, 1026 (9th Cir. 2018)...............................12

*United States v. Washington* 573 F.2d 1121, 1122-23 (9th Cir. 1978) ..................11

*Walker v. Columbia Broadcasting System, Inc.*, 443 F.2d 33 (7th Cir. 1971) ........11

## Statutes

18 U.S.C. § 2339C ...................................................................................................1, 6

28 U.S.C. § 455 ................................................................ ii, 4, 5, 9, 10, 12, 13, 23

28 U.S.C. § 455(a)……………………………………..……….ii, 14, 15, 16, 23, 24

28 U.S.C. § 455(b)(1)……………………………………………....ii, 15, 16, 22, 23

## Other Authorities

Baroni, Michael L., *Judge Carter: Fighter on a* Hill, OC Bar President's Page (2017).......................................................................................................2, 6

*United States Congress Senate Committee on the Judiciary, Confirmation Hearings on Federal Appointments: Hearings before the Committee on the*

iv

*Judiciary, United States Senate, One Hundred Fifth Congress, Second Session, on Confirmation of Appointments to the Federal Judiciary.* U.S. G.P.O., 1998 ...1

**INTRODUCTION**

Jason Fong could face 20 years in prison pursuant to 18 U.S.C. § 2339C (Concealing the Provision of Material Support and Resources and Funds) in front of a district court judge who has demonstrated objective bias against him and his case given that court's extrajudicial knowledge of military operations, military experience, and the court's imparting of knowledge of that training onto Mr. Fong.

By way of background, Petitioner is a former Marine, joining this service branch in July 2014. Records from his service indicate his intelligence and potential for growth as he worked as an Avionics Maintenance Technician through July of 2020. Mr. Fong decided not to re-enlist at that juncture, after growing disenchanted with military service. In December 2020, Mr. Fong was administratively discharged (Other than Honorable) due to these pending charges against him. The government alleges that Petitioner concealed the nature and source of material support for a foreign terrorist organization ("FTO"), Hamas, and on top of Petitioner owning guns and having extensive military training, the government alleges that Petitioner distributed instructions on how to make improvised explosive devices ("IEDs") and chemical weapons to a minor and others who said that they planned to fight for an FTO. In addition, the government alleges that Petitioner provided a link to others to raise funds for Hamas.

The district court judge assigned to his case is the Honorable David O. Carter. Judge Carter also served his country in the same branch of service as Petitioner – as a Marine from 1967-1969, notably and honorably serving in the Vietnam War, including fighting in the battle of Khe Sanh. *United States Congress Senate Committee on the Judiciary, Confirmation Hearings on Federal Appointments: Hearings before the Committee on the Judiciary, United States Senate, One Hundred Fifth Congress, Second Session, on Confirmation of Appointments to the Federal*

1

*Judiciary.* U.S. G.P.O., 1998. In the battle of Khe Sanh the Marine base where Judge Carter was serving came under siege and over the course of five months was under constant attack by infantry, mortar, artillery, and rockets. Baroni, Michael L., *Judge Carter: Fighter on a Hill*, OC Bar President's Page (2017). In 1968, the base was dismantled and destroyed which brought about further skirmishes. But, in stark contrast to Petitioner, Judge Carter was honorably and medically discharged after suffering wounds from a grenade blast, gunshot wound to the arm, and injuries from shrapnel in battle. *Id.* For his honorable service, Judge Carter was awarded a Bronze Star medal and two Purple Hearts. *Id.*

But Judge Carter is not just a decorated veteran and former Marine who left his military service in the long-ago past. Judge Carter has continued his service to the country through active and current involvement in global counter-terrorism efforts both prior to and since ascending the federal bench in 1998. Judge Carter's chambers are a "showcase of patriotism, no nonsense bravery, and daring adventures. Military memorabilia abounds [as well as] countless tokens of appreciation from American embassies and diplomatic offices." *Id.* His humanitarian work and work with the United States State Department to combat terrorism have taken him to Afghanistan, Syria, Bosnia, China, Pakistan, Malawi, Malaysia, Georgia, Kazakhstan, Turkmenistan, Nepal, and more. *Id.*

At the bail hearing before the Judge Carter he put forth a lot of this extrajudicial knowledge of both military operations, tactics, and counterterrorism efforts he is personally (and currently) involved in on behalf of the United States government, for example:

> THE COURT: The activity in terms of flight, although he possessed a passport, didn't lead to a situation where he purchased a ticket, was taking a war bride, had those connections with specificity overseas, such that he would fly into Istanbul work himself south to Izmir, cross the 60-mile border that was so open for so many years along the Iraq-Turkish border that the UN couldn't control.

2

(April 2, 2021 RT 61; 17-24)

In addressing Petitioner directly, the district court stated:

> THE COURT: …But any Marine is extraordinarily well-trained in combat. If you recall your heritage, it's that you're an infantry person first, no matter what MOS is designated for you. You can be a cook and, unlike any other branch of the service, you're still called upon to defend that perimeter as a rifleman, so there's no specialization. And therefore, you're an excellent marksman. You're trained in bomb techniques. You're trained in putting together an IED or a bomb. You represent that unique ability, quite frankly to turn the corner, and rightfully so, on behalf of the country when it's called upon, from that of an ordinary citizen, into a person of extreme violence.

(April 2, 2021 RT 62; 8-19)

> THE COURT: Well, I'll disclose to you: You know – you both know I go across the world in terms of some of these [terroristic] incidences in Afghanistan, Pakistan and Indonesia, Sri Lanka. In fact, they bombed the church I was in at Sri Lanka short time after I was there…

(April 2, 2021 RT 40; 19-25)

> THE COURT: I unfortunately have to follow [counterterrorism efforts across the globe] because of some things I do on behalf of our government.

(April 2, 2021 RT 41; 5-6)

> THE COURT: I watch that stuff, I have to.
> MS. KENNEY: I don't.
> THE COURT: You don't wanna see the behead—
> MS. KENNEY: I don't want that in my head, thank you.

(April 2, 2021, RT 53; 6-11)

The entire hearing is inured with exchanges like this. These are simply not pieces of knowledge an objective and unbiased observer would bring to the case. Furthermore, this information is not information the district court learned over the course of Petitioner's case, either. All of this editorializing comes from extrajudicial sources – and all at the beginning of the case, rather than at the end, after the district court has heard all of the facts and evidence in the case.

3

Perhaps most troublingly, when denying Petitioner bond on the basis of danger to the community (a decision that was later reversed by this Court), the district judge said the following:

> THE COURT: I find you an extraordinary risk beyond clear and convincing, in fact, ***beyond a reasonable doubt***, and that there are no combinations at this time of conditions that would reasonably address the danger you present. That's the final determination.

(April 2, 2021 RT 75; 1-5) (emphasis added).

Promptly after the bail hearing, Petitioner moved for recusal under 28 U.S.C. § 455, which requires a judge to disqualify himself if he has "personal knowledge of disputed evidentiary facts concerning the proceeding" or in any proceeding where the judge's "impartiality might reasonably be questioned. Dkt. 77. The government opposed the recusal motion. Dkt. 79. The district court denied the motion to recuse without allowing a reply to the government's opposition, nor holding a hearing on the matter, reasoning in part that "opinions formed by the judge on the basis of the facts introduced or events occurring in the course of the proceedings…do not constitute a basis for bias or partiality unless they display a deep-seated favoritism or antagonism that make fair judgment impossible." (*citing Liteky v. United States*, 510 U.S. 540, 554-55, 114 S.Ct. 1147 (1994). Dkt. 92. However, the factual findings of the district court clearly did not solely arise from the course of the hearing, and Judge Carter's extrajudicial involvement in counterterrorism would necessarily make fair judgment impossible in this case.

Ultimately, § 455 sets out an objective standard that does not depend on whether or not the judge is impartial in fact or was even aware of the facts that might cause an objective observer to question whether he can be impartial. Because the district judge has personal knowledge of military service and training, is actively involved in counter-terrorism efforts on behalf of the United States government globally, and clearly has extrajudicial knowledge about disputed facts in a matter he

4

is currently being called on to adjudicate that involves an ex-military member from his same branch with alleged ties to terroristic activity, recusal is statutorily required.

Judge Carter's efforts to bring American constitutional justice throughout the world are absolutely commendable, and undersigned counsel applauds and thanks Judge Carter for his service to our country. However, these extrajudicial involvements also make his presiding over Petitioner's case in particular problematic, as Petitioner embodies the objective antithesis of Judge Carter's demonstrated core values on and off the bench – here, Petitioner comes before the district court a less than honorably discharged veteran of the same branch of service as Judge Carter, with specialized military training and alleged ties to terrorist groups, who allegedly provided both material and instructions on weapons support to those groups. It is therefore not the mere fact of Judge Carter's prior service in the Marines, it is in fact that Judge Carter's *assessment* of this case and *perception* of Petitioner are inexorably bound up in the extrajudicial knowledge Judge Carter brings to this case. Disqualification of the district court in this case is not only appropriate, but perhaps the only way to ensure Petitioner is afforded his constitutional right to a fair trial. Thus, this Court should grant this petition for a writ of mandamus and require the district judge to recuse himself.

## RELIEF SOUGHT

A writ of mandamus directing the Honorable David O. Carter, Judge of the United States District Court for the Central District of California, to recuse himself from presiding over further proceedings in *U.S. v. Fong*, 20-CR-00146-DOC.

## ISSUE PRESENTED

Whether to issue a writ of mandamus because the district court clearly abused its discretion in finding disqualification was unnecessary under 28 U.S.C. § 455, no other adequate remedy can cure permitting a clearly disqualified judge from presiding over the case, and the equities favor issuing the writ?

## FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED BY THE PETITION

**I. The government is seeking to prosecute Petitioner for allegedly providing material support in furtherance of terroristic activities.**

Jason Fong is charged in a one-Count Information charging him with a violation of 18 U.S.C. § 2339C(c), Concealing the Provision of Material Support and Resources and Funds to a FTO beginning on or about May 18, 2020. He faces a maximum of 20 years in prison on this case. It is currently set for trial on January 25, 2022, before the Honorable David O. Carter.

The initial hints at possible impartiality began simultaneously with the beginning of the case. Contrary to the normal course of business in this District, rather than the case being randomly assigned to the wheel of available district court judges, this case was assigned to Judge Carter *prior to* the filing of the Information, which at the very least indicates Judge Carter volunteered to adjudicate Petitioner's case. This is apparently in keeping with a long-standing pattern of Judge Carter's: "Judge Carter is **known to volunteer for some of the highest profile, and most dangerous, cases**, including: The "Barbie v. Bratz" dolls battle, the Gay-Straight Alliance; and trials of the Mexican Mafia and Aryan Brotherhood…" *Baroni*, 2017 (emphasis added). With the allegations contained therein, and Judge Carter's extrajudicial knowledge of military operations and global terrorism, it seems even more likely he would have volunteered to hear this case.

**II. The parties discover at the April 2, 2021, bail hearing Judge Carter's bias against Petitioner and his extrajudicial knowledge about counterterrorism efforts around the globe.**

At the contested bail hearing held on April 2, 2021, the parties had the opportunity to present evidence and argument as to whether or not Petitioner would be detained pending the resolution of the case. The government relied on the search warrant affidavit extensively, alleging that Mr. Fong corresponded with secret

groups about terroristic activities, that he was found with "ghost"/untraceable guns, that he had provided instructions to a minor and others on how to make IEDs and chemical weapons. Notably, the government discussed Petitioner's text messages saying that "the Marines and the Army were terrorists" (Apr. 2, 2021 RT 15; 21-25), and that Mr. Fong allegedly provided information to a group chat about how to make IEDs and chemical weapons, when thereafter, a minor in the group "stated he was planning on blowing up Kessler Air Force Base in Alabama, and immediately the defendant provided the minor and other individuals in the group chat tactical information on entering buildings." (*Id*. at 17; 1-5).

In response, the defense explained that many comments relied on by the government were encased in several layers of hearsay, were taken out of context, or were the result of prompted responses from government operatives lying in wait in these groups.

While Judge Carter made certain findings that Mr. Fong would not be a flight risk, as to the issue of danger, Judge Carter relied extensively on Mr. Fong's military service, not only making assumptions about Mr. Fong's training and experience as Judge Carter also served as a Marine (because he did not allow Mr. Fong to speak), but also editorialized extensively on Judge Carter's own involvement in counterterrorism efforts around the globe on behalf of the U.S. government, both previously and presumably currently. Throughout the hearing Judge Carter made reference to military training and terminology, opining on how this training in the Marines transmuted Mr. Fong into a veritable human weapon:

> THE COURT: You're an excellent marksman. You're trained in bomb techniques. You're trained in putting together an IED or a bomb. You represent the unique ability, quite frankly, to turn the corner, and rightfully so, on behalf of the country when called upon, from that of an ordinary citizen into a person of extreme violence.

(April 2, 2021 RT 62; 8-19)

7

THE COURT: First of all, now I've moved from speech, to your capability from your combat training in the Marine Corps – on more than one occasion and your desire to use those, not only as an instructor but to make them. In and of itself, that would lead to the court's decision and finding that you're extraordinarily dangerous. Your May 18th Signal application then goes on by posting to Hamas, the al-Quassam brigade – let me repeat that: the al-Quassam brigade, which is a military wing of Hamas; this isn't even a fundraising group, that you're going to, uh, "find out more about crypto currency because it's the safest way to send money to help our brothers overseas….From this Court's perspective, ***I don't just have a domestic view,*** whether you're killing Russians or innocent Syrians or soldiers of any country, you represent an extraordinary threat.

(April 2, 2021 RT 69; 1-25)

THE COURT: Somebody in the military, or not in the military, might think this is fiction. But for anybody in the military, you've got the rare combination of knowledge and capability.

(*Id*. at 72; 6-9)

The district court judge also repeatedly discussed his extrajudicial knowledge of terrorist activities, his work with the U.S. government, and his heightened and specialized knowledge of the global politics of terrorism.

THE COURT: Well, I'll disclose to you: You know – you both know I go across the world in terms of some of these [terroristic] incidences in Afghanistan, Pakistan and Indonesia, Sri Lanka. In fact, they bombed the church I was in at Sri Lanka short time after I was there…

(April 2, 2021 RT 40; 19-25)

THE COURT: I unfortunately have to follow [counterterrorism efforts across the globe] because of some things I do on behalf of our government.

(April 2, 2021 RT 41; 5-6)

THE COURT: The activity in terms of flight, although he possessed a passport, didn't lead to a situation where he purchased a ticket, was taking a war bride, had those connections with specificity overseas, such that he would fly into Istanbul work himself south to Izmir, cross the 60-mile border that was so open for so many years along the Iraq-Turkish border that the UN couldn't control.

(April 2, 2021 RT 61; 17-24)

8

> THE COURT: Now, that might seem a very innocent signal to most people who aren't well versed in this area. But those tactics are *jihad*. That is how to wage war on both the Russians and the Americans, who are the outside enemy of al-Qaeda and ISIS, not the inner force, the outside force that al-Awlaki and al-Bagdadi swing from the initial al-Qaeda to looking outside, the foreign enemy, the United States, and the Russians before that.

(*Id*. at 65-66; 19-25;1)

And to reiterate, after making all of these findings with regard to dangerousness that were unrelated to the presentation by the government, the Court went on to state:

> THE COURT: I find you an extraordinary risk beyond clear and convincing, in fact, ***beyond a reasonable doubt***, and that there are no combinations at this time of conditions that would reasonably address the danger you present. That's the final determination.

(April 2, 2021 RT 75; 1-5) (emphasis added).

While Judge Carter would have read the extensive documents from the parties ahead of the contested bail hearing, this type of knowledge of the inner workings of military training, battle tactics, the enemies of terrorist organizations, how to interpret certain language or assess the actions of the Petitioner in the context Judge Carter's own counterterrorism mission and values – virtually all of that existed prior to Judge Carter ever volunteering for Mr. Fong's case. The district court may have been made aware about particular facts about Mr. Fong in the course of the bail hearing, but it would be clear to the objective observer that Judge Carter knew far more about the larger context of these FTO's and had already made up his mind as to Mr. Fong's position in that context "***beyond a reasonable doubt***," in fact, such that impartiality could reasonably be presumed.

**III.** **The defense moved for recusal as the lower court's conduct at the bail hearing disqualified the district judge's service under 28 U.S.C. § 455. This motion was denied without a hearing and without allowing a reply to the government's response**.

9

Promptly after the no-bail determination, defense counsel filed an appeal of that decision with this Court. Dkt. 60. This Court reversed the district court's ruling on the detention order and mandated that Mr. Fong be released pre-trial subject to the conditions originally imposed by the magistrate. Dkts. 75, 76. Within days of that ruling, Mr. Fong filed a Motion for Recusal of the district judge pursuant to 28 U.S.C. § 455. Dkt. 77. That Motion was set for a hearing on August 23, 2021, at 1:30 pm. The government responded in opposition on August 3, 2021. Dkt. 79. However, rather than hold the hearing as scheduled on August 23, the district court, on August 27, instead *sua sponte* denied the defense motion for recusal, without holding the scheduled hearing and without allowing a reply from the defense to the government's opposition. Dkt. 101. The denial by minute order largely parrots the government's opposition to the recusal motion which erroneously concluded Mr. Fong's basis for seeking recusal was merely Judge Carter's military service, the fact that the district court had been overturned on appeal, or the fact that Judge Carter had pointed out Mr. Fong's military training. This characterization is yet another indication of bias against Mr. Fong – these conclusions are gross trivializations of what Mr. Fong is arguing.

Mr. Fong promptly appealed the recusal decision that same day. Dkt. 101. The government filed a motion to dismiss the appeal for lack of jurisdiction on September 10, 2021. C.A. Dkt. 3. This petition for a writ of mandamus follows.

## REASONS WHY THE WRIT SHOULD ISSUE

### A. The Standard of Review.

A district judge's refusal to disqualify himself can be reviewed by way of writ of mandamus in this Circuit. *See e.g. In re Cement Antitrust Litig.*, 673 F.2d 1020, 1301 (9th Cir. 1982). The authority of courts of appeals to issue extraordinary writs is derived from 28 U.S.C. § 1651, which allows all courts established by Act of

10

Congress (i.e., this Court) to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." In the 1996 Notes of Advisory Committee on Rules for Fed. R. App. P. 21, governing writs of mandamus, "a writ of mandamus is not actually directed to a judge in any more personal way than is an order reversing a court's judgment. Most often a petition for writ of mandamus ***seeks review of the intrinsic merits of a judge's action*** and is in reality an adversary proceeding between the parties." *See, e.g.*, *Walker v. Columbia Broadcasting System, Inc.*, 443 F.2d 33 (7th Cir. 1971) (emphasis supplied). The denial of a motion to recuse a judge is reviewed for abuse of discretion. *Mangini v. U.S.*, 314 F.3d 1158, 1161 (9th Cir. 2003).

Petitioner acknowledges "Mandamus is an extraordinary writ. *King v. U.S. Dist. Ct. for Cent. Dist. Of California*, 16 F.3d 992 (9th Cir. 1994). And only "[i]n the exceptional case, where the issue of disqualification appears to be a significant one, the court may consider the motion to disqualify upon a writ of mandamus." *United States v. Washington* 573 F.2d 1121, 1122-23 (9th Cir. 1978). Before a writ of mandamus may issue, three conditions must be met: (1) The party seeking issuance of the writ has no other adequate means to attain the desired relief; (2) the Petitioner can show the right to issuance of the writ is "clear and indisputable"; and (3) The issuing court is satisfied the writ is appropriate under the circumstances. *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004). This is such an exceptional case, and all three factors here are met in Mr. Fong's case.

As to the first condition, Mr. Fong has no other adequate means to attain the relief of disqualifying the district court judge in this case, especially prior to proceeding to trial. He has made a record already about the biases he has observed over the course of the litigation in his case, and his motion for recusal was denied without a hearing or the opportunity to reply to the government's response. Here, Mr. Fong filed his motion for recusal two weeks after being denied bail, and filed

11

his appeal seeking a briefing schedule for writ of mandamus simultaneously with the district court's denial of the § 455 recusal motion without hearing or allowing a reply from the defense. The government's reliance on *United States v. Mikhel*, 889 F.3d 1003, 1026 (9th Cir. 2018) is therefore misplaced, as the mandamus petition in that case was denied for untimeliness.

The government's reliance on *U.S. v. Wolff*, 263 F. Appx. 612, 615-616 (9th Cir. 2008) for the premise that alternate relief is available other than mandamus is also inapposite, as the bias or appearance of bias in this case is not something readily correctable on appeal. In *Wolff*, the judge disclosed he had AOL stock and therefore had a financial interest which was on appeal determined to be an actual financial interest in the subject matter in controversy § 455 (b)(4). Our circumstances here are much different. Primarily, Mr. Fong is not alleging a financial conflict of interest, but rather, the extrajudicial source of Judge Carter's experience with military service and counterterrorism efforts that has already been pervasive in the case. Contrary to the situation here, the district court judge *Wolff* also recused himself from deciding a motion involving a company he had stock in, so unlike the case here, the district judge in *Wolff* recognized there was the appearance of a conflict and did not proceed further. Here, we have a district court judge that does not recognize or acknowledge that his military service and extensive knowledge about global conflicts makes him the wrong judge to hear this case. Ultimately, the judge in *Wolff* could have divested from his stock positions in AOL. Judge Carter cannot readily forget his decades of experience traveling, lecturing, and working on behalf of the U.S. State Department in counterterrorism. He cannot readily divest himself of his military training and experiences. These biases are here, now, and it is clear from the record Judge Carter has already relied on these biases to make legal determinations in Mr. Fong's case. Mr. Fong's constitutional right to a fair trial is what is at stake, and he simply cannot (and should not) wait to straighten this out on appeal. Overall, the facts in both cases

12

cited by the government as to the first factor actually bolster Mr. Fong's position that no other relief is available and his petition should be granted.

As to the second factor, the right to the issuance of the writ truly is clear and undisputable. This is not a close case for recusal. Here, in all likelihood Judge Carter selected Mr. Fong's case to "volunteer for" based on the district court's military and counterterrorism background. He interpreted evidence presented at the bail hearing through his own core values, his own pervasive biases. Virtually none of Judge Carter's editorialization of Mr. Fong's military training and experience came from what Judge Carter heard as evidence in the hearing or what he read in preparation for the hearing. Instead, Judge Carter walked into the courtroom armed with his own extensive background and wealth of specialized knowledge of the military and terrorism before he read even a single document in this case. Judge Carter very clearly drew on his own military experience to tell Mr. Fong how trained and dangerous he was. Judge Carter also clearly drew from his experience fighting terrorism globally on behalf of the U.S. government as a means of relating to the subject matter of this case and Petitioner's role within it. None of that information would be available or normal for the reasonably objective person (or judge) to know offhand, certainly not in the course of the proceedings as early as they were (bail review) and Judge Carter repeatedly betrayed his specialized and extrajudicial knowledge on military training and experience, as well as terrorism and counterterrorism, throughout the hearing and without reference to any record that was submitted to him, indicating that he was drawing on his own extrajudicial knowledge, rather than the proceedings before him, in making his rulings. This is clearly improper under § 455(a) and (b), and the issuance of the writ is therefore clear and undisputable.

Thirdly, the issuance of the writ is an appropriate exercise of discretion of this Court under the circumstances. Judge Carter is simply not the fair and neutral arbiter

13

of the facts and the law Mr. Fong is entitled to in his case. Judge Carter simply knows too much and has too much of a specialized knowledge base to interpret Mr. Fong's actions through, such that Mr. Fong has no meaningful chance at presenting a defense before this court. Judge Carter's specialized training and experience are commendable, but no one can reasonably expect him to check all of that experience and knowledge at the door when assessing Petitioner's case. By way of analogy, consider *voir dire*. Both the defense and prosecution readily reassure jurors that they may not be right for a certain case, but the right juror for another, and that neither side expects them to leave their lived experiences at the threshold of the courtroom door. Each side screens for those lived experiences, those biases, to determine whether each seated juror can fairly assess what each side has to present and thank and excuse the rest. And consider, even further, why so often criminal defense attorneys and prosecutors are struck from the venire so quickly – an attorney or even anyone with legal training potentially *brings too much specialized knowledge* of the subject matter with them into the jury room, such that we worry that they will affect the jury's decision and interpret the case through their own perspective and specialized training. We ask jurors to rely only on what is in front of them in evidence to make their decision. Judge Carter has already shown he cannot do that, nor should we ask him to, just as we do not ask jurors to forget their lived experiences. But in all actuality, Judge Carter would never be selected as a *juror* for this case – he would almost certainly be struck for cause. He therefore should not be allowed to remain the judge.

      **i. Disqualification is required because an objective member of the public could reasonably question the impartiality of the district court judge adjudicating facts of a case that he has specialized and particularized knowledge of by way of his military and counterterrorism background, prohibited by § 455(a).**

Section 455(a) requires disqualification for the *appearance* of impartiality, or when the judge's impartiality might reasonably be questioned. Whether a judge is, in fact, impartial is determinative under a § 455(b) analysis but is not dispositive for disqualification under § 455(a) – (a) requires merely the objective appearance of impartiality. From a policy perspective, public perceptions of the partiality of the court could undermine confidence in the judiciary and the legal process as a whole. Additionally, the objective standard relieves the reasonable observer from having to dig deeper into the judge's subjective intent – if there is an outward manifestation of what could reasonably be construed a bias, the judge should be disqualified. A judge therefore contemplating disqualification under § 455(a) should not ask whether he or she can impartially preside over a case, but rather, whether his or her impartiality would be questioned from the perspective of a reasonable observer "aware of all the surrounding facts and circumstances." *Cheney*, 541 U.S. 913 (2004).

A trivial risk of bias must be balanced against the possibility of the parties manipulating the system by moving to disqualify judges too easily. Uninformed speculation or criticism do not trigger disqualification under § 455(a), for example. The need for disqualification "is to be determined not by considering what a straw poll of the only partly informed man-in-the street would show[,] but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all relevant facts would recuse the judge." *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000). Courts of appeals have required disqualification when a reasonable observer might believe the judge was aware of events or information that could impair their impartiality, even when they were not aware. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988). Section 455(a) is therefore a measure to preserve public confidence in the judiciary.

Here, an objective observer of the April 2, 2021 bail hearing or someone who has read the transcript would reasonably be able to question the district judge's

impartiality knowing the record and the law. Judge Carter made it clear throughout the hearing that he himself was a former Marine (or at least former military), Judge Carter made repeated reference to what specialized training Mr. Fong would have received and what training Marines go through, Judge Carter used military terms of art, and Judge Carter made repeated reference to his counterterrorism work for the government on the record. In the context of a prosecution against Mr. Fong, a former Marine, dishonorably discharged for the charges in this case, for allegedly providing material support to terrorist groups, a reasonable and objective observer could and would reasonably question Judge Carter's ability to be impartial. Because § 455(a) requires merely the objective appearance of impartiality to preserve the public confidence in the judiciary, Judge Carter should have recused himself, and this Court should find that it was an abuse of his discretion not to.

> ii. **Disqualification is required because the district judge has "personal knowledge of disputed evidentiary facts concerning the proceeding" from his extrajudicial consulting and working for the U.S. government prohibited by § 455(b)(1)**.

In addition to recusal under § 455(a), Judge Carter should have recused himself under § 455(b)(1) because of the extrajudicial source of the information he has used so far in presiding over Petitioner's case and his extrajudicial conduct that impugns impartiality or perceived impartiality of his presiding over this case. In order to be disqualifying, "the alleged bias and prejudice…must stem from a source…other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). This "extrajudicial source" doctrine arises from a commonsense view that it is natural a judge might form opinions about the litigants during the course of the case, and their impartiality would not reasonably be questioned. However, as is explained in *Liteky v. United States*:

> Judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases,

16

ordinarily do not support a bias or partiality challenge. They **may** [support a challenge] if they reveal an opinion that derives from an extrajudicial source; and they **will** [support a challenge] if they reveal such a high degree of favoritism or antagonism to make fair judgment impossible.

510 U.S. 540, 555 (1994) (emphasis added).

Here, however, we are not talking about opinions of Mr. Fong or his case that Judge Carter formed just during the course of the litigation. The district court volunteered for this case and presided over the bail hearing already equipped with the specialized knowledge of military training Petitioner likely received and specialized knowledge about terrorism in other parts of the world:

> THE COURT: You're an excellent marksman. You're trained in bomb techniques. You're trained in putting together an IED or a bomb. You represent the unique ability, quite frankly, to turn the corner, and rightfully so, on behalf of the country when called upon, from that of an ordinary citizen into a person of extreme violence.

(April 2, 2021 RT 62; 8-19)

> THE COURT: First of all, now I've moved from speech, to your capability from your combat training in the Marine Corps – on more than one occasion and your desire to use those, not only as an instructor but to make them. In and of itself, that would lead to the court's decision and finding that you're extraordinarily dangerous. Your May 18th Signal application then goes on by posting to Hamas, the al-Quassam brigade – let me repeat that: the al-Quassam brigade, which is a military wing of Hamas; this isn't even a fundraising group, that you're going to, uh, "find out more about crypto currency because it's the safest way to send money to help our brothers overseas….From this Court's perspective, *I don't just have a domestic view,* whether you're killing Russians or innocent Syrians or soldiers of any country, you represent an extraordinary threat.

(April 2, 2021 RT 69; 1-25).

> THE COURT: Well, I'll disclose to you: You know – you both know I go across the world in terms of some of these [terroristic] incidences in Afghanistan, Pakistan and Indonesia, Sri Lanka. In fact, they bombed the church I was in at Sri Lanka short time after I was there…

(April 2, 2021 RT 40; 19-25)

17

THE COURT: I unfortunately have to follow [counterterrorism efforts across the globe] because of some things I do on behalf of our government.

(April 2, 2021 RT 41; 5-6)

These are just a selection of many of Judge Carter's remarks and his interpretation of the facts regarding Petitioner Fong's dangerousness and his extrajudicial conduct, filtered through the lens of Judge Carter's extrajudicial experience as both a veteran of the same branch of service and as someone who currently works in counterterrorism. These remarks and the knowledge about Judge Carter's background make fair judgment in Mr. Fong's case impossible – to believe that a decorated war veteran, honorably discharged, who has dedicated his life to bringing American constitutional values and combatting terrorism throughout the globe would not or does not harbor deep-seated antagonism toward a dishonorably discharged former Marine with alleged ties to a foreign terrorist organization is to believe a work of fiction.

This case is also near its inception, not at its end. The district court has not presided over this case for an extended period of time necessary to form an opinion one way or the other about Petitioner Fong or his defense. Ordinarily, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings do not constitute a basis for bias or partiality, in this case these comments betray a deep-seated antagonism that make fair judgment impossible. *Liteky* at 555. This prayer for relief comes after the bias observed on appeal of a detention order – the very beginning of the case. *Cf. In re Chevron U.S.A., Inc.*, 121 F.3d 163 (5th Cir. 1997). In fact, the district court applied the highest burden of proof afforded to those accused of crimes in our nation when finding Petitioner Fong dangerous:

> THE COURT: I find you an extraordinary risk beyond clear and convincing, in fact, ***beyond a reasonable doubt***, and that there are no combinations at this time of conditions that would reasonably address the danger you present. That's the final determination.

(April 2, 2021 RT 75; 1-5) (emphasis added).

Because the case is so new, and the district court's core values are already so clearly on display, it is even more problematic to allow the case to proceed before Judge Carter. It is impossible to determine where Judge Carter's extrajudicial bias ends and where his opinion of Jason Fong and the facts presented in his defense begins. At the bail hearing – the very beginning of the case – Judge Carter has already decided Mr. Fong is so dangerous, that he was willing to use a trial standard in ordering him detained.

The district court's extrajudicial conduct in this case also makes him presiding over this case particularly problematic. Disqualification is required when a judge exhibits conduct manifesting as bias or prejudgment, such as in Petitioner's case.[1] The district judge's extrajudicial conduct in consulting with the U.S. government in counterterrorism and lecturing about terrorism is analogous to him making extrajudicial comments on pending or impending cases, where disqualification was upheld or required. In *United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993) for example, the Tenth Circuit reversed a refusal to disqualify in a case where the defendants were abortion protestors and the judge had appeared on national television and stated, "these people are breaking the law." Even though Judge Carter has not, to counsel's knowledge, appeared on national television denouncing Petitioner specifically, his very work shows he has:

---

[1] Though the concept of impartiality "subsumes a lack of bias toward a party, and perhaps open-mindedness toward the issues before the court," impartiality generally "does not require the absence of preexisting views on the legal questions the judge might decide." *Republican Party of Minn. v. White*, 836 U.S. 765 U.S. 865 (2002).

19

> [D]eliberately [made] the choice to appear in such a forum [such as counterterrorism work with the U.S. government] to deliver strong views on matters which were likely to be ongoing before him. Together, these messages unmistakably conveyed an uncommon interest and degree of personal involvement in the subject matter. It was an unusual thing for a judge to do, and it unavoidably created the appearance that the judge had become an active participant in bringing law and order to bear on [those alleged to have committed terrorist adjacent acts], rather than remaining as a detached adjudicator.

Here, Judge Carter has made an ongoing and deliberate choice to continue to be involved in counterterrorism efforts across the globe, not just advocating against terrorism, but actually consulting with the State Department and traveling to areas of the world experiencing acts of terrorism. He follows terrorist attacks closely,[2] despite knowing that any one of these cases may come before him in court. By taking a clear stance in his time outside of court, this "unavoidably" creates an appearance that he is an active participant in the War on Terror "bringing the law to bear" on someone like Petitioner, "rather than remaining a detached adjudicator." Denying the recusal motion is tantamount to an abuse of discretion.

The analysis here is also similar to *Hathcock v. Navistar International Transportation Corp.*, 53 F.3d 36, 41 (4th Cir. 1995), where the Fourth Circuit reversed a refusal to disqualify where, while a jury was pending against an automobile company, the judge, attending an auto torts seminar, expressed hostility to defendants and defense counsel in such cases. Here, the district judge actively consults in counterterrorism endeavors with the U.S. government while not on the bench. This work, while highly commendable, nevertheless takes a very firm position against the alleged activity Mr. Fong is purported to be involved in in the case before him. Judge Carter does not need to explicitly say that at some

---

[2] Apr. 2, 2021 RT 39; 24-25; p. 40; 13-15 and 19-25; p. 41; 5-6 and 18-22; p. 53; 6-9; p. 61; 17-24; p. 64;6-14; p. 65; 19-25; p. 69; 9-25.

antiterrorism conference he is opposed to terrorism or defendants like Petitioner to the media or otherwise – his work speaks for itself.

The fact that the district judge also valiantly fought in the battle of Khe Sanh, where he helped defend a Marine base, also closely parallels some of the allegations the government made in the April 2, 2021, hearing in stating that Petitioner provided instructions on making IEDs and other chemical weapons after a member of one of the groups expressed plans to blow up an Air Force Base in Alabama. After the district judge endured months of attacks from insurgents, rockets, mortars, and other attacks on the base where he was stationed, hearing about a potential attack on anther military base would likely arouse strong feelings in the district court judge. Judge Carter's personal history here bears an extremely close resemblance to the conduct with which Petitioner has been charged. *Cf. Mann v. Thacker*, 246 F.3d 1092 (8th Cir. 2001).

This case is also similar to *United States v. Alabama*, 828 F.2d 1532 (11th Cir. 1987) where the Eleventh Circuit held that the trial judge should have disqualified himself from a lawsuit against Alabama and its state universities where the judge had been a state legislator involved in legislative battles germane to the litigation. Here, the district judge is actively, not formerly, involved in global counterterrorism measures which are of course germane to this case. Judge Carter's commentary throughout the April 2, 2021, hearing also indicate specialized and intimate knowledge about terroristic threats domestically and abroad. He is a government actor actively advocating against terroristic and antidemocratic governments throughout the world.

Where the judge simply possesses information generally available to the public, disqualification is unnecessary. Here, however, that is simply not the case. Even with a close reading by defense counsel of the transcript of the record on April

21

2, 2021, defense counsel as a member of the general public is not privy to the level of detail that the district judge is by virtue of his work with the U.S. government counteracting terrorism. Rather, Judge Carter has personal knowledge of disputed evidentiary facts with which § 455(b)(1) is concerned, and has used that extrajudicial conduct and knowledge to pre-determine Petitioner's level of involvement and dangerousness in this case. For example, where Petitioner argued that he intended to fundraise for Hamas for humanitarian reasons, and in the absence of any contradiction from the government to say that was not true, Judge Carter said:

> THE COURT: First of all, now I've moved from speech, to your capability from your combat training in the Marine Corps – on more than one occasion and your desire to use those, not only as an instructor but to make them. In and of itself, that would lead to the court's decision and finding that you're extraordinarily dangerous. Your May 18th Signal application then goes on by posting to Hamas, the al-Quassam brigade – **let me repeat that: the al-Quassam brigade, which is a military wing of Hamas; this isn't even a fundraising group**, that you're going to, uh, "find out more about crypto currency because it's the safest way to send money to help our brothers overseas….From this Court's perspective, I don't just have a domestic view**,** whether you're killing Russians or innocent Syrians or soldiers of any country, you represent an extraordinary threat.

(April 2, 2021 RT 69; 1-25).

This is one of several examples where the district court editorializes on information not generally known in the public sphere. Though this information is likely available to the specifically interested public, it is certainly not something the general public has any knowledge of. The fact that the al-Quassam brigade is a military wing of Hamas was not presented by the government nor the defense in the bail hearing – this fact was supplied by the district court and used to support the district court's determination that Petitioner was a danger to the community. *Cf. In re Hatcher*, 150 F.3d 631 (7th Cir. 1998). The district court is clearly willing and empowered to bring extrajudicial knowledge, experience, and conduct into critical phases of Petitioner's case. There is no reason to believe the district court would not continue to inject his own personal experience and bias into future hearings, and

there is no way to meaningfully assure Judge Carter will rule solely on the facts and evidence before him in future hearings and perhaps even a trial given his wealth of experience in this highly specialized area.

### iii. The government's motion to dismiss Petitioner's appeal should be denied.

Petitioner has established jurisdiction for this Court to consider his writ of mandamus, provided reasons why alternate avenues of relief are not available, why relief is appropriate in this case, and has laid out why the district court's presiding over this case is improper, both under §§ 455(a) and 455(b)(1). Mr. Fong has demonstrated he has a clear and undisputed right to the writ, that there are no other adequate means of remedy to disqualify the judge presiding over his case, and that issuing a writ is appropriate. For those reasons, the government's motion to dismiss this pending appeal of the judge's denial of the recusal motion should be denied.

## CONCLUSION

The equities warrant mandamus here. The district court clearly abused its discretion by finding § 455 did not require disqualification. Even with the deferential standard to the findings of the district court, the district court made short shrift of Mr. Fong's arguments and did not meaningfully engage at all about the nexus between Judge Carter's extrajudicial knowledge and conduct both as a Marine and battling terrorism in his decades since his honorable discharge from the service and the circumstances of Mr. Fong being a former Marine facing a terrorism adjacent charge. Mr. Fong does not argue Judge Carter is impartial because he was a Marine. Mr. Fong does not argue Judge Carter is biased because of his judicial rulings against Petitioner. These are gross simplifications of the larger issue.

Rather, Petitioner argues that the district court's rulings are rooted in extrajudicial experience in the military, Judge Carter's active involvement in

counterterrorism efforts, and Petitioner's alleged involvement in terroristic activities after separating from the Marine Corps, all of which are on full display throughout the bail hearing on April 2, 2021. The findings against Petitioner are frankly irrelevant, but the editorializing about military service and training and the operations of terrorist groups in the complete absence of any of the factual support for Petitioner's training or experience in the record are instructive and supportive of Petitioner's position that Judge Carter relied on extrajudicial information in forming his opinion that Petitioner was not entitled to bail. Mr. Fong is not arguing that Judge Carter is biased against him because Judge Carter ruled against him, rather, his argument centers on the premise that Judge Carter ruled against him on the basis that his specialized and extrajudicial knowledge about military and counterterrorism operations inured in Judge Carter a certain perception and belief about Mr. Fong's dangerousness that would never have been overborne by the actual evidence presented in the bail hearing.

This is, in fact, an extraordinary situation requiring extraordinary relief and judicial economy favors resolving this now rather than proceeding through an entire trial and coming back to this Court on appeal. Mr. Fong, in all likelihood, has a judge that has volunteered to hear his case based on that judge's specialized knowledge of the subject matter at hand (both military and counterterrorism operations), a judge that was not randomly assigned to him, a judge that has already made pre-determinations of the evidence before him and an assessment of Petitioner's role and extent of military training regardless of what the evidence presented to him may reveal, and a judge with extrajudicial knowledge and conduct relating to counterterrorism and the hierarchies, means of communication, and means of attack of terroristic groups. It bears repeating that whether this amounts to actual bias in fact is irrelevant under § 455(a) – it is whether, from an objective perspective, the

24

district court judge's impartiality "might reasonably be questioned," and here, the appearance of impartiality could not frankly be more plain.

For the foregoing reasons, Petitioner Fong respectfully requests that this Court issue a writ of mandamus requiring recusal of the judge currently assigned to the case.

Date: September 14, 2021

Respectfully submitted,

/s/ Karren Kenney
Kenney Legal Defense
2900 Bristol Street, Suite C204
Costa Mesa, CA, 92626
Telephone: (855) 505-5588
Email: Karren.Kenney@gmail.com

*Counsel for Petitioner Jason Fong*

25

## CERTIFICATE OF COMPLIANCE

1. This petition complies with type volume limits because, excluding the parts of the document exempted by Fed. R. App. 32(f) (cover page, disclosure statement, table of contents, table of authorities, statement regarding oral argument, signature block, certificates of counsel, and any attachments):

   [X] this petition contains 8182 words

2. This petition document complies with the typeface and style requirements because:

   [X] this petition has been prepared in a proportionally spaced typeface using Microsoft Word

Dated: September 14, 2021                              /s/ Karren Kenney
                                                                       *Counsel for Petitioner Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 14th day of September, 2021, I caused this Petition for a Writ of Mandamus to be filed electronically with the Clerk of the Court using the CM/ECF System.

I further certify that on this 14th day of September, 2021, I caused the required copies of the Petition for Writ of Mandamus to be served upon each party below:

Honorable Judge David O. Carter
Ronald Regan Federal Building and United States Courthouse
411 West Fourth Street
Courtroom 9D
Santa Ana, CA 92701-4516

Mark P. Takla
Terrorism and Export Crimes Section
411 West Fourth Street
8th Floor
Santa Ana, CA 92701

Christine M. Ro
General Crimes Section
411 West Fourth Street
8th Floor
Santa Ana, CA 92701

## TABLE OF ATTACHMENTS

1. Docket Sheet, *United States v. Fong*, 20-CR-00146-DOC

2. Information (Dkt. 1, 11/6/2020)

3. Transcript of Bail Hearing dated April 2, 2021

4. Motion for Recusal (Dkt. 77, 7/25/21)

# ATTACHMENT 1

APPEAL,PASPRT

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Southern Division − Santa Ana)
## CRIMINAL DOCKET FOR CASE #: 8:20−cr−00146−DOC All Defendants

Case title: USA v. Fong                                    Date Filed: 10/06/2020

Assigned to: Judge David O.
Carter

Appeals court case numbers:
21−50089 Ninth Circuit,
21−50191 Ninth Circuit

**Defendant (1)**

**Jason Fong**                    represented by    **Karren Kenney**
*also known as*                                     Kenney Legal Defense
asian_ghazi                                         2900 Bristol Street Suite C204
                                                    Costa Mesa, CA 92626
                                                    855−505−5588
                                                    Email: karren.kenney@gmail.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    Designation: Retained

                                                    **Katherine T. Corrigan**
                                                    Corrigan Welbourn and Stokke APLC
                                                    4100 Newport Place Suite 550
                                                    Newport Beach, CA 92660
                                                    949−251−0330
                                                    Fax: 949−251−1181
                                                    Email: kate@cwsdefense.com
                                                    *TERMINATED: 11/20/2020*
                                                    *LEAD ATTORNEY*
                                                    Designation: CJA Appointment

**Pending Counts**                                 **Disposition**

18:2339C(c) CONCEALING
THE PROVISION OF
MATERIAL SUPPORT AND
RESOURCES AND FUNDS
(1)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                              **Disposition**

None

**Highest Offense Level
(Terminated)**

None

**Complaints**                                     **Disposition**

None

**Plaintiff**

**USA**                                  represented by   **Mark P Takla**
                                                          AUSA − Office of US Attorney
                                                          Terrorism and Export Crimes Section
                                                          411 West Fourth Street 8th Floor
                                                          Santa Ana, CA 92701
                                                          714−338−3591
                                                          Fax: 714−338−3561
                                                          Email: mark.takla@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Assistant US Attorney*

                                                          **Christine M Ro**
                                                          AUSA − Office of US Attorney
                                                          General Crimes Section
                                                          312 North Spring Street Suite 1100
                                                          Los Angeles, CA 90012
                                                          213−894−4496
                                                          Fax: 213−894−0141
                                                          Email: christine.ro@usdoj.gov
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/06/2020 | 1 | INFORMATION filed as to Jason Fong (1) count(s) 1. Offense occurred in Orange. (cio) Modified on 10/7/2020 (cio). (Entered: 10/07/2020) |
| 10/06/2020 | 2 | CASE SUMMARY filed by AUSA Mark Takla as to Defendant Jason Fong; defendants Year of Birth: 1996 (cio) Modified on 10/7/2020 (cio). (Entered: 10/07/2020) |
| 10/06/2020 | 3 | NOTICE OF REQUEST FOR DETENTION filed by Plaintiff USA as to Defendant Jason Fong (cio) Modified on 10/7/2020 (cio). (Entered: 10/07/2020) |
| 10/06/2020 | 4 | MEMORANDUM filed by Plaintiff USA (See attachment). (cio) (Entered: 10/07/2020) |
| 10/06/2020 | 5 | GOVERNMENTS REQUEST FOR ISSUANCE OF WRIT AND ARREST WARRANT ON INFORMATION Filed by Plaintiff USA as to Defendant Jason Fong. (cio) (Entered: 10/07/2020) |
| 10/06/2020 | 6 | ORDER by Magistrate Judge Autumn D. Spaeth: granting 5 REQUEST for Writ of Habeas Corpus ad Prosequendum for Jason Fong on 10/19/2020 at 10:00 A.M. before Judge Duty Magistrate Judge as to Jason Fong (1) (cio) (Entered: 10/07/2020) |
| 10/06/2020 | 8 | MEMORANDUM filed by Plaintiff USA (See attachment). (cio) (Entered: 10/07/2020) |
| 10/06/2020 | 9 | APPLICATION FOR WRIT OF HABEAS CORPUS Filed by Plaintiff USA as to Defendant Jason Fong. (cio) (Entered: 10/07/2020) |
| 10/06/2020 | 10 | ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS by Magistrate Judge Autumn D. Spaeth: granting 9 APPLICATION for Writ of Habeas Corpus ad Prosequendum for Jason Fong on 10/19/2020 at 10:00 A.M. before Judge Duty Magistrate Judge as to Jason Fong (1) (cio) (Entered: 10/07/2020) |
| 10/07/2020 | 11 | Writ of Habeas Corpus ad Prosequendum Issued as to Jason Fong (cio) (Entered: 10/07/2020) |
| 10/08/2020 | 12 | STIPULATION for Order For Protective Order Regarding Discovery Containing Personal Identifying Information, Privacy Act Information, and Confidential Informant Information filed by Plaintiff USA as to Defendant Jason Fong (Attachments: # 1 Proposed Order)(Takla, Mark) (Entered: 10/08/2020) |
| 10/09/2020 | 13 | PROTECTIVE ORDER REGARDING DISCOVERY CONTAINING PERSONAL IDENTIFYING INFORMATION, PRIVACY ACT INFORMATION, AND CONFIDENTIAL INFORMANT INFORMATION by Judge David O. Carter as to Defendant Jason Fong, re: Stipulation 12 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 10/13/2020) |

| 10/19/2020 | 14 | MINUTES OF POST−INDICTMENT ARRAIGNMENT: held before Magistrate Judge Karen E. Scott as to Defendant Jason Fong (1) Count 1. Defendant arraigned. Defendant entered not guilty plea to all counts as charged. Attorney: Katherine T Corrigan for Jason Fong, Appointed, present. Case assigned to Judge David O. Carter. Jury Trial set for 12/8/2020 08:30 AM before Judge David O. Carter. Status Conference set for 11/16/2020 01:30 PM before Judge David O. Carter. Court Reporter: Deborah Parker. (aco) (Entered: 10/22/2020) |
|---|---|---|
| 10/19/2020 | 15 | CONSENT to Video Conference/Telephonic Conference filed by Defendant Jason Fong. (aco) (Entered: 10/22/2020) |
| 10/19/2020 | 16 | ADVISEMENT OF STATUTORY & CONSTITUTIONAL RIGHTS filed by Defendant Jason Fong. (aco) (Entered: 10/22/2020) |
| 10/19/2020 | 17 | FINANCIAL AFFIDAVIT filed as to Defendant Jason Fong. (Not for Public View pursuant to the E−Government Act of 2002) (aco) (Entered: 10/22/2020) |
| 10/19/2020 | 18 | STATEMENT OF CONSTITUTIONAL RIGHTS filed by Defendant Jason Fong (aco) (Entered: 10/22/2020) |
| 10/19/2020 | 19 | WAIVER OF INDICTMENT by Defendant Jason Fong before Magistrate Judge Karen E. Scott (aco) (Entered: 10/22/2020) |
| 11/12/2020 | 20 | First STIPULATION to Continue Trial Date from 12/8/2020 to 2/23/2021 , STIPULATION re: excludable delay from 12/8/2020 to 2/23/2021 filed by Plaintiff USA as to Defendant Jason Fong (Attachments: # 1 Proposed Order)(Takla, Mark) (Entered: 11/12/2020) |
| 11/12/2020 | 21 | ORDER TO CONTINUE Trial Date and Findings Regarding Excludable Time Periods Pursuant to Speedy Trial Act by Judge David O. Carter as to Defendant Jason Fong. Trial continued to 2/23/2021 at 08:30 AM before Judge David O. Carter. Status Conference continued to 2/15/2021 at 01:30 PM before Judge David O. Carter. (twdb) (Entered: 11/17/2020) |
| 11/18/2020 | 22 | REQUEST TO SUBSTITUTE ATTORNEY Karren Kenney in place of attorney Kate Corrigan Filed by Defendant Jason Fong. (Attachments: # 1 Proposed Order) (Kenney, Karren) (Entered: 11/18/2020) |
| 11/20/2020 | 23 | ORDER by Judge David O. Carter: Granting 22 REQUEST for Approval of Substitution of Attorney. Attorney Karren Kenney for Jason Fong added. (twdb) (Entered: 11/20/2020) |
| 01/15/2021 | 24 | Second STIPULATION to Continue Trial Date from 2/23/2021 to 5/25/2021 , STIPULATION re: excludable delay from 2/23/2021 to 5/25/2021 filed by Plaintiff USA as to Defendant Jason Fong (Attachments: # 1 Proposed Order)(Takla, Mark) (Entered: 01/15/2021) |
| 01/15/2021 | 25 | ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT 24 by Judge David O. Carter as to Defendant Jason Fong:THEREFORE, FOR GOOD CAUSE SHOWN: The trial in this matter is continued from February 23, 2021 to May 25, 2021 at 8:30 a.m. The status conference hearing is continued to May 17, 2021 at 1:30 p.m. The time period of February 23, 2021 to May 25, 2021, inclusive, is excluded in computing the time within which the trial must commence. (bm) (Entered: 01/15/2021) |
| 02/23/2021 | 26 | REQUEST for Hearing as to Bail Review Filed by Defendant Jason Fong. Request set for hearing on 2/26/2021 at 02:00 PM before Judge David O. Carter. (Attachments: # 1 Proposed Order) (Kenney, Karren) (Entered: 02/23/2021) |
| 02/23/2021 | 28 | NOTIFICATION RE: REQUEST for Hearing as to Bail Review 26 filed by Defendant Jason Fong. The Request for hearing was APPROVED. Request set for hearing on 2/26/2021 at 01:00 PM before Magistrate Judge Karen E. Scott. (lom) (Entered: 02/24/2021) |
| 02/24/2021 | 27 | NOTICE of Manual Filing of Under Seal Documents filed by Plaintiff USA as to Defendant Jason Fong (Takla, Mark) (Entered: 02/24/2021) |
| 02/24/2021 | 29 | OBJECTION to Notice of Manual Filing (G−92) 27 , filed by Defendant Jason Fong (Kenney, Karren) (Entered: 02/24/2021) |
| 02/25/2021 | 30 | NOTICE of Manual Filing of Under Seal Documents filed by Plaintiff USA as to Defendant Jason Fong (Takla, Mark) (Entered: 02/25/2021) |
| 02/25/2021 | 31 | OBJECTION to Notice of Manual Filing (G−92) 30 , filed by Defendant Jason Fong *and Request to Strike* (Kenney, Karren) (Entered: 02/25/2021) |
| 02/25/2021 | 34 | SEALED − GOVERNMENT'S EX PARTE APPLICATION FOR ORDER SEALING DOCUMENT; DECLARATION OF MARK TAKLA (bm) (Entered: 02/26/2021) |

| 02/25/2021 | 35 | SEALED − ORDER SEALING DOCUMENT (bm) (Entered: 02/26/2021) |
|---|---|---|
| 02/25/2021 | 36 | SEALED − UNDER SEAL EXHIBIT A TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR RELEASE (bm) (Entered: 02/26/2021) |
| 02/25/2021 | 37 | SEALED − GOVERNMENT'S EX PARTE APPLICATION FOR ORDER SEALING DOCUMENT; DECLARATION OF MARK TAKLA (bm) (Entered: 02/26/2021) |
| 02/25/2021 | 38 | SEALED − ORDER SEALING DOCUMENT (bm) (Entered: 02/26/2021) |
| 02/25/2021 | 39 | SEALED − GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR BOND; EXHIBIT (bm) (Entered: 02/26/2021) |
| 02/26/2021 | 32 | NOTICE of Manual Filing of under seal documents and item not conducive to e−filing filed by Plaintiff USA as to Defendant Jason Fong (Takla, Mark) (Entered: 02/26/2021) |
| 02/26/2021 | 33 | OBJECTION to Notice of Manual Filing (G−92) 32 , filed by Defendant Jason Fong *Re Exhibit B* (Kenney, Karren) (Entered: 02/26/2021) |
| 02/26/2021 | 40 | MINUTES OF Detention Hearing held before Magistrate Judge Karen E. Scott as to Defendant Jason Fong. Government's request for detention is: DENIED. The Court Orders: Jason Fong (1) $300,000.00 AB. SEE ATTACHED COPY OF CR−01 BOND FORM. Defendant and defense counsel appear by video. Court Smart: CS 02/26/2021. (es) (Entered: 03/01/2021) |
| 03/02/2021 | 42 | MEMORANDUM FOR RELEASE ORDER AUTHORIZATION filed by PSA Officer as to Defendant Jason Fong. (jp) (Entered: 03/04/2021) |
| 03/03/2021 | 45 | GOVERNMENT'S EX PARTE APPLICATION FOR SEALING DOCUMENT; Declaration of Mark Takla, Filed by Plaintiff USA as to Defendant Jason Fong. (mat) (Entered: 03/08/2021) |
| 03/03/2021 | 46 | SEALED ORDER by Magistrate Judge Karen E. Scott: denying 45 EX PARTE APPLICATION SEALING DOCUMENT. (mat) (Entered: 03/08/2021) |
| 03/04/2021 | 41 | APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION Filed by Plaintiff USA as to Defendant Jason Fong. (Attachments: # 1 Notification re: Application for Bail Review or Reconsideration of Order Setting Conditions of Release or Detention) (Takla, Mark) (Entered: 03/04/2021) |
| 03/04/2021 | 43 | OBJECTION to APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION 41 , filed by Defendant Jason Fong *and Request Court Consider Recorded Detention Hearing Proceedings* (Kenney, Karren) (Entered: 03/04/2021) |
| 03/05/2021 | 44 | SCHEDULING NOTICE by Judge David O. Carter as to Defendant Jason Fong. The Court has requested a seven−day expedited transcript be prepared by the transcription company re: the hearing held before Magistrate Judge Karen E. Scott on February 26, 2021 40 . The Court holds in abeyance the Application for Review / Reconsideration of Order Setting Conditions of Release 41 . THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 03/05/2021) |
| 03/09/2021 | 47 | EX PARTE REQUEST FOR STAY OF RELEASE ORDER filed by Plaintiff USA as to Defendant Jason Fong Re: Detention Hearing, 40 (Attachments: # 1 Proposed Order)(Takla, Mark) (Entered: 03/09/2021) |
| 03/09/2021 | 48 | OBJECTION to Miscellaneous Document 47 , filed by Defendant Jason Fong *Objection to Government's Ex Parte Request for Stay of Release Order* (Kenney, Karren) (Entered: 03/09/2021) |
| 03/09/2021 | 49 | ORDER ISSUING STAY OF RELEASE ORDER by Judge David O. Carter as to Defendant Jason Fong, re: 47 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 03/09/2021) |
| 03/12/2021 | 50 | TRANSCRIPT filed as to Defendant Jason Fong for proceedings held on 2−26−21. Court Reporter/Electronic Court Recorder: BABYKIN COURTHOUSE SERVICES, phone number (626) 963−0566. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/2/2021. Redacted Transcript Deadline set for 4/12/2021. Release of Transcript Restriction set for 6/10/2021.(ha) (Entered: 03/12/2021) |
| 03/12/2021 | 51 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Jason Fong for proceedings 2/26/21 re Transcript 50 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ha) TEXT ONLY ENTRY (Entered: 03/12/2021) |

| | | |
|---|---|---|
| 03/16/2021 | 52 | SCHEDULING NOTICE by Judge David O. Carter as to Defendant Jason Fong. The Court sets a ZOOM hearing on the Government's Request that the District Court review the Magistrate Judge's release order. 41 The ZOOM hearing will be held on MARCH 22, 2021, at 1:00 p.m. Government counsel is ordered to serve this notice on the assigned Pretrial Officer. The Court's ZOOM information is https://cacd−uscourts.zoomgov.com/j/1618147150?pwd=eXFCVzloVmdDVlVyL29LZTVoUi9Ldz09 Webinar ID: 161 814 7150 / Passcode: 634618 (1−669−254−5252).THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 03/16/2021) |
| 03/22/2021 | 53 | MINUTES OF Status Conference Held Via Zoom before Judge David O. Carter as to Defendant Jason Fong. Court and counsel confer re: Government's Request that the District Court review the Magistrate Judge's order. 41 The Court continues the above−stated hearing and sets as in−person hearing. ( Hearing set for 3/31/2021 at 10:30 AM before Judge David O. Carter.) Court Reporter: Debbie Gale. (twdb) (Entered: 03/23/2021) |
| 03/29/2021 | 54 | NOTICE of Manual Filing of Under Seal Document filed by Plaintiff USA as to Defendant Jason Fong (Takla, Mark) (Entered: 03/29/2021) |
| 03/29/2021 | 55 | SEALED − GOVERNMENT'S EX PARTE APPLICATION FOR ORDER SEALING DOCUMENT; DECLARATION OF MARK TAKLA (bm) (Entered: 03/30/2021) |
| 03/29/2021 | 56 | SEALED − ORDER SEALING DOCUMENT (bm) (Entered: 03/30/2021) |
| 03/29/2021 | 57 | SEALED DOCUMENT − UNDER SEAL DOCUMENT (bm) (Entered: 03/30/2021) |
| 03/30/2021 | 58 | SCHEDULING NOTICE by Judge David O. Carter as to Jason Fong. At the request of defense counsel, the Court re−sets the Government's Request that the District Court review the Magistrate Judge's order 4/2/2021 at 11:30 AM before Judge David O. Carter. Government counsel is ordered to notify the assigned Probation Officer(s). THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 03/30/2021) |
| 04/02/2021 | 59 | MINUTES OF BAIL REVIEW HEARING (Held and Completed) as to Jason Fong (1): Court and counsel confer re: Government's Request that the District Court review the Magistrate Judge's order. 41 The Court DENIES bail for the defendant and orders the defendant detained pending trial. Court Reporter: Debbie Gale. (bm) (Entered: 04/16/2021) |
| 04/16/2021 | 60 | NOTICE OF APPEAL to Appellate Court re: Conditions of Release filed by Defendant Jason Fong re MINUTES OF BAIL REVIEW HEARING (Held and Completed) as to Jason Fong (1): Court and counsel confer re: Government's Request that the District Court review the Magistrate Judge's order. 41 The Court DENIES bail for the defendant and orders the defendant detained pending trial. Court Reporter: Debbie Gale. (bm) 59 Appeal filing FEE NOT PAID. (Kenney, Karren) (Entered: 04/16/2021) |
| 04/16/2021 | 61 | TRANSCRIPT ORDER as to Defendant Jason Fong for Court Reporter. Order for: Criminal Appeal. Court will contact Rachael Robinson at raeroblaw@gmail.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter.(Kenney, Karren) (Entered: 04/16/2021) |
| 04/16/2021 | 62 | NOTIFICATION by Circuit Court of Appellate Docket Number 21−50089 as to Defendant Jason Fong, Ninth Circuit regarding Notice of Appeal − Conditions of Release to 9th Circuit Court of Appeals, 60 . (twdb) (Entered: 04/19/2021) |
| 04/26/2021 | 63 | Third STIPULATION to Continue Trial Date from 5/25/2021 to 10/05/2021 , STIPULATION re: excludable delay from 5/25/2021 to 10/05/2021 filed by Plaintiff USA as to Defendant Jason Fong (Attachments: # 1 Proposed Order)(Takla, Mark) (Entered: 04/26/2021) |
| 04/27/2021 | 64 | ORDER TO CONTINUE Trial Date and Findings Regarding Excludable Time Periods Pursuant to Speedy Trial Act 63 by Judge David O. Carter as to Defendant Jason Fong. Trial continued to 10/5/2021 at 08:30 AM before Judge David O. Carter. Status Conference continued to 9/13/2021 at 01:30 PM before Judge David O. Carter. (twdb) (Entered: 04/28/2021) |
| 04/29/2021 | 65 | EX PARTE APPLICATION for Order for AMENDMENT TO PROTECTIVE ORDER REGARDING DISCOVERY CONTAINING PERSONAL IDENTIFYING INFORMATION, PRIVACY ACT INFORMATION, AND CONFIDENTIAL INFORMANT INFORMATION Filed by Plaintiff USA as to Defendant Jason Fong. (Attachments: # 1 Proposed Order) (Takla, Mark) (Entered: 04/29/2021) |

| 04/29/2021 | 66 | OBJECTION to EX PARTE APPLICATION for Order for AMENDMENT TO PROTECTIVE ORDER REGARDING DISCOVERY CONTAINING PERSONAL IDENTIFYING INFORMATION, PRIVACY ACT INFORMATION, AND CONFIDENTIAL INFORMANT INFORMATION 65 , filed by Defendant Jason Fong (Kenney, Karren) (Entered: 04/29/2021) |
|---|---|---|
| 04/30/2021 | 67 | TRANSCRIPT filed as to Defendant Jason Fong for proceedings held on 4/2/2021 Bail Review Hrg. Court Reporter: DEBBIE GALE. Contact via: WEBSITE: www.debbiegale.com or EMAIL:DebbieGaleCSR@gmail.com, 714−558−8141 (all requests must be in writing/no phone orders). Transcript may only be viewed at the court public terminal or purchased through Court Reporter DEBBIE GALE before the deadline for Release of Transcript restriction. After transcript release date, it may be still be obtained from the Court Reporter or through PACER. (ASCII, Condensed, and Word Indexing/Concordance are also available for purchase at any timethrough the Court Reporter.) Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/21/2021. Redacted Transcript Deadline set for 6/1/2021. Release of Transcript Restriction set for 7/29/2021.(Gale, Debbie) (Entered: 04/30/2021) |
| 04/30/2021 | 68 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Jason Fong for proceedings 4/2/2021 Bail Review Hearing re Transcript 67 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Gale, Debbie) TEXT ONLY ENTRY (Entered: 04/30/2021) |
| 05/05/2021 | 69 | SUPPLEMENTAL INFORMATION IN SUPPORT OF GOVERNMENTS EX PARTE APPLICATION TO MODIFY OCTOBER 9, 2020 PROTECTIVE ORDER filed by Plaintiff USA as to Defendant Jason Fong Re: Miscellaneous Order, 13 (Takla, Mark) (Entered: 05/05/2021) |
| 05/05/2021 | 70 | AMENDMENT TO PROTECTIVE ORDER REGARDING DISCOVERY CONTAINING PERSONAL IDENTIFYING INFORMATION, PRIVACY ACT INFORMATION, AND CONFIDENTIAL INFORMANT INFORMATION by Judge David O. Carter 65 , as to Jason Fong (1). (twdb) (Entered: 05/05/2021) |
| 06/03/2021 | 71 | ORDER of USCA filed as to Defendant Jason Fong, CCA #21−50089. We therefore remand this case for the limited purpose of enabling the district court to provide this court with an adequate explanation on this latter point. See Wheeler, 795 F.2d at 841 ([A] district court'sreasons for its decision must be adequately explained; conclusory statements are insufficient.). The (9th CCA) Clerk will serve this order on the district court. [See document for all details.] (mat) (Entered: 06/04/2021) |
| 06/20/2021 | 72 | NOTICE of UNAVAILABILITY OF COUNSEL filed by Defendant Jason Fong (Kenney, Karren) (Entered: 06/20/2021) |
| 06/21/2021 | 73 | MINUTES OF IN CHAMBERS ORDER by Judge David O. Carter: REASON AND FINDING as to Defendant Jason Fong. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 06/22/2021) |
| 07/06/2021 | 74 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA Christine M Ro on behalf of Plaintiff USA. Filed by Plaintiff USA. (Attorney Christine M Ro added to party USA(pty:pla))(Ro, Christine) (Entered: 07/06/2021) |
| 07/21/2021 | 75 | ORDER of USCA filed as to Defendant Jason Fong, CCA #21−50089. Accordingly, we reverse the district courts April 2, 2021, detention order. On remand, the district court shall place appellant on pre−trial release subject to the conditions imposed by the magistrate judge in her February 26, 2021 order. The mandate shall issue forthwith. REVERSED and REMANDED. [See document for more details.] (mat) (Entered: 07/23/2021) |
| 07/21/2021 | 76 | MANDATE of the 9th CCA filed as to Defendant Jason Fong re Notice of Appeal − Conditions of Release to 9th Circuit Court of Appeals, 60 , CCA #21−50089. The judgment of this Court, entered July 21, 2021, takes effect this date. This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. [See USCA Order, 75 , Accordingly, we reverse the district courts April 2, 2021, detention order. On remand, the district court shall place appellant on pre−trial release subject to the conditions imposed by the magistrate judge in her February 26, 2021 order.] (mat) (Entered: 07/23/2021) |
| 07/25/2021 | 77 | NOTICE OF MOTION AND MOTION for Recusal Filed by Defendant Jason Fong. Motion set for hearing on 8/23/2021 at 01:30 PM before Judge David O. Carter. (Kenney, Karren) (Entered: 07/25/2021) |
| 07/28/2021 | 78 | MEMORANDUM FOR RELEASE ORDER AUTHORIZATION filed by PSA Officer as to Defendant Jason Fong. Submitted in compliance with conditions as set forth in (cio) (Entered: 07/29/2021) |

| | | |
|---|---|---|
| 08/02/2021 | 81 | BOND AND CONDITIONS OF RELEASE filed as to Defendant Jason Fong conditions of release: $300,000 Unsecured Appearance Bond (SEE BOND CONDITIONS) approved by Magistrate Judge John D. Early. (cio) (Entered: 08/03/2021) |
| 08/02/2021 | 82 | DECLARATION RE: PASSPORT filed by Defendant Jason Fong, declaring that I have been issued a passport or other travel document(s), but they are not currently in my possession. I will surrender any passport or other travel document(s) issued to me, to the U.S. Pretrial Services Agency by the deadline imposed. I will not apply for a passport or other travel document during the pendency of this case. (cio) (Entered: 08/03/2021) |
| 08/02/2021 | 83 | AFFIDAVIT OF SURETIES (Property) in the amount of $300,000 ; Certified copy of Deed of Trust CERTIFIED ; filed by Defendant Jason Fong. Approved by Magistrate Judge John D. Early. (cio) (Entered: 08/03/2021) |
| 08/02/2021 | 84 | AFFIDAVIT OF SURETIES (Property) in the amount of $300,000 ; Certified copy of Deed of Trust CERTIFIED ; filed by Defendant Jason Fong. Approved by Magistrate Judge John D. Early. (cio) (Entered: 08/03/2021) |
| 08/02/2021 | 85 | PASSPORT RECEIPT from U. S. Pretrial Services as to Defendant Jason Fong. USA passport was received on 08/2/2021. (cio) (Entered: 08/03/2021) |
| 08/02/2021 | 86 | BOND REMARK: 5312 ROYALE AVENUE, IRVINE, CA 92604 Short Form Deed of Trust filed by CHARLES FONG and CHIA LEH HO located at IRVINE, CA 92604 as reflected on instrument number 2021000476103 naming the Clerk of Court as Beneficiary therein on the property re defendant Jason Fong. See document number 95 for corrected certified deed of trust. Corrected re: date of certification. (Attachments: # 1 APPRAISAL, # 2 DEED OF TRUST, # 3 GRANT DEED, # 4 LOT BOOK REPORT, # 5 MORTGAGE STATEMENT, # 6 CERTIFICATE OF TRUST) (cio) Modified on 8/17/2021 (ts). (Entered: 08/03/2021) |
| 08/02/2021 | 95 | BOND REMARK: Corrected Certified Copy Short Form Deed of Trust filed by Charles Fong and Chia Leh Ho, Trustees for the Fong Family Living Trust located at Irvine, CA 92604 as reflected on instrument number 2021000476103 naming the Clerk of Court as Beneficiary therein on the property re defendant Jason Fong. Corrected as to certified date only. See document number 86 for additional documents. (ts) (Entered: 08/17/2021) |
| 08/03/2021 | 79 | OPPOSITION to NOTICE OF MOTION AND MOTION for Recusal 77 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Ro, Christine) (Entered: 08/03/2021) |
| 08/03/2021 | 80 | NOTICE of Under Seal Filing filed by Plaintiff USA as to Defendant Jason Fong (Ro, Christine) (Entered: 08/03/2021) |
| 08/03/2021 | 87 | SEALED − GOVERNMENT'S EX PARTE APPLICATION FOR ORDER SEALING DOCUMENT; DECLARATION OF CHRISTINE M. RO (bm) (Entered: 08/04/2021) |
| 08/03/2021 | 88 | SEALED − ORDER SEALING DOCUMENT (bm) (Entered: 08/04/2021) |
| 08/03/2021 | 89 | SEALED − EXHIBITS 1 AND 2 TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO RECUSE THE HONORABLE DAVID O. CARTER (DE 79) (bm) (Entered: 08/04/2021) |
| 08/09/2021 | 90 | [EX PARTE APPLICATION] TO CONFORM DEFENDANTS CONDITIONS OF RELEASE ON DETENTION FORM TO THOSE STATED ORALLY AT DEFENDANTS DETENTION HEARING filed by Plaintiff USA as to Defendant Jason Fong (Attachments: # 1 Proposed Order)(Takla, Mark) Modified on 8/11/2021 (hr). (Entered: 08/09/2021) |
| 08/10/2021 | 92 | MINUTES (IN CHAMBERS) by Judge David O. Carter: Denying 77 MOTION for Recusal as to Jason Fong (1). SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 08/11/2021) |
| 08/11/2021 | 91 | MINUTES (IN CHAMBERS) Order Granting in Part and Denying in part Government's Ex Parte Application (Dkt. 90 ) by Magistrate Judge Karen E. Scott: The Court GRANTS the Government's motion and hereby clarifies the search conditions announced at the detention hearing as follows. Defendant shall submit to a search of his person and/or property, including computer hardware and software, by the Supervising Agency in conjunction with the U.S. Marshal. The Supervising Agency is authorized to use computer monitoring software to determine compliance with the Court's conditions. (see document for further details (et) (Entered: 08/11/2021) |
| 08/13/2021 | 93 | NOTICE filed by Plaintiff USA as to Defendant Jason Fong *GOVERNMENTS NOTICE OF INTENT TO INVOKE THE CLASSIFIED INFORMATION PROCEDURES ACT (CIPA) AND MOTION TO DESIGNATE A CLASSIFIED INFORMATION SECURITY OFFICER (CISO)* (Attachments: # 1 |

| | | |
|---|---|---|
| | | Proposed Order)(Ro, Christine) (Entered: 08/13/2021) |
| 08/15/2021 | 94 | OBJECTION to Notice (Other), 93 , filed by Defendant Jason Fong *Of Intent to Invoke the Classified Information Procedures Act (CIPA)* (Kenney, Karren) (Entered: 08/15/2021) |
| 08/19/2021 | 96 | NOTICE OF MOTION AND MOTION to Continue Jury Trial from October 5, 2021 to January 25, 2022. *Declaration of Karren Kenney* Filed by Defendant Jason Fong. (Kenney, Karren) (Entered: 08/19/2021) |
| 08/23/2021 | 97 | REPLY Non−Opposition NOTICE OF MOTION AND MOTION to Continue Jury Trial from October 5, 2021 to January 25, 2022. *Declaration of Karren Kenney* 96 filed by Plaintiff USA as to Defendant Jason Fong. (Takla, Mark) (Entered: 08/23/2021) |
| 08/24/2021 | 98 | SCHEDULING NOTICE TEXT ONLY ENTRY by Judge David O. Carter as to Defendant Jason Fong. The Court GRANTS the Motion to Continue Jury Trial from October 5, 2021 to January 25, 2022 96 , for good cause, including waiving Speedy Trial time.Counsel shall immediately submit a proposed order for this Court's approval. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 08/24/2021) |
| 08/25/2021 | 99 | [PROPOSED] ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT filed by Plaintiff USA as to Defendant Jason Fong Re: Reply (Motion Related)(CR) 97 (Takla, Mark) (Entered: 08/25/2021) |
| 08/25/2021 | 100 | ORDER TO CONTINUE Trial Date and Findings Regarding Excludable Time Periods Pursuant to Speedy Trial Act by Judge David O. Carter as to Defendant Jason Fong. Trial continued to 1/25/2022 at 08:30 AM before Judge David O. Carter. Status Conference continued to 1/10/2022 at 01:30 PM before Judge David O. Carter. (twdb) (Entered: 08/25/2021) |
| 08/27/2021 | 101 | NOTICE OF APPEAL TO APPELLATE COURT (Interlocutory) filed by Defendant Jason Fong re MINUTES (IN CHAMBERS) by Judge David O. Carter: Denying 77 MOTION for Recusal as to Jason Fong (1). SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) 92 . FEE NOT PAID. (Kenney, Karren) (Entered: 08/27/2021) |
| 08/30/2021 | 102 | FILING FEE LETTER issued as to Defendant Jason Fong, re Notice of Appeal − Interlocutory, 101 . (mat) (Entered: 08/30/2021) |
| 08/30/2021 | 103 | NOTIFICATION by Circuit Court of Appellate Docket Number 21−50191 as to Defendant Jason Fong, Ninth Circuit regarding Notice of Appeal − Interlocutory, 101 . (twdb) (Entered: 08/31/2021) |
| 09/01/2021 | | APPEAL FEES PAID as to Defendant Jason Fong, re: Notice of Appeal − Interlocutory, 101 ; Receipt Number SA017383 in the amount of $505. (dve) (Entered: 09/01/2021) |

**ATTACHMENT 2**

**F I L E D**
CLERK, U.S. DISTRICT COURT

10/6/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JGU _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>JASON FONG,<br>  aka "asian_ghazi,"<br><br>          Defendant. | No. **8:20-cr-00146-DOC**<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 2339C(c): Concealing the Provision of Material Support and Resources and Funds] |

The United States Attorney charges:

[18 U.S.C. § 2339C(c)]

On or about May 18, 2020, in Orange County, within the Central District of California, and elsewhere, defendant JASON FONG, also known as "asian_ghazi," a national of the United States located in the United States, knowingly concealed and disguised the nature, location, source, ownership, and control of material support and resources and funds, knowing the same were to be provided to a

///

1   foreign terrorist organization, namely Hamas, also known as the Izz

2   al-Din al Qassam Brigades, in violation of 18 U.S.C.§ 2339B.

3                                   NICOLA T. HANNA
                                    United States Attorney
4

5

6                                   CHRISTOPHER D. GRIGG
                                    Assistant United States Attorney
7                                   Chief, National Security Division

8                                   ANNAMARTINE SALICK
                                    Assistant United States Attorney
9                                   Chief, Terrorism and Export Crimes
                                      Section
10

11                                  MARK TAKLA
                                    Assistant United States Attorney
                                    Deputy Chief, Terrorism and Export
12                                    Crimes Section

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT 3**

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  - - - - - - -

5    UNITED STATES OF AMERICA,        )
                                      )      <u>**CERTIFIED**</u>
6              Plaintiff,             )
                                      )
7         vs.                         ) No. 8:20-cr-00146-DOC-1
                                      )    Item Number 1
8    JASON FONG, also known as        )
     asian_ghazi,                     )
9                                     )
               Defendant.             )
10   _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16   Government's Request [41] for Review of Magistrate Order

17                 Santa Ana, California

18                 Friday, April 2, 2021

19

20

21

22   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-8141

25

**APPEARANCES OF COUNSEL:**

FOR THE UNITED STATES OF AMERICA:

     DEPARTMENT OF JUSTICE
     OFFICE OF THE UNITED STATES ATTORNEY
     Terrorism and Export Crimes Section
     BY:  Mark P. Takla
         Assistant United States Attorney
     411 West 4th Street
     8th Floor
     Santa Ana, California 92701
     714-338-3591
     mark.takla@usdoj.gov


FOR DEFENDANT JASON FONG, also known as asian_ghazi:

     Karren Kenney (retained)
     KENNEY LEGAL DEFENSE CORPORATION
     5000 Birch Street - West Tower Suite 3000
     Newport Beach, California 92660
     855-505-5588
     karren.kenney@gmail.com

ALSO PRESENT:

     Terry Ginsburg, Supervising Probation Officer

     Nicholas Walker, Probation Officer

1                     **I N D E X**

2    **PROCEEDINGS**                                     **PAGE**

3    REVIEW OF MAGISTRATE ORDER
        PURSUANT TO GOVERNMENT REQUEST [41]
4

5    Appearances                                  4

6    Initial Remarks by the Court             5

7    Government's Position                     5

8    Defense position                        19

9    Court's findings                       60

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

4

```
        1              SANTA ANA, CALIFORNIA, FRIDAY, APRIL 2, 2021

        2                           Item Number 1

        3                          (11:28 a.m.)

11:34   4              THE COURT:  Call the matter of 20-00146,

        5   United States v. Jason Fong.

11:34   6                           APPEARANCES

11:34   7              THE COURT:  And we'll begin with the government's

        8   appearance.

11:34   9              Mr. Takla.

11:34  10              MR. TAKLA:  Good morning, Your Honor.  Mark Takla

       11   on behalf of the United States.

11:34  12              THE COURT:  Ms. Kenney.

11:34  13              MS. KENNEY:  Good morning, Your Honor.  Karren

       14   Kenney on behalf of Mr. Fong.  He's present in court in

       15   custody.

11:35  16              Also present is my client's --

11:35  17              THE COURT:  Have a seat for just a moment.  That's

       18   an order.  Sit down.  And then move the microphones closer

       19   to you.  And we'll just use it as a state court process

       20   because when you stand -- I appreciate the courtesy, but I'm

       21   going to change my whole courtroom around concerning COVID.

       22   So by staying seated, Debbie can hear you.  You don't have

       23   to go to the lectern, and we can clean the microphone each

       24   time for the next party.

11:35  25              So pretend we're back in state court.  Okay?
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

5

| 11:35 | 1 | MS. KENNEY:  Thank you, Your Honor. |

11:35   1          MS. KENNEY:  Thank you, Your Honor.

11:35   2          Karren Kenney on behalf of Jason Fong.  He's

        3   present in court in custody.  Also present is my client's

        4   family:  His father, his mother and his sister.

11:35   5          And I do wanna make, uh -- for the record, there

        6   apparently seems to be several agents that are also present

        7   that were involved in this case, that are sitting on -- to

        8   my right.

11:35   9          THE COURT:  All right.

11:35  10          And I've read it before, but we're gathering the

       11   search warrant, once again, as we speak.

11:36  12          **INITIAL REMARKS BY THE COURT**

11:36  13          THE COURT:  I've already made a determination that

       14   Mr. Fong does not present a flight risk.  But now we're on

       15   the dangerousness aspect.  So I don't care which counsel

       16   addresses the Court.  We're going to have a number of

       17   rounds, and you can call witnesses, if you'd like to.

11:36  18          MR. TAKLA:  Your Honor, I'll start since it's my

       19   motion.

11:36  20          THE COURT:  Please.

11:36  21          **GOVERNMENT'S POSITION**

11:36  22          MR. TAKLA:  Your Honor, the government strongly

       23   believes that the defendant is a danger to the community.

       24   He's exhibited all the warning signs of violence.

11:36  25          On February 13, before COVID even --

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

6

```
11:36    1              THE COURT:  Now, I'm going to slow you way down
         2    Okay?
11:36    3              All right.  Thank you.  February 13th.
11:36    4              MR. TAKLA:  Before -- before COVID started, he
         5    stated:
11:36    6                  "I have the money saved for equipment
         7                  because I planned on dying here
         8                  violently."
11:36    9              THE COURT:  Now, I want you to get that document
        10    that you -- because we've got a myriad of documents now.
11:36   11              Show that to me.
11:36   12              MR. TAKLA:  Your Honor, that's in the search
        13    warrant affidavit, which is Exhibit A.
11:36   14              THE COURT:  Okay.  Now, just a moment.
11:36   15              We're going to pull that up, Kelly.  And while
        16    we're doing that, I've looked at it before, and read it off
        17    the record.  Now I'm going to get a paper copy and you're
        18    going to show me the page in just a moment.
11:37   19              THE CLERK:  It's 65 pages.
11:37   20              THE COURT:  It can be 5,000 pages.
11:37   21              THE CLERK:  Just give me a minute.
11:37   22              THE COURT:  Kelly, give me the first portion as it
        23    comes off the press.
11:38   24          (Documents provided to the Court.)
11:39   25              THE COURT:  Thank you, Kelly.
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

7

| | | |
|---|---|---|
| 11:39 | 1 | I want to ask, Mr. Walker, if he's submitted any |
| | 2 | additional paperwork. |
| 11:39 | 3 | P.O. WALKER: Good morning, Your Honor. Pretrial |
| | 4 | Services has not submitted any additional paperwork. |
| 11:41 | 5 | THE COURT: Thank you. All right. |
| 11:53 | 6 | All right. Counsel, thank you. |
| 11:53 | 7 | I have read this a number of times off of the |
| | 8 | site, but I wanted to get a paper copy. And in particular, |
| | 9 | amongst other pages, I finally found what I was looking for. |
| 11:53 | 10 | It's going to be on page 28, and one of the many |
| | 11 | statements I'm going to focus on is the February 13, 2020, |
| | 12 | Instagram group chat where Fong posted, quote: |
| 11:53 | 13 | "I have money saved up for equipment I |
| | 14 | need because I plan on dying here |
| | 15 | violently, initially." |
| 11:54 | 16 | Still not opposed to it. I still hold to my |
| | 17 | finding that he's not a flight risk. Everything that I've |
| | 18 | read in these documents, Counsel, indicated he was staying |
| | 19 | in the United States, and whatever activity he was going to |
| | 20 | be involved in was in the United States, although there's |
| | 21 | indication of training in Syria or going overseas. I don't |
| | 22 | see the further act of completion, like Badawi or Elhuzayel, |
| | 23 | going to the airport or purchasing tickets. |
| 11:54 | 24 | I am extraordinarily concerned about the |
| | 25 | dangerousness aspect. So on the defense side, I'm going to |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

8

```
          1   have quite a few questions especially in light of the last

          2   question I asked; and that is, at the time of apprehension,

          3   he was found, I believe, with an AR-15 or assault rifle that

          4   was loaded.

11:54     5        All right.  Counsel, please continue on behalf of

          6   the government.

11:54     7             MR. TAKLA:  Thank you, Your Honor.

11:54     8             Additionally, in addition to that statement, he

          9   stated, with respect to the LGBTQ community:  They must be

         10   eradicated.

11:55    11             He also stated he wanted to hunt down a teacher

         12   that he thought was a pedophile.  He stated --

11:55    13             THE COURT:  I want a better record of this.  I

         14   want the page that you're referring to and the warrant or

         15   where I would find that information.

11:55    16             I've read it now three times.

11:55    17             MR. TAKLA:  Yes, Your Honor.

11:55    18             THE COURT:  Doesn't mean I can rapidly find it in

         19   a 60-page warrant.

11:55    20             Slow down.  Go back and give me the page numbers.

11:55    21             MR. TAKLA:  Yes, Your Honor.  And I'munna be re --

         22   relying on, uh, the right-hand, bottom page numbers since

         23   there're --

11:55    24             THE COURT:  Thank you.

11:55    25             MR. TAKLA:  -- multiple page numbers.
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

9

| | | |
|---|---|---|
| 11:55 | 1 | So for those three statements that I just made, |
| | 2 | that is on page 28. |
| 11:55 | 3 | THE COURT:  All right. |
| 11:55 | 4 | So would that be subsection (b), that: |
| 11:55 | 5 | "DT stated that Fong was prepared |
| | 6 | document defend him if people started |
| | 7 | rioting or the government failed.  And |
| | 8 | DT stated that Fong had loaded weapons |
| | 9 | next to his bed and had told or |
| | 10 | explained to DT that he had them in case |
| | 11 | he needed to respond quickly." (As |
| | 12 | read.) |
| 11:56 | 13 | MR. TAKLA:  Actually, no, Your Honor. |
| 11:56 | 14 | THE COURT:  Just a moment, Counsel. |
| 11:56 | 15 | "DT observed several weapons in Fong's |
| | 16 | bedroom at his home in Irvine, |
| | 17 | California.  DT knew Fong stored his |
| | 18 | AR-looking rifle in -- on a mount next |
| | 19 | to his bed with a magazine loaded into |
| | 20 | the weapon.  Fong stated he had 30-round |
| | 21 | magazines for his AR-15 that were |
| | 22 | non-California compliant." |
| 11:56 | 23 | So let me go back to my questions now. |
| 11:56 | 24 | I want to hear again a description of what was |
| | 25 | found in the bedroom and in what condition and where this |

|       | 1  | was located. |
|-------|----|--------------|
| 11:56 | 2  | MR. TAKLA:  Yes, Your Honor. |
| 11:56 | 3  | That is on page 35 of the search warrant -- |
| 11:56 | 4  | THE COURT:  Okay.  Just -- |
| 11:56 | 5  | MR. TAKLA:  -- the search warrant affidavit, using |
|       | 6  | the bottom -- |
| 11:56 | 7  | THE COURT:  Thank you. |
| 12:00 | 8  | MR. TAKLA:  -- right-hand numbers. |
| 11:56 | 9  | THE COURT:  Thank you. |
| 11:56 | 10 | MR. TAKLA:  So in -- |
| 11:56 | 11 | THE COURT:  Thank you, Counsel.  That means stop. |
|       | 12 | I'll tell you when to speak again. |
| 12:00 | 13 | All right.  On page 33 -- I didn't have the |
|       | 14 | warrant in front me on the last occasion, which is why I |
|       | 15 | struggled with the exact condition of the bedroom.  And this |
|       | 16 | was shown to me -- thank you -- on the last occasion. |
| 12:00 | 17 | It states, in Paragraph 29, subsection (a): |
| 12:00 | 18 | "In Fong's bedroom, law enforcement |
|       | 19 | found an un-serialized AR-15 assault |
|       | 20 | rifle, a bolt action rifle with a scope, |
|       | 21 | two handguns, nine high-capacity handgun |
|       | 22 | and rifle magazines and several thousand |
|       | 23 | rounds of ammunition.  The AR-15 type |
|       | 24 | assault rifle was found on an improvised |
|       | 25 | rifle rack on the side of [the] bed." |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

11

```
       1              (As read.)
12:01  2              Now, just one moment.  There it is.  And it goes
       3   on to state that it was,
12:01  4                 "-- loaded with a round in the chamber
       5                 and a high-capacity magazine with a
       6                 second high-capacity magazine taped to
       7                 it."
12:01  8              Which must've caused extreme concern because of
       9   his willingness or statements to kill a police officer on
      10   the spot, and also the capability of violence because these
      11   weapons are locked and loaded and ready to go.
12:01 12              Now, just a moment.
12:01 13              So what I'm going to assume is this:  In those two
      14   magazines -- were they taped back to back?
12:02 15              On an AR-15 or an old M16.  You can take those
      16   magazines and tape them so it gives 20 plus 20, if you spin
      17   it quickly.
12:02 18              Is that what was occurring here?
12:02 19              MR. TAKLA:  Your Honor --
12:02 20              THE COURT:  What was the capability?  Did he have
      21   40 rounds ready to go, two magazines of approximately 20
      22   each?
12:02 23              MR. TAKLA:  Correct.  And I need to check with --
12:02 24              THE COURT:  Thank you.  The answer's yes.
12:02 25              All right.  Counsel, please continue.  I'll turn
```

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | it back to you now.                                        |
| 12:02 | 2  | MR. TAKLA:  Thank you, Your Honor.                         |
| 12:02 | 3  | Again, going back to the defendant's statements --         |
|       | 4  | and this is on page 15 of the search warrant affidavit -- he |
|       | 5  | stated that dying like a martyr sounded better than an     |
|       | 6  | earthly marriage.                                          |
| 12:02 | 7  | Also, on page 15, he said:                                 |
| 12:02 | 8  | "I pray to Allah every night that I                        |
|       | 9  | can become *shaheed* instead of die                        |
|       | 10 | peacefully."                                               |
| 12:03 | 11 | On page 29, he stated:                                     |
| 12:03 | 12 | "I am done [sic].  I am only here in                       |
|       | 13 | America for the violence right now."                       |
| 12:03 | 14 | On page 29, he stated:                                     |
| 12:03 | 15 | "Time to remove our government.  I                         |
|       | 16 | would actually wage *jihad* against the                    |
|       | 17 | United States [sic]."  (As read.)                          |
| 12:03 | 18 | Also on page 29, referring to the company that he          |
|       | 19 | worked for, because he missed prayer:                      |
| 12:03 | 20 | "F this place.  I am going to kill                         |
|       | 21 | these Fs."  (As read.)                                     |
| 12:03 | 22 | And on page 31, he told a Marine Corps associate           |
|       | 23 | he would not hesitate to shoot a police officer who was just |
|       | 24 | doing his job.                                             |
| 12:03 | 25 | Now, as the Court is concerned, Your Honor, the            |

| | | |
|---|---|---|
| | 1 | government is also concerned that this rhetoric is very, |
| | 2 | very scary.  It's particularly scary when it comes from a |
| | 3 | U.S. service member who's been trained in combat. |
| 12:03 | 4 | The fact that the defendant had a ghost gun, which |
| | 5 | was untraceable, that he built himself, and illegal under |
| | 6 | state law is also very concerning.  He had nine |
| | 7 | high-capacity magazines, which were also illegal under state |
| | 8 | law. |
| 12:04 | 9 | And the removal of the guns from his house and |
| | 10 | firearm restrictions are just not enough for this case, |
| | 11 | because defendant has demonstrated an ability to be able to |
| | 12 | purchase an untraceable ghost gun and make it into a |
| | 13 | California illegal assault rifle. |
| 12:04 | 14 | Firearm restrictions only work if there's trust in |
| | 15 | the defendant that he's not gonna violate those |
| | 16 | restrictions.  And searches all day long are not gonna |
| | 17 | protect the public if the defendant chooses to build another |
| | 18 | ghost gun that's untraceable and keep it. |
| 12:04 | 19 | Defendant also had a gas mask and body armor in |
| | 20 | his bedroom.  The argument that those are souvenirs is |
| | 21 | absurd 'cause the Marine Corps doesn't allow service members |
| | 22 | to keep body armor and gas masks. |
| 12:05 | 23 | What the government submits is that is in keeping |
| | 24 | with his very first statement on February 13th, when he |
| | 25 | said: |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

14

| | | |
|---|---|---|
| 12:05 | 1 | "I have money saved for equipment |
| | 2 | because I planned on dying here |
| | 3 | violently." |
| 12:05 | 4 | That's the type of equipment somebody might want |
| | 5 | to get. |
| 12:05 | 6 | Your Honor, there's also some evidence that the |
| | 7 | defendant has an inability to cope with negativity.  When he |
| | 8 | was restricted from being able to pray, his response was, |
| | 9 | "I'm going to kill these Fs."  That's not a normal response. |
| 12:05 | 10 | His Marine Corps associate also said he had anger |
| | 11 | issues.  And, Your Honor, there's additional evidence that's |
| | 12 | not in the search warrant affidavit that I do wanna proffer |
| | 13 | that I think is important on this issue because, in 2017, |
| | 14 | defendant's family called the Irvine Police Department |
| | 15 | because they were concerned with defendant's activities. |
| 12:06 | 16 | MS. KENNEY:  Your Honor, I'm sorry.  At this |
| | 17 | point, I'munna have to at least lodge an objection for |
| | 18 | purposes of making a clean record. |
| 12:06 | 19 | This information that's now being proffered by the |
| | 20 | government was not provided.  I don't have anything from the |
| | 21 | Irvine Police Department in regards to a 2017 call. |
| 12:06 | 22 | THE COURT:  Thank you. |
| 12:06 | 23 | Please continue. |
| 12:06 | 24 | MR. TAKLA:  Thank you, Your Honor. |
| 12:06 | 25 | And that, uh, was disclosed in the discovery. |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

15

| | | |
|---|---|---|
| 12:06 | 1 | But in 2017, defendant's sister called the Irvine |
| | 2 | Police Department because he had punched two holes in two |
| | 3 | doors at their residence.  Defendant's sister was so |
| | 4 | concerned about it that she waited to call the police at a |
| | 5 | time when the defendant was not in the residence. |
| 12:06 | 6 | The sister reported that, "When defendant gets |
| | 7 | angry, he goes to his room and loads and unloads firearms to |
| | 8 | calm down."  His family reported he's got anger management |
| | 9 | issues.  And his mother reported that she did not approve of |
| | 10 | weapons in the house in 2017. |
| 12:07 | 11 | Now, they declined to press charges and the Irvine |
| | 12 | Police Department just reported it and took some pictures. |
| | 13 | But what this shows, Your Honor, is that defendant's house |
| | 14 | is probably not the best place for him.  His parents don't |
| | 15 | have an ability to control him. |
| 12:07 | 16 | There is a real danger here, Your Honor.  From the |
| | 17 | defendant's rhetoric, these are all the warning signs.  I |
| | 18 | hesitate to say his family's in danger, but there is a |
| | 19 | history.  And this household seems to intensify his anger. |
| 12:07 | 20 | I also note, Your Honor, that defendant's fellow |
| | 21 | service members could be in danger here too.  He stated that |
| | 22 | he believes that the Marines and the Army were terrorists. |
| | 23 | And despite the fact that he's no longer in the Marine |
| | 24 | Corps, it's not difficult to get on a military base without |
| | 25 | a military ID. |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

16

12:08    1            Now, Your Honor, I want to clarify one question
         2    I -- that you had last time for me about his contact with
         3    individuals overseas.  Uh, he did report to other people in
         4    the group chat that he'd been offered a position as a
         5    trainer.

12:08    6            THE COURT:  Trainer.  Right.

12:08    7            MR. TAKLA:  That's on page 20 of the search
         8    warrant affidavit.

12:08    9            Now, ultimately, the FBI did not find any
         10   corroboration of that.  But they did find that the defendant
         11   had deleted some chats and deleted some messaging apps, and
         12   so we think that was correct.  Uh, we just didn't find any
         13   independent evidence of it.

12:08    14           And I haven't even got to the most important
         15   chargeable conduct yet, Your Honor, and that's defendant's
         16   distribution of IED-making instructions to people who he
         17   thought were gonna engage in bad actions.  And this is on
         18   page 25 and 26 of the search warrant affidavit.  I'm gonna
         19   walk through the timeline.

12:09    20           On March 4th, the minor stated he was gonna go
         21   fight for a foreign terrorist organization.  That
         22   organization is HTS.

12:09    23           On March 17th, two weeks later, the defendant
         24   provided to the individuals in the group chat, including
         25   that minor, information to make IED's and chemical weapons.

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

17

12:09    1        One week later, the minor stated he was planning

2    on blowing up Kessler Air Force Base in Alabama.  And

3    immediately the defendant provided to the minor and

4    individuals in the group chat tactical information on

5    entering buildings.  So when you walk up to a building, how

6    to use the door and the building to shield yourself when you

7    enter.

12:09    8        Now, defendant later stated he thought the minor

9    was joking.  But he also stated that, if the minor wanted to

10    commit an attack in the United States, he would not do

11    anything; he would stand back.

12:10    12        Now, I want to stop right here, Your Honor.

12:10    13        Defendant's the adult.  He was 24 years old.  He's

14    a U.S. service member.  And a minor says, "I'm going to blow

15    up an Air Force Base."  And he's not sure whether the

16    minor's joking.  Defendant does nothing to dissuade the

17    minor; and instead, five days later, again provides

18    IED-making information to the minor and other people on that

19    group chat.  And he said, "We're gonna keep this information

20    on this chat as a library."

12:10    21        Now, ultimately when interviewed by law

22    enforcement, defendant stated that he thought the

23    information -- the IED-making information and chemical

24    weapons information -- would be used by the minor in Syria

25    in favor of a foreign terrorist organization, HTS, to commit

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

18

```
       1    ambushes.  So when he sent that information, he thought that
       2    information was gonna be used on behalf of a foreign
       3    terrorist organization.
12:11  4            And then we get to the charged conduct here,
       5    Your Honor, which is arguably the most minor of the stuff
       6    that I've spoken about already, particularly on the issue of
       7    danger, where he sent out a solicitation link to several
       8    individuals on a group chat, a link where they can donate to
       9    Hamas, which is another foreign terrorist organization.  He
      10    said the money would be used to fight Israel.
12:11 11            And when he was interviewed by law enforcement, he
      12    admitted to saying -- to researching Hamas, knowing Hamas
      13    was a foreign terrorist organization, and wanted to solicit
      14    money for Hamas so that they could fight Israel.
12:11 15            Your Honor, these aren't normal statements people
      16    make, even in the time of COVID, and it's certainly not
      17    normal for a U.S. service member who's been trained in
      18    combat, to do.
12:12 19            Defendant is absolutely dangerous.  He's a trained
      20    marine who believes that the Marines are the terrorists.
      21    And he's expressed hatred and violence against various parts
      22    of the community, including the U.S. Government, the LGBTQ
      23    community, a high school teacher, and law enforcement.
12:12 24            Defendant's danger is not possible to mitigate
      25    with conditions.  The ability to get an untraceable firearm
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

19

```
          1   is not something that a condition can prevent.  And

          2   defendant expressed an interest in dying violently.

12:12     3          Unlike the Badawi and Elhuzayel case, Your Honor,

          4   those defendants were planning on committing acts abroad.

          5   And in that scenario, the FBI has a little bit more liberty

          6   to be able to catch them at the airport, wait till they buy

          7   plane tickets, um, wait till they go ahead and do the steps

          8   that they need in order to commit their activities, because

          9   the conduct that they're worried about is going to be

         10   abroad.

12:13    11          Defendant's conduct is here.  And those aren't

         12   steps that the FBI and Pretrial Services can mitigate.

         13   Because if defendant wants to commit an act, he can do it.

         14   He's got the training, the background.  And, unfortunately,

         15   even in the last few weeks, we've seen a lot of gun

         16   violence.  These are the warning signs, Your Honor.

12:13    17          And for those reasons, the government believes

         18   he's a danger.

12:13    19          THE COURT:  All right.  Thank you.

12:13    20          Let me turn to the defense, please.

12:13    21          Ms. Kenney.

12:13    22          MS. KENNEY:  Yes, Your Honor.

12:13    23                      DEFENSE POSITION

12:13    24          MS. KENNEY:  I would just like to start with

         25   stating that I believe Judge Scott properly granted bond for
```

1    Mr. Fong.  And the information that I provided to her in the

2    February 26th, '21 hearing, I'm assuming the Court has also

3    reviewed.

12:14    4        Your Honor, in regards to the burden of

5    establishing dangerousness that the government has, at this

6    point I think the government is overreaching and taking

7    things out of context.  They're relying on a search warrant

8    that contains multiple levels of hearsay, without actually

9    referencing any of the specific chats and any of the actual

10    transcripts of these interviews that they're claiming

11    support what they're saying.

12:14    12        I keep saying this:  Things are being taken out of

13    context.

12:14    14        I've objected to just the information in the

15    search warrant because it contains multiple layers of

16    hearsay.  They're relying on an interview that an officer

17    did of someone who was an associate of Mr. Fong's, and

18    they're relying on chats, some of which were in Russian --

19    and somebody apparently tried to transcribe them and put

20    their transcriptions in the pictures of the chats.

12:15    21        Again, I object.  I don't -- I don't know how

22    valid those transcriptions are.  I do know, 'cause I have

23    come from Russian descent, Russian does not translate

24    word-for-word into the English language.  There's some sort

25    of -- the person translating it has to, uh, decide exactly

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

21

|  |  |  |
|---|---|---|
|  | 1 | what's being said in terms of putting it from Russian to |
|  | 2 | English.  So I don't agree with all of these translations. |
| 12:15 | 3 | I don't have somebody that I can, um, bring in |
|  | 4 | to -- bring into this Court, at least for purposes of this |
|  | 5 | hearing, to tell the Court if they're valid or not.  So I at |
|  | 6 | least want that on the record.  I'm not agreeing that the |
|  | 7 | translations that they're relying upon that were in Russian |
|  | 8 | are actually what was said. |
| 12:16 | 9 | Your Honor, the Court requested my client's |
|  | 10 | military record.  I'm assuming that the Court had the |
|  | 11 | ability to review that.  And he had great marks when he did |
|  | 12 | serve our country.  One of his supervisors, as of |
|  | 13 | November 2019, had stated that he had a -- Mr. Fong has |
|  | 14 | enormous potential for growth as a Marine, and during his |
|  | 15 | training period he oversaw the completion of multiple -- |
| 12:16 | 16 | *(Court reporter requests clarification for the* |
|  | 17 | *record.)* |
| 12:16 | 18 | MS. KENNEY:  Judge, can I take my mask off? |
| 12:16 | 19 | THE COURT:  You can, if you'd like to.  And if |
|  | 20 | you'd like to have Mr. Fong separated from you, you -- |
| 12:16 | 21 | MS. KENNEY:  That's fine.  I've been vaccinated. |
| 12:16 | 22 | THE COURT:  We have also.  But I always want a |
|  | 23 | record of that.  But to be heard better, if you would like |
|  | 24 | your mask off, I will consent to that. |
| 12:17 | 25 | MS. KENNEY:  Okay.  Thank you. |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

22

```
12:17    1              His supervisor also stated that he was pursuing
         2    higher education at Irvine Valley College.  He had a
         3    3.62 GPA, and he, um, was recommended for professional
         4    military education, retention, and promotion.
12:17    5              A second supervising officer also concurred with
         6    the assessment and said that:  (Reading:)
12:17    7                 "Mr. Fong is an ambitious, efficient,
         8                 and highly intelligent avionics
         9                 technician, whose performance,
        10                 singularly and collectively, has been
        11                 outstanding.  He's dedicated NCO who
        12                 constantly mentors and trains his
        13                 subordinates to ensure they keep up with
        14                 current requirements and reach their
        15                 full potential.  These traits have
        16                 earned him the respect of his seniors,
        17                 his peers, and junior marines alike.  He
        18                 was also recommending him for
        19                 promotion." (As read.)
12:18   20              Your Honor, I looked through his entire military
        21    record, there was not one negative thing.
12:18   22              As the Court knows, Mr. Fong grew up here locally
        23    in Irvine.  His family is present.  I think that his Marine
        24    record speaks volumes of his character, Your Honor.
12:18   25              In addition, I want to make a comment about the
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

23

|  |  |  |
|--|--|--|
| | 1 | interview that was -- was being relied upon, from the person |
| | 2 | called "DT," somebody who was in the Marines with my client. |
| 12:18 | 3 | I don't know if the Court had opportunity to |
| | 4 | actually see the transcript of DT's interview that was |
| | 5 | provided, I believe, in Exhibit B. There was voluminous |
| | 6 | materials that the Court was provided. I'm not sure exactly |
| | 7 | what the Court was able to get through. |
| 12:18 | 8 | But in regards to DT's interview -- and I'm not |
| | 9 | taking this from a search warrant. I'm taking this from the |
| | 10 | actual transcript, or text, when I'm referring to things. |
| 12:19 | 11 | DT told the supervise -- or the interviewing |
| | 12 | officer that my client was a firearms instructor, um, in the |
| | 13 | past, and he worked at a range in Orange. So he had a |
| | 14 | liking for guns before this incident happened. He was in |
| | 15 | the Marines. He's just -- there's people that just enjoy |
| | 16 | guns, that are huge proponents of the Second Amendment. And |
| | 17 | that is one of the Constitutional rights, at least for now, |
| | 18 | that we still have as Americans -- although it is currently |
| | 19 | under attack. |
| 12:19 | 20 | He was asked -- DT was asked, um, about the |
| | 21 | instructor status of Mr. Fong, and said that he was a |
| | 22 | civilian instructor in the City of Orange. And my client |
| | 23 | actually would take trips out to Arizona to shoot his gun |
| | 24 | because there was more open area. And, as we all know, |
| | 25 | Arizona's really relaxed when it comes to respecting the |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

24

|        |    |                                                            |
|--------|----|------------------------------------------------------------|
|        | 1  | Second Amendment.                                          |
| 12:20  | 2  | Um, he didn't do any competitions. DT told them            |
|        | 3  | that he thought my client was an expert, was not sure about |
|        | 4  | that. And, um, at the end of the interview, the            |
|        | 5  | interviewing officers -- and let's -- let's place the      |
|        | 6  | scenario of how DT was being interviewed.                  |
| 12:20  | 7  | I believe it was an NCIS person that showed up to          |
|        | 8  | interview him, which puts on an extra added layer of       |
|        | 9  | pressure, when you're in the Marines, to speak. So he was  |
|        | 10 | being questioned by the authorities, in addition to the NCIS |
|        | 11 | people. And one of the interviewing officers said:         |
| 12:20  | 12 | "That's our whole concern, David, is                       |
|        | 13 | like -- is this kid someone potentially                    |
|        | 14 | planning something methodically? Is he                     |
|        | 15 | gonna -- is he kind of like hiding                         |
|        | 16 | behind a computer screen? You know what                    |
|        | 17 | I mean? Put yourself in our shoes.                         |
|        | 18 | People's safety. Community safety."                         |
| 12:21  | 19 | And then in response to that, DT said:                     |
| 12:21  | 20 | "Personally, I can't really see him                        |
|        | 21 | doing any of that -- whether or not,                       |
|        | 22 | like, he were to go to the edge, there's                   |
|        | 23 | been plenty of times where he could                        |
|        | 24 | have, but hasn't."                                         |
| 12:21  | 25 | And that's DT's interview, page 55. The Bates              |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

25

|         |    |                                                         |
|---------|----|---------------------------------------------------------|
|         | 1  | stamp number is ending '2809.                           |
| 12:21   | 2  | DT went on to also tell the interviewing officers:      |
| 12:21   | 3  | "As far as him actually going out and                   |
|         | 4  | doing anything, I really don't think he                 |
|         | 5  | would.  His primary goal is to have his                 |
|         | 6  | own property and be away from people."                  |
| 12:21   | 7  | So with that mindset, I don't really see him going      |
|         | 8  | to kill a bunch of people because of hate.  I think he's |
|         | 9  | leaning more towards like "I'm gonna get away from people |
|         | 10 | because I hate them."                                   |
| 12:22   | 11 | And there are people that -- you know, society          |
|         | 12 | today -- and I'm sure the Court would agree, it's complete |
|         | 13 | chaos, and there's a lot of hate in the world.  And     |
|         | 14 | especially for now, which is relevant to my client and his |
|         | 15 | family, Your Honor, with the Asian -- rise in Asian hate, |
|         | 16 | it's -- it's really bad.  My client has seen his family, |
|         | 17 | um -- the product of bullying in the City of Irvine, and |
|         | 18 | certain things -- certain statements being made to his  |
|         | 19 | mom -- to "Go back to China" and things like that -- I mean, |
|         | 20 | it's real and this whole family has experienced it.     |
| 12:22   | 21 | So I can understand why Mr. Fong would wanna be         |
|         | 22 | away from people, especially in today's world.          |
| 12:23   | 23 | In addition, Your Honor, the dangerousness that         |
|         | 24 | we're talking about would be -- be "now" -- his -- dangerous |
|         | 25 | now.  Is he dangerous if we let him out today?          |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

26

12:23  1           Remember, Your Honor, he was arrested back in May

       2    of 2020.  And it was at -- the timing was a little weird,

       3    'cause he'd already stopped the group chats, and he kicked

       4    out one of the -- I believe the operatives.  There was three

       5    government operatives in this very small group.  And I'll

       6    get to the prodding that they were doing so you can put this

       7    into context.

12:23  8           But, remember, his conduct happened between

       9    February and April.  That is at the height of when the world

      10    shut down.  We're in the middle of this international

      11    pandemic.  People were scared.  I was scared.  People were

      12    afraid of civil war.  Everyone's just existing.  And we lost

      13    the last year of our lives.  And I look back and, just, it

      14    feels like a nightmare that just wouldn't end.

12:24 15           People were afraid.  People became "preppers."

      16    And I'm sure Your Honor knows what that is:  When you're

      17    afraid that groups are gonna take over the government.

      18    We've seen that stuff nationwide with the crazy protesting

      19    going on, the people that went to the Capitol.  There's just

      20    a lot of crazy -- is as if it's the end times.  It's crazy.

12:24 21           So I think we have to keep that in mind when we're

      22    looking at this.  'Cause had this happened five years ago,

      23    it would be more concerning.  But because of the time frame

      24    that this is occurring in, and the context that it's in,

      25    some of this is understandable.

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

27

| | | |
|---|---|---|
| 12:25 | 1 | Mr. Fong was more of a prepper. And with the |
| | 2 | Asian hate, you know, he just wanted to be ready to defend |
| | 3 | his family. And that is in the actual text in these groups. |
| 12:25 | 4 | In regards to -- you know, people were paranoid, |
| | 5 | obviously, because of hate and during the pandemic. But |
| | 6 | even as the Court pointed out at the last hearing, there's |
| | 7 | no evidence that he had plans to travel anywhere. He didn't |
| | 8 | make any specific threats to anyone. I know Mr. Takla's |
| | 9 | claiming "from the search warrant," but I'll get to that. |
| | 10 | There was no bomb-making materials found at his house. |
| | 11 | There was no direct communications with any terrorist |
| | 12 | groups. |
| 12:25 | 13 | He's been in custody since May, Your Honor. |
| | 14 | There's no jail letters like claiming allegiance to Allah or |
| | 15 | talking about terrorist activities -- which I think is huge |
| | 16 | because they did have a mail cover on him. He was writing |
| | 17 | his sister. He was writing his mom. His parents have been |
| | 18 | a part of the church that I belong to: Saddleback Church, |
| | 19 | which is in South County. Mom would continuously send him |
| | 20 | things from, you know, *Daily Hope* and Pastor Rick and things |
| | 21 | Christian-based because Jason grew up as a Christian, and at |
| | 22 | some point was looking for more. And I won't get into a |
| | 23 | sidetrack of the -- Saddleback is a seeker church and some |
| | 24 | people seek deeper connection. |
| 12:26 | 25 | THE COURT: Well, they have an excellent |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

28

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | counseling program out there also.                       |
| 12:26 | 2  | MS. KENNEY:  Yes.  Celebrate Recovery.                   |
| 12:26 | 3  | And he was looking for more substance.  And              |
|       | 4  | unfortunately -- the devil works in the ways he works -- he |
|       | 5  | got taken to a different route and he started getting    |
|       | 6  | involved in Islam.  And for him, personally, that's what he |
|       | 7  | believed was filling his void.  He was able to go to the |
|       | 8  | church and actually volunteer his time for security.  He |
|       | 9  | didn't formally convert until January of 2020, Your Honor. |
| 12:27 | 10 | But before that time, after seeing the Christ            |
|       | 11 | Church massacre, which I'm sure Your Honor's well-aware of, |
|       | 12 | he was extremely disturbed and volunteered his time at the |
|       | 13 | mosque in Irvine as security.                            |
| 12:27 | 14 | THE COURT:  I see.                                        |
| 12:27 | 15 | MS. KENNEY:  I tried to get a letter from the            |
|       | 16 | person in charge of that mosque through his mother's help, |
|       | 17 | but they were uneasy about getting involved in anything  |
|       | 18 | because of, you know, the way people view Muslims,       |
|       | 19 | unfortunately.  They didn't want to get involved.  But my |
|       | 20 | client did disclose that to me, and his parents did confirm |
|       | 21 | it.                                                      |
| 12:28 | 22 | In addition, Your Honor, there's no jail calls of        |
|       | 23 | him claiming allegiance to any terrorist organization.  I |
|       | 24 | just think this whole thing, which happened in a matter of |
|       | 25 | like three months, has been completely blown out of      |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

29

```
          1    proportion.  And the things that have been presented to the

          2    Court have been cherrypicked to make it look like something

          3    that it's really not when you look at the big picture and

          4    the actual evidence, not just a search warrant.

12:28     5            Your Honor, I do wanna make a comment that, during

          6    the time they were executing the warrant, one of the

          7    officers -- who's not here -- was from Irvine Police

          8    Department.  His name is Michael Moore.  And I don't know if

          9    he realized his mic was still on, but there is a transcript

         10    of my client's statement and all the officers who were there

         11    that had their microphones on -- so even if they got out of

         12    the presence of my client, they were still being recorded.

12:29    13            There's one point in the interview where Michael

         14    Moore steps away and he's talking to, I believe -- let me --

         15    I don't wanna get this wrong.  It just says an "Unidentified

         16    Male Number 3" in the transcript.  But Michael Moore is in,

         17    I guess, a side room -- I can only guess -- and he says:

12:29    18            "On charges so, um, but we were not --

         19             based on pictures we saw, we couldn't

         20             tell if he had more than that or not,

         21             um --"

12:29    22            And then the unidentified male says:

12:29    23            "The upstairs, I know they're looking

         24             now.  They only had -- there was only an

         25             AR that I saw."
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

30

| 12:30 | 1 |            "MICHAEL MOORE:" -- the investigator -- "Right. |
| | 2 | Now he's saying he just has the one." |
| 12:30 | 3 |            "UNIDENTIFIED MALE.  Okay." |
| 12:30 | 4 |            "MICHAEL MOORE:  So which sucks." |
| 12:30 | 5 |            So we've got a main investigator that's sitting |
| | 6 | here thinking he's going to find some huge arsenal.  And |
| | 7 | they didn't.  And it was based on all of, you know, pictures |
| | 8 | or YouTube videos that are being shared.  And it just |
| | 9 | completely like grew.  And it just got so big -- and it's |
| | 10 | like they get there and they're disappointed in what they |
| | 11 | found. |
| 12:30 | 12 |            But Michael Moore didn't stop there, Your Honor. |
| | 13 | And I know Your Honor's gonna understand where I'm going |
| | 14 | 'cause I'm gonna bring in the relevance of the state court |
| | 15 | action.  And Your Honor was a state court judge I appeared |
| | 16 | in front of when I was a baby lawyer -- and you probably |
| | 17 | wouldn't remember that -- in C5. |
| 12:31 | 18 |            So in state court, he's charged with a total of |
| | 19 | 10 counts.  Your Honor, they are all wobblers.  Penal Code |
| | 20 | section -- the only weapon's charges, Penal Code |
| | 21 | Section 30605, possession of an assault weapon.  That |
| | 22 | carries a three-year max, as the Court knows. |
| 12:31 | 23 |            The additional charges, all which are wobblers, |
| | 24 | are for large-capacity magazines, Penal Code Section 32310. |
| | 25 | You, uh -- you have to, um -- figuring out the max |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

31

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | sentencing, eight months for each, his max on a state case         |
|       | 2  | is 9 years.  They're all wobblers.                                 |
| 12:31 | 3  | Michael Moore -- and I'm assuming it was through                   |
|       | 4  | the assistance of the government and their whole team --           |
|       | 5  | submitted a declaration under seal, which I was able to            |
|       | 6  | obtain from state court, claiming, from some of the                |
|       | 7  | information that Mr. Takla's presented this Court --               |
|       | 8  | claiming that my client threatened his teacher, was wanting        |
|       | 9  | to, um, eradicate "LGBT," admitting to fund-raising for            |
|       | 10 | Hamas.  And a state court judge sees this, and                     |
|       | 11 | Investigator Moore had the nerve to ask the Court to set the       |
|       | 12 | bail at a million dollars.                                         |
| 12:32 | 13 | My client could've murdered someone and got the                    |
|       | 14 | same bail, as the Court knows.  The Orange County bail             |
|       | 15 | schedule for what he's being charged with is $20,000.  So          |
|       | 16 | this overreaching by this entire team of the government is         |
|       | 17 | just beyond me, especially now that I know Michael Moore           |
|       | 18 | was, on his hot mic, upset that he only found one gun.             |
| 12:33 | 19 | You know, moving -- moving on to the specifics                     |
|       | 20 | that Mr. Takla had stated.  The first one -- and it was also       |
|       | 21 | in Moore's declaration -- the former teacher threat.               |
| 12:33 | 22 | Looking at the actual transcript of my client's                    |
|       | 23 | interview, not the search warrant, at page 105, my client          |
|       | 24 | told Investigator Moore that he had no intentions of hurting       |
|       | 25 | anyone.  Referring to his former teacher, when they asked          |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

32

| | |
|---|---|
| 1 | him about it, Mr. Fong said, in high school, he observed the |
| 2 | teacher look down the shirts of underage girls in his |
| 3 | classes. And this is something that all the students would |
| 4 | talk about. And that was the main reason he didn't like |
| 5 | 'em: Pedophile activity or pedophile -- pedophilia conduct, |
| 6 | which most people would agree. |

12:34  7        But he told them during his interview that he
8   didn't have any plans to track him down. There was nothing
9   on his computer trying to figure out where the teacher lived
10   or any type of commentary anywhere that he was gonna track
11   this -- this teacher down and kill 'em. Again, it's -- it's
12   taken out of context.

12:34 13        In addition, Your Honor, in regards to
14   eradicating -- the statement about eradicating the "LGBT"
15   community. And I'm looking again at the transcript of my
16   client's interview. And this is at page 137 of the
17   transcript:

12:35 18          "I just think that LGBTQ and stuff
19          like that is wrong. I just think it
20          largely -- from my viewpoint, it is not
21          normal, per se. They're contributing to
22          the death of the family structure, and
23          that's what I said." (As read.)

12:36 24        So again, there's no plans for him to do anything
25   to target any specific LGBTQ groups.

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

33

12:35   1          There's a lot of people that follow the Christian

       2   faith, Islam, the Catholic faith, the Jewish faith that

       3   would agree with that statement, Your Honor.  They wouldn't

       4   necessarily say it pubic -- publically for being -- fear of

       5   being canceled, especially in today's "cancel culture."  But

       6   I would surmise to say the majority of Americans probably

       7   feel the same way.

12:36   8          I don't think that's something that should be used

       9   against him, to keep him in jail, without bond, for a case

     10   that -- he needs to help me on the outside and figure this

     11   out and prepare for trial, given the access to counsel

     12   issues.

12:36   13          In regard to admitting to fundraising for Hamas,

     14   in this link that we've heard about, Your Honor -- again,

     15   I'm looking at the transcript, not a search warrant,

     16   page 74.  My client told Investigator Moore that his

     17   whole -- his whole intent was like humanitarian purposes of

     18   giving to the Palestinian people.  He was never intending to

     19   support terrorism.  He never says that.

12:36   20          In fact, in his texts that are in the chats, as

     21   well as in his interview, he makes it clear he does not

     22   support terrorism.  He even says,

12:37   23          "I'm not really versed in Hamas, as a

     24           whole.  I just figured I found this

     25           organization and figured they were for

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

34

```
 1              Palestinian people.  That's kind of why
 2              I just -- I wasn't aware of that
 3              designation of a terrorist group in
 4              terms of like ISIS or al-Qaeda.  I just
 5              thought it was like a militia for --
 6              standing for the Palestinians.  I
 7              thought it would be more of like
 8              humanitarian."
12:37  9              And then we -- he was asked where he found the
10      link, and he said, "Largely, it was just kind've like an
11      Internet search."
12:37 12              It wasn't like he was, "Hey, I'm part of this
13      group and I'm gonna fund-raise, and we've got this link.
14      We're gonna -- you know, we're gonna have meetings with the
15      people that we're sending the money to, and we're really
16      gonna fund-raise."
12:38 17              It was more of just in haste, which obviously was
18      a bad decision.  But it wasn't as calculated as the
19      government's tryin'a lead the Court to believe.
12:38 20              Again, later on in his interview, the
21      investigator's literally trying to put words in his mouth.
22      And at some point, my client says, "Everyone has a right to
23      their opinion."
12:38 24              And, Your Honor, my client was completely
25      respectful during any entire interview, probably because of
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

35

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | his training as a Marine.  I was very impressed with how he |
|         | 2  | held his composure and how respectful he was to the      |
|         | 3  | investigating officers.  But he said,                    |
| 12:38   | 4  | "Everyone has a right to their                           |
|         | 5  | opinion.  You know, that's kind of just                  |
|         | 6  | the way I like to look at it.  But as --                 |
|         | 7  | per support -- telling them to support,                  |
|         | 8  | I mainly -- my intention was mainly                      |
|         | 9  | humanitarian."  (As read.)                               |
| 12:38   | 10 | He even told them:                                       |
| 12:38   | 11 | "I didn't really know too much                           |
|         | 12 | about -- um, Hamas.  I support                           |
|         | 13 | Palestine, especially in a time like                     |
|         | 14 | Ramadan to kind of give aid to people we                 |
|         | 15 | care about on the other side of the                      |
|         | 16 | world."  (As read.)                                      |
| 12:39   | 17 | "Regarding what I thought about                          |
|         | 18 | Hamas -- and, of course, now I know" --                  |
| 12:39   | 19 | He says, now he knows, after he's -- after he sent       |
|         | 20 | that link, they found stuff on his phone.  Then he starts |
|         | 21 | researching:  Oh, Hamas.                                 |
| 12:39   | 22 | He didn't do the research before he sent that            |
|         | 23 | link, Your Honor.  It was done after the fact, after he  |
|         | 24 | pressed "send" and a link goes on out.  But he wasn't    |
|         | 25 | actively fund-raising for them.                          |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

36

12:39  1        Your Honor, just, in -- in addition, to the
       2  fund-raising issue, was the sharing of that link negligent?
       3  I think we would agree on that.  But there was no criminal
       4  intent behind that because he was unaware of the risks
       5  associated with sharing this link that -- and look where
       6  he's at now because of it.  Um, it was done in haste.  He
       7  was looking for a way to give charity and humanitarian
       8  support during Ramadan.  And it was two of the government
       9  operatives, Your Honor, that were prodding my client and
      10  wanting to know how they could donate.

12:40 11        And that leads us to the government prodding.  One
      12  of the operatives asked my client to teach him to shoot.
      13  There's a text message, and this is in Russian -- and this
      14  is just taking their interpretation of the Russian, which I
      15  don't know if it's accurate, but one of the operatives says,
      16  "I wanted you to teach me how to shoot."

12:40 17        On another one, the operative asks my client to
      18  teach him how to organize and assemble a weapon.  "Will you
      19  train me how to organize and assemble a weapon?"  This is at
      20  Bates stamp number ending '1021.  Again, it's the government
      21  operatives in this group that are trying to lead my client
      22  down some rabbit hole and -- excuse my language -- screw 'em
      23  over.  And here he is.

12:41 24        They were the ones prodding him, Your Honor.  This
      25  wasn't him doing this on his own and pressuring people to do

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

37

|        |    |                                                           |
|--------|----|-----------------------------------------------------------|
|        | 1  | this.  This is in response to them asking for this.       |
| 12:41  | 2  | One of the -- the same operative says, "And I want        |
|        | 3  | you to teach me to shoot."  And if -- my client says, "Of |
|        | 4  | course," 'cause he started this group.                    |
| 12:41  | 5  | THE OPERATIVE:  "I wanna learn.  AR-1 I liked             |
|        | 6  | more."                                                     |
| 12:41  | 7  | He wants to learn how to assemble guns.  In               |
|        | 8  | another one, he asks, "I wanna learn how to make an IED." |
| 12:42  | 9  | That's coming from the government operative,              |
|        | 10 | Your Honor.  The government operative's asking my client, |
|        | 11 | "Hey, teach me how to make an IED."                       |
| 12:42  | 12 | It's not my client saying, "Hey, today's lesson is        |
|        | 13 | going to be how to make an IED."  My client didn't -- didn't |
|        | 14 | bring that up.  This was always in response to government |
|        | 15 | prodding.                                                 |
| 12:42  | 16 | After the operative asks my client -- like he             |
|        | 17 | want -- or tells him that he wants to learn how to make an |
|        | 18 | IED, then he says, "and car bombs."                       |
| 12:42  | 19 | So my client says, "Well, these are only against          |
|        | 20 | aggressors."  Like, my client's making sure that this isn't |
|        | 21 | for any type of terrorist-related activity.  And he made it |
|        | 22 | clear in his chats that he was not supporting terrorism in |
|        | 23 | any way.                                                  |
| 12:43  | 24 | Going to some of the specific chats, Your Honor.          |
|        | 25 | The chat groups my client created were a result of a      |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

38

|       |    |                                                         |
|-------|----|---------------------------------------------------------|
|       | 1  | culmination of different things.  One, the Christ Church |
|       | 2  | massacre that he actually saw the video of, which was very |
|       | 3  | disturbing.  I personally have not watched it.  He's a huge |
|       | 4  | supporter of his constitutional rights:  Obviously, free |
|       | 5  | speech, bearing arms, and his freedom of religion. |
| 12:43 | 6  | His group was focused on learning defense -- |
|       | 7  | defensive tack-ics -- tactics, basic firearm safety, um, |
|       | 8  | religious small talk for a group, politics, inventing.  It |
|       | 9  | was -- whenever they talked about *jihad* in this group, it |
|       | 10 | was for offensive *jihad*, Your Honor. |
| 12:43 | 11 | And I don't know if the Court's familiar, |
|       | 12 | there's -- in the Islam region -- I had to look this up -- |
|       | 13 | what?  I'm sorry.  Defensive *jihad*, not offensive. |
| 12:44 | 14 | There's three types of *jihad*.  There's offensive, |
|       | 15 | defensive, and spiritual.  My client's group was focused on |
|       | 16 | the defensive perspective in terms of protecting family and |
|       | 17 | community.  That's why he taught, um, firearms safety. |
| 12:44 | 18 | There was a truth movement he was interested in. |
|       | 19 | He was never trying to get any of the members to take on any |
|       | 20 | type of terroristic ideals. |
| 12:44 | 21 | He wanted people to stay in America, protect their |
|       | 22 | families, live a normal life, but practice the |
|       | 23 | Second Amendment coupled with, you know, their religious |
|       | 24 | beliefs and practicing those as well.  He wanted a group to |
|       | 25 | be able to preserve their families in times like this: |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

39

1    Again, the pandemic and how crazy it's been over the past
2    year.
12:44    3         When the government, um, operative -- one of the
4    government operatives asked about my client's military unit,
5    he just said that they were on standby, and he would
6    probably, uh -- he was concerned with reinforcing auth --
7    the issue of authera -- authoritarianism -- sorry.  That's a
8    mouthful.  He gave directions on basics survival skills.
12:45    9         Um, the group chats.  He never intended to wade --
10    wage any *jihad* on the American government.  Again, it was
11    for defensive purposes only.
12:45   12         And I know, at least in terms of the general
13    public, you hear the term *"jihad,"* you just automatically
14    think terrorism, which that's not true.  Like I said,
15    there's three different types of *jihad* within the Islam
16    religion.
12:45   17         THE COURT:  The Christ Church massacre, was that
18    submitted to the Court?  'Cause I just tried to pull that up
19    on the Internet.  In other words, you referred to that.  I
20    didn't see that in any exhibit.  And I tried to read
21    hundreds of pages on this.
12:46   22         Was that submitted to the Court.
12:46   23         MR. TAKLA:  Not by the government, Your Honor.
12:46   24         THE COURT:  And here's why I'm asking:  I don't
25    recall -- 'cause I follow attacks across the world -- I

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

40

```
       1    don't recall explicit video of the Christ Church massacre.
       2    It was the response to the massacre.  And it was a response
       3    by the police.  But inside the, um, massacre itself, I don't
       4    recall seeing person's executed.
12:46  5            MS. KENNEY:  Your Honor, my client stated that
       6    there was a video posted right after it happened that he saw
       7    that was taken down.
12:46  8            THE COURT:  I -- I don't have that.
12:46  9            I have -- what we know so far:  Christ Church
      10    shooting from the Guardian, and "New footing emerges moments
      11    after the Christ Church" -- so you can see me up here on
      12    YouTube, because I didn't see any of that.  And I want to
      13    disclose that I just looked.  But I don't have some of those
      14    massacre films that, unfortunately, I'm used to dealing with
      15    in another unrelated effort.
12:47 16            MS. KENNEY:  Your Honor, I don't --
12:47 17            THE COURT:  -- unrelated to this Court action.
12:47 18            MS. KENNEY:  I don't think it's available.
12:47 19            THE COURT:  Well, I'll disclose to you:  You
      20    know -- you both know I go across the world in terms of some
      21    of these incidences in Afghanistan, Pakistan and Indonesia,
      22    Sri Lanka.  In fact, they bombed the church I was at in
      23    Sri Lanka short time after I was there -- not connected to
      24    me, Counsel -- but when you read "across" that massacre,
      25    that was the hotel -- not church -- that was the hotel I
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

41

|         |    |                                                            |
|---------|----|------------------------------------------------------------|
|         | 1  | would normally stay in, so I missed it by a week.          |
| 12:47   | 2  | MS. KENNEY:  That's scary.                                 |
| 12:47   | 3  | THE COURT:  That was the Easter attack on that             |
|         | 4  | same hotel.                                                |
| 12:47   | 5  | Um, but I -- unfortunately, have to follow that            |
|         | 6  | because of some things I do on behalf of our government.   |
| 12:48   | 7  | And I don't recall in the Christ Church massacre,          |
|         | 8  | as I did on the London attack, for instance, or on the tower |
|         | 9  | bridge attack -- I don't recall that specific footage.     |
|         | 10 | Everything I watched, in terms of some of the French, Paris |
|         | 11 | attacks, *et cetera* -- uh, and the Christ Church massacre, it |
|         | 12 | was a response to that.                                    |
| 12:48   | 13 | So that's why -- I'm not questioning the integrity         |
|         | 14 | of that.  I'm not questioning --                           |
| 12:48   | 15 | MS. KENNEY:  Right.                                         |
| 12:48   | 16 | THE COURT:  -- if something was taken down.  I             |
|         | 17 | just --                                                    |
| 12:48   | 18 | MS. KENNEY:  I believe it was taken down.                  |
| 12:48   | 19 | THE COURT:  I've just followed, unfortunately, and         |
|         | 20 | have to, because of some counterterrorism efforts across the |
|         | 21 | world.  And I didn't recall that.  So I'm not questioning   |
|         | 22 | credibility.  It could be taken down.  I'm not aware of it  |
|         | 23 | nor, in going through the record, did I see any, um --     |
|         | 24 | anything in the record that, uh -- of what he would've     |
|         | 25 | viewed.  Not that I know that that's germane.  I just want  |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

42

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | to disclose to you why I was up here typing on the Internet  |
|       | 2  | for a moment.                                                |
| 12:49 | 3  | MS. KENNEY:  And, Your Honor, going back to the              |
|       | 4  | actual chats, and not search warrant, my client stated in    |
|       | 5  | one of his chats that, um:                                   |
| 12:49 | 6  | "I'm just ready to defend my family,                         |
|       | 7  | my community, secure my future."                             |
| 12:50 | 8  | He also stated --                                            |
| 12:49 | 9  | THE COURT:  Just one moment.                                 |
| 12:49 | 10 | Off the record.                                              |
| 12:49 | 11 | *(Court and clerk confer.)*                                  |
| 12:49 | 12 | THE COURT:  All right.                                       |
| 12:49 | 13 | Now, please continue, Counsel.                               |
| 12:49 | 14 | MS. KENNEY:  He also stated, um, that he was                 |
|       | 15 | talking to one of, I believe, the operatives.  There was --  |
|       | 16 | saying that, uh -- my client was saying that, "Muslim men    |
|       | 17 | are to defend" --                                            |
| 12:49 | 18 | THE COURT:  Slower.  Slower.  We need a record.              |
|       | 19 | Start again.                                                 |
| 12:49 | 20 | MS. KENNEY:  Uh-huh.                                          |
| 12:49 | 21 | "Muslim men are to defend their homes                        |
|       | 22 | from encroachment like Native American's                     |
|       | 23 | initially did.  I told 'em a handgun                          |
|       | 24 | arguably isn't a priority.  Rifle and                        |
|       | 25 | chest rigs or armor --"                                      |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

43

12:50    1        *(Court reporter requests clarification for the*

          2        *record.)*

12:50    3          MS. KENNEY:  (Reading continued:)

12:50    4           "I like chest rigs because you can

          5           throw them on easily, and they're good

          6           for reduce [sic]."

12:50    7           "I told them the white nationalists

          8           and other pro-Trump ignorance are ready

          9           to harm -- to bring harm to you and your

        10           families."

12:50   11        So again, Your Honor, when you put it in context,

        12   it's in terms of like the civil -- civil unrest that people

        13   were expecting during the pandemic.

12:50   14        There's also a chat that was cut off in the next

        15   page in discovery -- didn't actually have what he said --

        16   but he did make a statement that he was vetting, you know,

        17   people in the group because he wasn't supporting any type of

        18   terrorism activity.

12:51   19        My client said, um:

12:51   20         "I would like to know if you view or

        21          believe ISIS to be a true *caliphate*."

12:51   22        And *"caliphate"* meaning in the historical sense --

        23   not in the sense of the terrorist group --

12:51   24         "I believe them to be terrorists.

        25         This is true.  And I do not support

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

44

|   |   |   |
|---|---|---|
|  | 1 | them." |
| 12:51 | 2 | So he's saying this in his group chats:  That he |
|  | 3 | does not support terrorism.  We cannot kill innocents. |
| 12:51 | 4 | And in regards to, um, a comment that is blocked |
|  | 5 | out in this chat -- I don't know why it's blocked out; it's |
|  | 6 | redacted -- my client said, |
| 12:51 | 7 | "If they wanna blow themselves up in |
|  | 8 | Syria, I don't even know why I'm |
|  | 9 | training them.  I'm not training |
|  | 10 | terrorists or suicide bombers.  I'm |
|  | 11 | training soldiers:  Soldiers who love |
|  | 12 | life and wanna win and nothing more." |
| 12:52 | 13 | And then, when asked if somebody was planning |
|  | 14 | anything in the U.S., by an operative, um, my client said. |
| 12:52 | 15 | "Planning an attack is not needed and |
|  | 16 | not thoughtful." |
| 12:52 | 17 | Again, my client's making it clear he does not |
|  | 18 | support terrorism. |
| 12:52 | 19 | There was even one part, Your Honor -- or one |
|  | 20 | point in the time frame where my client kicked people out |
|  | 21 | that he thought were radicals.  And he posted an explanation |
|  | 22 | to his new group explaining, um, why he had kicked them out. |
|  | 23 | And again, it -- it goes in line with:  He was not gonna |
|  | 24 | tolerate people who were just interested in terroristic |
|  | 25 | activities. |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

45

| | | |
|---|---|---|
| 12:52 | 1 | At one point my client says, in one of the chats, |
| | 2 | that he's not even sure about HTS, "to be honest, because |
| | 3 | they fight against ISIS. But I'm not sure if they fully |
| | 4 | follow the Quran." |
| 12:53 | 5 | So my client was always interested in following |
| | 6 | the actual Islam religion and the Quran -- not the extremism |
| | 7 | that some people engage in, but true Islam. |
| 12:53 | 8 | He stated in another text: |
| 12:53 | 9 | "My goal is to get married and have |
| | 10 | kids and own my business and make |
| | 11 | *halal*." |
| 12:53 | 12 | And I don't know if the Court knows what *halal* is, |
| | 13 | but it's -- |
| 12:53 | 14 | THE COURT: I do. |
| 12:53 | 15 | MS. KENNEY: -- it's making money from good |
| | 16 | intentions not poor intentions. |
| 12:53 | 17 | When he was questioned, he told one of the |
| | 18 | investigating officers -- |
| 12:53 | 19 | THE COURT: Just a moment. |
| 12:53 | 20 | He also lied. He initially denied -- so let's |
| | 21 | make this complete for both sides, 'cause I was about to |
| | 22 | discuss that with you -- he had to eventually be confronted |
| | 23 | before he stated what his actions were. |
| 12:54 | 24 | Go to the page, Counsel -- I'll read to you. |
| 12:54 | 25 | MS. KENNEY: Wait. I'm not following. |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

46

| 12:54 | 1 | THE COURT: So you're not caught shortsighted -- |
| | 2 | let me find that on page -- |
| 12:54 | 3 | MR. TAKLA: 32, Your Honor. |
| 12:54 | 4 | MS. KENNEY: 32 of the search warrant or actual |
| | 5 | transcript? |
| 12:54 | 6 | THE COURT: Search warrant. No. Strike that. |
| 12:56 | 7 | It would actually be on page 30 of the search |
| | 8 | warrant, not 32. And it would be in Paragraph 28. |
| 12:56 | 9 | After the reading of Miranda rights in |
| | 10 | subsection (a), it reads that: |
| 12:56 | 11 | "Fong claimed he stopped using |
| | 12 | Instagram or social media sometime in |
| | 13 | January or February of 2020. Fong used |
| | 14 | WhatsApp for work and the Signal |
| | 15 | application for communicating with |
| | 16 | friends he met online. Fong said he |
| | 17 | used the Signal application because it |
| | 18 | offered end-to-end encryption and |
| | 19 | privacy. Fong was initially hesitant to |
| | 20 | provide the names, even user names, of |
| | 21 | those he communicated with online, |
| | 22 | stating that he was having trouble |
| | 23 | recalling their names. |
| 12:57 | 24 | "Fong stated that he formed his online |
| | 25 | group on the Signal app, the |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

47

|       |    |                                                |
|-------|----|------------------------------------------------|
|       | 1  | Signal Group, that he was the leader of        |
|       | 2  | the group.  Fong stated two members of         |
|       | 3  | the Signal Group were Person 1 and             |
|       | 4  | Person 2."  (As read.)                         |
| 12:57 | 5  | "Fong stated Person 1 was a kid from           |
|       | 6  | Florida who was 15 or 16 of age.  Fong         |
|       | 7  | referred to groups like AK [sic] and           |
|       | 8  | ISIS as terrorists and stated he did not       |
|       | 9  | condone extremism.  Fong stated these          |
|       | 10 | groups have damaged Islam rather than          |
|       | 11 | unifying it.  And Fong denied supporting       |
|       | 12 | or believing in terrorist groups.              |
| 12:57 | 13 | "Fong explained than an 'FTO' was any          |
|       | 14 | group that the United States government        |
|       | 15 | or State Department designated as a            |
|       | 16 | terrorist organization."                       |
| 12:57 | 17 | In subsection (d) it states:                   |
| 12:57 | 18 | "Fong initially denied that anyone,            |
|       | 19 | including Person 1 and Person 2,               |
|       | 20 | mentioned any terrorist groups.  Fong          |
|       | 21 | initially denied providing Person 1 or         |
|       | 22 | Person 2 with training other than              |
|       | 23 | religious guidance and firearm safety.         |
| 12:58 | 24 | "Fong initially denied discussing              |
|       | 25 | weapons or bombs with any members of any       |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

48

```
            1          online group.  Fong initially denied
            2          supporting any FTO, including Hamas.
            3          Fong initially stated he did not know
            4          Hamas was a designated FTO" --
12:58       5          And that, of course, is a Foreign Terrorist
            6   Organization.  Has to be certified or designated.
12:58       7              "Fong initially denied soliciting
            8          anyone to donate to a terrorist
            9          organization.
12:58      10              "Fong initially denied ever meeting
           11          any -- in person any members from his
           12          online groups."
12:58      13          Subsection (e):
12:58      14              "After being confronted with messages
           15          found in his phone, Fong admitted
           16          Person 1 and Person 2 told him that --
           17          that they wanted to join HTS in Syria.
12:58      18              "Fong admitted to providing
           19          photographs from a munitions manual
           20          regarding explosives and improvised
           21          explosive devices."
12:59      22          -- which we all know are IEDs --
12:59      23              "-- to the Signal Group, which
           24          included Person Number 1 and Person
           25          Number 2, even after he knew they both
```

```
           1        wanted to join HTS.
12:59      2           "Fong stated that he did not have --
           3        he should not've sent the information,
           4        but his intentions were not to hurt
           5        people."
12:59      6        Going on:
12:59      7           "He admitted to Person and 1 and 2 he
           8        would likely use the information for war
           9        against the Russians and Syrian army in
          10        support of HTS.  He admitted, then, to
          11        knowing that Hamas was a designated FTO
          12        by the United States State Department.
12:59     13           "He also stated he believed the LGBTQ
          14        community was contributing to the death
          15        of family structure in the west.  And
          16        stated his online statement that the
          17        LGBTQ community should be eradicated was
          18        only an angry outburst."  (As read.)
01:00     19        And then it goes on.
01:00     20        So this was after a confrontation or at least a
          21    submission.
01:00     22        MS. KENNEY:  Again, Your Honor, just 'cause I have
          23    the actual transcript of my client's interview pulled up and
          24    bookmarked, do we have any references?  'Cause, again, this
          25    goes back to my problem with the search warrant and the
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

50

1   characterization of the conversation.  Do we have any

2   references to the actual transcript pages so I can at least

3   look at where they think that he said all of this or did all

4   of that?

01:00   5   THE COURT:  You know, I would appreciate that

6   coming from all both of you.  In other words, I've got

7   hundreds and hundreds of pages I've read now.

01:00   8   It appears to me that you gave a lot of

9   information to the magistrate judge.  You've tried to give a

10  lot to Court.  We've tried to read that.

01:00   11  So I leave that, each, as your responsibility.

01:00   12  MS. KENNEY:  Well, Your Honor, I would just

13  request that the Court can actually read my client's

14  interview that is part of Exhibit B.

01:00   15  THE COURT:  I think I've already read that,

16  Counsel.

01:00   17  MS. KENNEY:  His actual interview with the police?

01:01   18  THE COURT:  Wasn't that submitted to the Court?

01:01   19  MR. TAKLA:  Your Honor, uh, with respect to the

20  Exhibit B, that was declined by the magistrate judge.  She

21  said it wasn't helpful, and then, uh, didn't file it.

01:01   22  THE COURT:  I don't know what Exhibit B is,

23  apparently.  I haven't read that.

01:01   24  MS. KENNEY:  I thought it was filed.  At least

25  that's what I saw in the court record.

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

51

| | | |
|---|---|---|
| 01:01 | 1 | THE COURT:  Well, Exhibit B to something that I |
| | 2 | apparently don't have. |
| 01:01 | 3 | MS. KENNEY:  Anyways, Your Honor, should I |
| | 4 | continue? |
| 01:01 | 5 | THE COURT:  Please. |
| 01:01 | 6 | MS. KENNEY:  Okay. |
| 01:01 | 7 | THE COURT:  We need to take a break, though, and |
| | 8 | come back at some point.  We have another matter at 1:30. |
| | 9 | So if that meets with your permission.  I have no other |
| | 10 | options except to be courteous to you, and I'll have you |
| | 11 | back at 3:00 or 3:30. |
| 01:01 | 12 | MS. KENNEY:  Um, when he was asked -- well, this |
| | 13 | was actually, I believe, listed, from what the Court just |
| | 14 | read -- that he did say that, um, terrorist damage Islam |
| | 15 | more than unify it.  And that's one of the reasons why he |
| | 16 | doesn't condone it. |
| 01:02 | 17 | And he stated in his interview -- interview, "I |
| | 18 | don't condone extremism at all." |
| 01:02 | 19 | Um, and when he was asked about why he was sharing |
| | 20 | certain things in his group, my client explained that he |
| | 21 | liked to -- he liked to talk about the historical aspects |
| | 22 | of, um, things his group -- in his Muslim group -- the |
| | 23 | history of the *mujahideen* -- I don't wanna pronounce -- |
| | 24 | *mujahideen* -- uh, mainly just out of historical interest. |
| 01:02 | 25 | And he shared, uh, weapons information because |

```
         1    it's a hobby and it's a self-defense thing.  He stated:
01:03    2           "I just -- I was just kind of like --
         3            I mean, obviously for shooting, that's
         4            just -- that's kind of just a hobby-est
         5            sort of self-defense thing, you know,
         6            eventually, when you're like -- I
         7            basically gave viewpoint, like,
         8            eventually somebody would have to" --
01:03    9            THE COURT:  Slower.  Slower.  We're going to lose
        10    the transcript, if you read quickly.
01:03   11            MS. KENNEY:  (Reading continued:)
01:03   12           "Somebody -- have to defend your
        13            family, you know, or eventually some
        14            day.  I think it be good for Muslims to
        15            bear arms especially after Christ
        16            Church, you know, that shooting."  (As
        17            read.)
01:03   18            That was on page 57 of his interview.
01:03   19            THE COURT:  I'm not arguing about Christ Church.
        20    You all know what the deep web is and quite frankly the web
        21    has 90 percent below the surface.  We see about
        22    10 percent -- not in terms of volume -- but about 10 percent
        23    of the web is above, which the public commonly looks at, and
        24    Googled, or whatever.  About 90 percent of it's below.
01:04   25            So, Counsel, this could've come -- I don't know if
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

53

```
        1    your client's adept at the deep web or not, but this
        2    could've come -- so I'm not -- I'm not saying that.  But
        3    everything I've seen about the Christ Church is much
        4    different than the Paris attacks, much different than Pearl
        5    getting beheaded, et cetera.
01:04   6            MS. KENNEY:  Okay.  He --
01:04   7            THE COURT:  I watch that stuff.  I have to.
01:04   8            MS. KENNEY:  I don't.
01:04   9            THE COURT:  You don't wanna see the behead --
01:04   10           MS. KENNEY:  I don't want that in my head.  Thank
        11   you.
01:04   12           Um, he says:
01:04   13              "I mean, just like in the event I do
        14           buy a gun and actually go out and learn
        15           to use it and stuff like that, mainly
        16           for defense only." (As read.)
01:04   17           And then when he's asked later on in the interview
        18   about training -- you know, they were accusing him of
        19   wanting to, like, train terrorists, which he denied 'cause
        20   he's against all terrorism -- he says:
01:05   21              "I didn't feel obligated to help them,
        22           you know, them wanting to go over.  For
        23           the most part, all they mention was just
        24           hijera, and that's kind of why.  But I
        25           always wanted" --
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

54

```
01:05    1              THE COURT:  Slower.  Slower, Counsel.
01:05    2         (Court reporter requests clarification for the
         3    record.)
01:05    4              MS. KENNEY:  H-I-J-E-R-A.
01:05    5         (Reading continued:)
01:05    6            "The reason why I ever talked to them
         7            about, you know, guns or self-defense or
         8            anything of that sort was with the
         9            attention [sic] -- intention that they
        10            stay here to use those skills as -- you
        11            know, as an American, you know, just a
        12            regular civilian."
01:05   13         And then, at some point, when Investigator Moore
        14    from Irvine was talking to him, my client said,
01:06   15            "A lot of things in text can be taken
        16            out of context.  We were joking."
01:06   17         And then he mentions that, in reference to the
        18    caliphate -- again, it's the historical caliphate.  I'm not
        19    talking about ISIS.  They're not a caliphate.
01:06   20         And then, um, when one of -- and I believe this
        21    officer's present in the courtroom -- asked him about the
        22    statement, "You're here for the violence?"  Mr. Fong said,
01:06   23            "In the event of war, um, I would take
        24            part in it to try and restore order.
01:06   25            Again -- and that would be in terms of, you know,
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

55

|  |  |
|---|---|
|  | 1 |
| 01:06 | 2 |
|  | 3 |

```
        1    the civil unrest issue.
01:06   2            Later on, in his interview, he's talking about,
        3    again, wanting to support the Palestinian people.  And when
        4    one of the officers that's in court asked him, you know,
        5    we're concerned that there's a plan out there, my client
        6    said, "I did not have a plan."  And he didn't -- wasn't
        7    trying to motivate them to do anything in -- with a plan.
        8    And there's -- as the Court knows, there's no evidence of
        9    that in this -- in this case.
01:07  10            My client also said that, "I think terrorism is
       11    not the answer."
01:07  12            I also wanna make a comment, Your Honor, in
       13    regards to the "dying as a martyr" comment.  That was
       14    completely taken out of context.  There's -- the text
       15    messages of where that's discussed, my client's talking with
       16    a government operative, and he talks about some girl that
       17    was trying to message him, and saying that he'd stopped
       18    talking to her because she thought they were incompatible.
       19    And she just messaged him again because her previous
       20    endeavors must not've worked out 'cause they stopped
       21    communicating.
01:08  22            And then my client said:
01:08  23               "I'm currently in the process of
       24               trying to scare her back off, to let her
       25               know if it didn't work then, it sure is
```

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | not going to work now.  I told her that                    |
|       | 2  | dying as a martyr sounds way better than                   |
|       | 3  | marrying in the West, in general, and                      |
|       | 4  | that my afterlife is worth way more than                   |
|       | 5  | any earthly marriage."                                     |
| 01:08 | 6  | So, Your Honor, he's saying this in the context            |
|       | 7  | of -- this girl reaches back out to him, after she's already |
|       | 8  | stopped communicating, and he's trying to scare her off, and |
|       | 9  | that that's what he told the girl.  So I hope the Court can  |
|       | 10 | see that that was completely taken out of context in regards |
|       | 11 | to what's in the actual text messages, not a search warrant. |
| 01:08 | 12 | I may be done, Your Honor.  I just need to...               |
| 01:08 | 13 | THE COURT:  Take your time.  There's no problem.            |
| 01:08 | 14 | But, please, for both of you, be available at               |
|       | 15 | 3:30, if we don't conclude.                                 |
| 01:09 | 16 | MS. KENNEY:  In regards to the statement that the           |
|       | 17 | government's trying to use -- that my client was here only   |
|       | 18 | to, uh, die, only for the violence -- that was made in the   |
|       | 19 | context of paranoia and government outreach, obviously       |
|       | 20 | during the pandemic, and protecting the Islam community, as  |
|       | 21 | a "prepper" -- um, civil unrest, sort of doomsday-type       |
|       | 22 | things.                                                      |
| 01:09 | 23 | Again, my client wasn't -- was never interested in          |
|       | 24 | being a terrorist, training terrorists, anything of that     |
|       | 25 | nature.  And I think the actual evidence, not the search     |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | warrant, supports that.                                  |
| 01:09 | 2  | My client was frustrated at one point with his           |
|       | 3  | work, not being able to pray.  And at one point he was just |
|       | 4  | venting because he was over -- you know, he was overwhelmed |
|       | 5  | with frustration.  So when the government's trying to say, |
|       | 6  | like, "Oh, he wanted to kill his employers," he was saying |
|       | 7  | that in the context of being so frustrated because they had |
|       | 8  | him working such long days -- I believe, it was           |
|       | 9  | ten-hour days -- and he wasn't able to pray like he is     |
|       | 10 | supposed to be doing, um, I believe, three times during -- |
|       | 11 | or five times during the day.                            |
| 01:10 | 12 | Yeah, he just corrected me, Your Honor.  Thank           |
|       | 13 | you.                                                     |
| 01:10 | 14 | It was -- it was frustrating to him.  In this            |
|       | 15 | conversation of when he said this, he was driving home from |
|       | 16 | work completely frustrated.                              |
| 01:10 | 17 | Everybody in this room can probably admit to             |
|       | 18 | saying something in gest or out of frustration that they  |
|       | 19 | didn't necessarily intend to act upon.  You're just saying |
|       | 20 | things in frustration.                                   |
| 01:11 | 21 | In regards to the "hurting the police officers,"         |
|       | 22 | Your Honor, that was -- that was said in the context of,  |
|       | 23 | like, a defensive context in case marshal law was imposed. |
|       | 24 | There were people within the last year who sincerely thought |
|       | 25 | marshal law was going to be declared because of what was  |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

58

| | |
|---|---|
| | 1 going on with the Presidential election, the, um, pandemic, |
| | 2 this -- this isn't -- this wasn't uncommon. |
| 01:11 | 3 He never wanted -- and said -- he never was gonna |
| | 4 hunt down a cop and hurt the cop for the sake of hurting a |
| | 5 cop. That's not in the evidence, Your Honor. |
| 01:11 | 6 And then some term in regards to blowing up an Air |
| | 7 Force Base. That was a statement that somebody else in the |
| | 8 group -- who I believe was a government operative -- making |
| | 9 that statement. My client didn't take it seriously, and |
| | 10 then ended -- ended up making a joke about it, saying, "No |
| | 11 need to blow them up. Just yank the nerds off their |
| | 12 computers and they'll die of anxiety." |
| 01:12 | 13 It was clearly not taken seriously by my client. |
| | 14 And it's just hard because you can't see the tone or the |
| | 15 intent in any text message. And I'm sure the Court would |
| | 16 agree -- or everybody would agree with that. And, in this |
| | 17 case, things are being taken out of context, Your Honor. |
| 01:12 | 18 I believe that the conditions that Judge Scott set |
| | 19 are completely restrictive. They're probably the most |
| | 20 restrictive I've ever personally seen on a case. And |
| | 21 especially in light of -- there was another individual who's |
| | 22 charged with the riots at the capital. We all saw the |
| | 23 footage of that. And he came through this Court. His name |
| | 24 was Christian Secor. And he was in front of Judge Early for |
| | 25 a detention hearing. |

01:13   1              Judge Early detained him.  He got sent to

        2    Washington, DC.  And the defense attorney there successfully

        3    got him out on bond, on a $200,000 appearance bond, but he's

        4    on 24-hour lockdown at his home.

01:13   5              Your Honor, this is a person that was actually

        6    seen in the Capitol building.  He's charged with civil

        7    disorder, all of those difference charges that the people

        8    that are involved in this case in DC are being charged with.

        9    And this person resides in Costa Mesa.

01:13  10              Um, the restrictions that Judge Scott put on my

       11    client were an ankle monitor.  He -- you know, house arrest.

       12    He can't leave his house, except for certain reasons --

       13    obviously, to come to my office because there's a protective

       14    order.  And I have yet to be able to show him any discovery.

       15    And now the discovery in this case is climbing to 7,000

       16    pages, with numerous recordings and translations that are

       17    gonna need to be reviewed.

01:14  18              Your Honor, I don't think the government is -- has

       19    established that, if my client gets out, he's just gonna go

       20    off and start killing people.  I don't think it's there for

       21    the reasons and the specifics and the evidence I actually

       22    pointed out -- not referencing the search warrant.  The

       23    conditions would guarantee that he comes to court, behaves

       24    while he's out on bond, in his parents home -- that they are

       25    willing to put up for -- a $3,000 secured bond.

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

60

01:14  1            THE CLERK:  Not 3,000.

01:14  2            MS. KENNEY:  300,000.

01:14  3            -- 300,000 secured bond, and be on ankle

4      monitoring, not have access to the Internet.

01:15  5            It's the most restrictive, Your Honor.  He needs

6      to be able to help me prepare his defense.  And with the

7      current state of things, with the Santa Ana Jail and not

8      being actually able to go through things -- I can't sit at a

9      table with him -- um, I just don't think that he's a danger

10     to the community, especially in light of him being in

11     custody since May of last year.

01:15  12           He's completely distanced himself from the Islam

13     religion, and his family's been completely supportive,

14     Your Honor.

01:15  15           And in terms of the, you know, Bail Reform Act, I

16     think that's what -- what is just and fair in this case.

01:15  17           THE COURT:  I want to thank both of you.  It's

18     been quite a journey.  And I especially want to thank each

19     of you for your courtesy concerning some of the questions

20     that the Court asked on the last occasion.

01:16  21           Some of the delay's been caused -- so, the

22     transcripts were obtained at Ms. Kenney's request -- some of

23     the delays have been caused because the Court asked

24     questions concerning his military background.

25

01:16   1                       **COURT'S FINDINGS**

01:16   2                THE COURT:  Let me begin with this for this record

        3   by stating that HTS is *Tahrir al-Sham*.  "Hamas," of course,

        4   you may be much more familiar with.  But like the *al-Nusra*

        5   front and others that operate in Syria and along the Iraqi

        6   border.  The designations can sometimes morph from "ISIS" to

        7   "ISIL."  And the designations, on many occasions by the

        8   United States is kept track of, of different groups involved

        9   in the Syria-Iraq area.

01:16  10                The beginning of this Court's journey is what

       11   appears to be the willingness to travel to Syria, without

       12   this Court seeing the implementation of that.  There is

       13   discussion about going in the future, two or three years in

       14   the future; and, therefore, Counsel on behalf of the

       15   government, I'd previously ruled against you in terms of the

       16   defendant being a flight danger.

01:17  17                The activity in terms of flight, although he

       18   possessed a passport, didn't lead to a situation where he

       19   purchased a ticket, was taking a war bride, had those

       20   connections with specificity overseas, such that he would

       21   fly into Istanbul, work himself south to Izmir, cross the

       22   60-mile border that was so open for so many years along the

       23   Iraq-Turkish border that the UN couldn't control.  I didn't

       24   see any of that kind of that past indicia.

01:18  25                I have quite a different finding, though, because

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

62

| | | |
|---|---|---|
| | 1 | I believe that, not only do you represent a danger, |
| | 2 | Mr. Fong, but an extraordinary danger.  I'm going to set my |
| | 3 | record very carefully in this matter. |
| 01:18 | 4 | First of all, you should be extremely proud of |
| | 5 | your service in the United States Marine Corps.  But, as |
| | 6 | such, you represent that unique American who may've entered |
| | 7 | under patriotic desire on behalf of our country.  But any |
| | 8 | Marine is extraordinarily well-trained in combat.  If you |
| | 9 | recall your heritage, it's that you're an infantry person |
| | 10 | first, no matter what MOS is designated for you. |
| 01:19 | 11 | You can be a cook and, unlike any other branch of |
| | 12 | the service, you're still called upon to defend that |
| | 13 | perimeter as a rifleman, so there's no specialization.  And |
| | 14 | therefore, you're an excellent marksman.  You're trained in |
| | 15 | bomb techniques.  You're trained in putting together an IED |
| | 16 | or a bomb.  You represent that unique ability, quite |
| | 17 | frankly, to turn that corner, and rightfully so, on behalf |
| | 18 | of the country when it's called upon, from that of an |
| | 19 | ordinary system [sic], into a person of extreme violence. |
| | 20 | You're to be commended for your service.  By the same token, |
| | 21 | you represent an extraordinary combination of combat skills |
| | 22 | that the average American exercising their First Amendment |
| | 23 | rights don't have. |
| 01:20 | 24 | The second thing is this redundancy and whether |
| | 25 | there is an anomaly or not.  I don't believe it is. |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

63

01:20  1          On February 6th, you enter into an Instagram

       2  social media group, chat room, *Baqiyah*, a number of members.

       3  I'm not too concerned about your language skills and commend

       4  you on being able to speak Russian.  But pursuant to this,

       5  there've been a number of meetings that have taken place.

01:20  6          I'm extraordinarily concerned when I hear what I

       7  call martyrdom*, jihad*.  I'm extraordinarily concerned when I

       8  have statements that you're willing to die as a martyr in

       9  Syria, regardless of what the group, whether it's al-Nusra,

      10  ISIL, ISIS, HTS.  And while these statements are being made,

      11  and although you say you're against killing innocent

      12  individuals, you well-understood both "AK," [sic] which is

      13  al-Qaeda, and ISIS are terrorist organizations dedicated to

      14  killing.

01:21 15          On February 17th, 2020, during the ^Signal

      16  application and messaging, you agreed with UCI Number 1 that

      17  there was much *haram* and *fitna* in America and Arab

      18  countries.

01:21 19          Disloyal statements can be made, and you can

      20  represent your First Amendment rights.  But on April 15th,

      21  during the conversation, you stated, quote:

01:21 22              "Dying as a martyr sounds way better

      23              than marrying in the West in general and

      24              that My afterlife is worth way more than

      25              any earthly marriage."

01:22   1                -- the beginning of a journey that this Court

        2    believes makes you extraordinarily dangerous.  And,

01:22   3                    "I pray to Allah every night that I

        4                become a *shaheed* instead of die

        5                peacefully."

01:22   6                And we both know what "*shaheed*" is.  And we both

        7    understand it very well, don't we?

01:22   8                You go on, on March 6th of 2020, to state and

        9    understand that al-Awlaki was a terrorist.  And we both know

       10    who al-Awlaki is, and we know he operates at the highest

       11    echelons, along with al-Baghdadi and the rest, at the very

       12    top of this pyramid structure.  And we understand his

       13    teachings.  And it's violent extremism, and death.  And

       14    there's no other explanation for it.

01:22  15                You go on to state that you must make *jihad*.  And

       16    we know that that's war.  You go on to state, on March 3rd,

       17    that with *mujahideen Amerikeoon*, the group chat, that you're

       18    going to send financial donations to Malhama Tactical.  And

       19    we both understand, but for my record, instead of belaboring

       20    this, page 15, Footnote 13, holy warriors.

01:23  21                MS. KENNEY:  Your Honor, is the transcript --

01:23  22                THE COURT:  Thank you, Counsel.  I did not

       23    interrupt you.  You will not interrupt me during my

       24    presentation.  Then you can come back and ask questions.  I

       25    want that same politeness.

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

65

01:23    1              Thank you.  I will make my record now, Counsel.

2    And,

01:23    3                "I'd be down to put it all on the line

4               to go help them train, but we shall

5               see."

01:24    6               Now, you talk about joining the Soldiers of the

7    Caucasus.  And depending upon which part, the Soldiers of

8    the Caucasus we know are primarily Muslim, Tajik.

01:24    9             THE DEFENDANT:  Yes, Your Honor.

01:24    10          THE COURT:  You don't have to answer my question.

11    I'm just telling you now.  And they operate up in The

12    Northern Alliance, along the border.  So this isn't some

13    Christian group.  This is connected again to *jaheed* [sic].

01:24    14          And on March 8, 2020, you sent the *mujahideen*

15    *Amerikeoon*, via the Signal application, the image and book

16    *of mujahideen* fighters, describing it as a compendium and

17    examples of attacks that take place and each commander's

18    reasoning and philosophy.

01:24    19          Now, that might seem a very innocent signal to

20    most people who aren't versed in this area.  But those

21    tactics are *jihad*.  That is how to wage war on both the

22    Russians and Americans, who are the outside enemy to

23    al-Qaeda and ISIS, not the inner force, the outside force

24    that al-Awlaki and al-Bagdadi swung from the initial

25    al-Qaeda, to looking to outside, the foreign enemy, the

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

66

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | United States -- and the Russians before that.                       |
| 01:25  | 2  | And on March 24th, during the chat, you stated:                      |
| 01:25  | 3  | "To be honest, if I were to join any                                 |
|        | 4  | group in Syria, my choice would be the                               |
|        | 5  | Soldiers of the Caucuses.  They are pure                             |
|        | 6  | and lawfully fighting for Islam."                                     |
| 01:25  | 7  | And you are further stated:                                          |
| 01:25  | 8  | "Only HTS, Malhama, and the Soldiers                                 |
|        | 9  | of the Caucasus are on the right path                                |
|        | 10 | because they fight against *kafir*."                                  |
| 01:26  | 11 | I don't want you to speak to me.  But you and I                      |
|        | 12 | know what *"kafir"* is.                                              |
| 01:26  | 13 | And you planned to leave the military, which                         |
|        | 14 | you're entitled to do -- because the U.S. Army are                   |
|        | 15 | terrorists, and so are the Marines.                                  |
| 01:26  | 16 | On April 17th, you go on to send a voice                             |
|        | 17 | message -- once again, through the Signal application --             |
|        | 18 | stating you tried to find the Kavas [sic] group, but were            |
|        | 19 | unable to look because you believed it had been designated           |
|        | 20 | by the United States as a terrorist group.                           |
| 01:26  | 21 | So now I know that you're searching.  You aren't                     |
|        | 22 | confined to just ATS [sic].  You're looking across the               |
|        | 23 | spectrum of terrorist groups for affiliation.                        |
| 01:26  | 24 | You have every right, if you believe, on page 18,                    |
|        | 25 | as an American, to distrust the U.S. government.  But you go          |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | on, on April 19th, to state:                              |
| 01:26 | 2  | "The *mujahideen* in America if I get to                  |
|       | 3  | *Dar ul-Harb* first, we will be your guys.                |
|       | 4  | We'll probably try getting in with                        |
|       | 5  | *Khorasan* and working more with *Ajnad*,                 |
|       | 6  | though they're both small and really                      |
|       | 7  | determined groups."                                       |
| 01:27 | 8  | Take a look at those groups.  They're                     |
|       | 9  | extraordinarily violent.  Offshoots sometimes of ISIS and |
|       | 10 | al-Qaeda are the most violent.                            |
| 01:27 | 11 | So, once again, searching.                                |
| 01:27 | 12 | On April 21st, you go on to say that you thought          |
|       | 13 | the LK [sic] "conducted the 9/11 attacks against the      |
|       | 14 | United States were loyal to" AK [sic].  And you state that, |
|       | 15 | "It's a stupid idea to die for HTS."                      |
| 01:27 | 16 | It doesn't appear that you're down for martyrdom;         |
|       | 17 | but your certainly down for training, which I'll get to in |
|       | 18 | just a moment.                                            |
| 01:28 | 19 | You go on to say that when you were a *kafir*, you        |
|       | 20 | wanted to travel to kill ISIS and other extremist groups. |
|       | 21 | And then you go on to state you're not opposed to killing |
|       | 22 | them, "They are the dogs of the west," and stated that    |
|       | 23 | "ISIS," Syr- -- "Iranians, Syrians, Russians are all there |
|       | 24 | for control," in reference to Syria.                      |
| 01:28 | 25 | But on April 25th, during this meeting that, uh,          |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

68

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Malhama Tactical was recruiting for you to be an instructor.        |
|       | 2  | You state that you wanted to make and test a thermite bomb          |
|       | 3  | in the desert.                                                      |
| 01:28 | 4  | Now, I'm moving from speech, which could be                         |
|       | 5  | construed or misconstrued as a First Amendment right, to            |
|       | 6  | action.                                                             |
| 01:28 | 7  | And on May 3rd there's a conversation.  But                         |
|       | 8  | May 5th caught the Court's eye, on page 20,                         |
|       | 9  | subparagraph (q).  You tell a UCI that Muslim brothers told         |
|       | 10 | you that it was a bad idea to travel to Syria.                      |
| 01:29 | 11 | Now, for a while, I thought that I would possibly                   |
|       | 12 | find that you were, in fact, a travel risk.  But one of the         |
|       | 13 | things I went back through in the record, with these                |
|       | 14 | hundreds and hundreds of pages -- I was looking for                 |
|       | 15 | something to validate that.  I didn't find that.  If I              |
|       | 16 | would've found that, I would've made a different ruling on          |
|       | 17 | flight.                                                             |
| 01:29 | 18 | But you go on to say that you and the                               |
|       | 19 | UCI-E-1 [sic] needed to move to a state where they can              |
|       | 20 | practice with weapons every weekend, and that you were bored        |
|       | 21 | and wanted to kill people, like Person Number 1.                    |
| 01:29 | 22 | You go on to state that "HTS fighter" had asked                     |
|       | 23 | you to teach them to make bombs because the Turks already           |
|       | 24 | killed their bomb-maker.                                            |
| 01:30 | 25 | Now, why is that relevant to the Court?                             |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

69

01:30   1            First of all, now I've moved from speech, to your

2   capability from your combat training in the Marine Corps --

3   whether you saw combat or not -- to now discuss bomb-making

4   on more than one occasion and your desire to use those, not

5   only as an instructor but to make them.

01:30   6            In and of itself, that would lead to the Court's

7   decision and finding that you're extraordinarily dangerous.

01:30   8            Your May 18th Signal application then goes on by

9   posting to Hamas, the *al-Qassam* brigade -- let me repeat

10   that: The *al-Qassam* brigade -- which is a military wing of

11   Hamas; this isn't even the fund-raising group -- that you're

12   going to, uh, "find out more about crypto currency because

13   it's the safest way to send money to help our brothers

14   overseas."

01:31   15            And whether it's this country or another country,

16   it's hard to find the peacefulness in your actions, when you

17   state:

01:31   18              "It's very difficult to fight there

19             because Israeli scum are in power and

20             Israeli's weaponry are -- structured are

21             very difficult." (As read.)

01:31   22            So, from this Court's perspective, I don't just

23   have a domestic view, whether you're killing Russians or

24   innocent Syrians or soldiers of any country, you represent

25   an extraordinary threat.

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

70

01:31    1          On March 17th you then start sending information

2   about chemical weapons and improvised explosives to

3   *mujahideen Amerikeoon*.

01:31    4          And this goes on in statements, that:

01:32    5            "Various chemicals, when combined,

6             could cause breathing issues and

7             chest" --

01:32    8          And you know, in the Marine Corps, you've gone

9   through that training.  They actually put you in a trailer

10   and expose you to chemical weapons.

01:32   11         By the way, you also know how to use them, if

12   you've got basic Marine Corps training.

01:32   13         And you go on to state that -- the materials

14   stated that:

01:32   15           "Various chemicals, when combined,

16            could cause breathing issues and chest

17            pain."

01:32   18         You certainly know that from the Marine Corps.

01:32   19         And, "contained recipes for making improvised

20   explosive devises."

01:32   21         Quote:

01:32   22           "Please don't send yourself to Allah

23            so soon from a dumb mistake,"

01:32   24         -- meaning:  Don't blow yourself up.  From my

25   impression:  Go kill others.

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

71

01:32  1          Goes on.  You "posted military tactical

2  instructions for entering a building to minimize losses

3  and," quote:

01:33  4              "Take it.  Save it.  Study it."

01:33  5          And you subsequently, in that group chat with

6  members of *mujahideen*, you state, quote:

01:33  7              "The ideal combat environment would be

8              forest and mountain, however, but we

9              don't always get to pick our battles."

01:33  10         There's a tactical environment.  To the average

11  civilian, means nothing.  To anybody with a military

12  background -- understand it very well.

01:33  13         On April 1st, 2020, you posted to *mujahideen* in

14  America, once again, regarding the making of chemical

15  weapons and improvised explosive devises, and this included

16  instructions on "how to make mortar scrap mines, nail

17  grenades" --

01:33  18         Unfortunately, the Court understands that very,

19  very well.

01:34  20         "-- sodium chlorate and sugar or aluminum

21  explosives" --

01:34  22         Now, this isn't some farfetched recipe.  This is

23  right down the line with military training.  This isn't

24  fiction.  This isn't a delusional person.

01:34  25             "Fertilizer explosives, nitric acid,

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

72

|  |  |  |
|---|---|---|
| | 1 | improvised black power, potassium |
| | 2 | nitrate, plastics explosive filler, |
| | 3 | chemical fire bottles, sodium chlorate, |
| | 4 | recoilless launcher, grenade launcher, |
| | 5 | pipe hand grenades." |
| 01:34 | 6 | Somebody in the military -- or not in the |
| | 7 | military, might think this is fiction. But for anybody in |
| | 8 | the military, you've got the rare combination of knowledge |
| | 9 | and capability. |
| 01:34 | 10 | "It stays in this chat with ours like |
| | 11 | a library so that if you ever need it |
| | 12 | [sic], you know where to look." (As |
| | 13 | read.) |
| 01:35 | 14 | And then you go on with more training on page 25. |
| | 15 | And this is the ambush of the Russians that proceeded the |
| | 16 | United States. Lots of film out there -- that the U.S. |
| | 17 | uses, by the way -- both countries went through a |
| | 18 | significant and interesting journey. |
| 01:35 | 19 | And this is "offered" by a former Afghan officer. |
| | 20 | And that's the *mujahideen* tactics at the time in attacking |
| | 21 | and killing Soviet soldiers before these same tactics were |
| | 22 | used on Americans. |
| 01:35 | 23 | You not only knew that, you express this interest |
| | 24 | in engaging in violence. So it's not just your capability. |
| | 25 | You send a private message that you had built a firearm and |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

73

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
|          | 1  | advised to be careful purchasing certain firearms in             |
|          | 2  | California.                                                       |
| 01:35    | 3  | So internally, when I'm pouring through the                      |
|          | 4  | weekend of documents, and took the time today to reread a        |
|          | 5  | number of other documents on the bench, I found out that         |
|          | 6  | that's not only true, that what we have, in a sense, is a        |
|          | 7  | non-serialized weapon in your possession.  So internally,        |
|          | 8  | what you're saying isn't fiction or delusional, it's             |
|          | 9  | matching what the police later find at your residence.           |
| 01:36    | 10 | And you stated:                                                  |
| 01:36    | 11 | "We needed [sic] a civil war.  I think                           |
|          | 12 | most Americans are scumbags or cunts,                            |
|          | 13 | and this is exclusively [sic] to only                            |
|          | 14 | men."  (As read.)                                                |
| 01:36    | 15 | And on February 13th:                                            |
| 01:36    | 16 | "I have money saved up for equipment I                           |
|          | 17 | need because I planned on dying here                             |
|          | 18 | violently, initially.  Still not opposed                         |
|          | 19 | to it."                                                          |
| 01:36    | 20 | You either changed yourself in not willing to die                |
|          | 21 | and just be a trainer or now you're down for the cause.          |
|          | 22 | Now, you're seeking martyrdom.                                   |
| 01:37    | 23 | In the interview, you initially lied to the FBI.                 |
|          | 24 | You had to be confronted.  But I stopped the last proceeding     |
|          | 25 | to inquire about the capability that you possessed.  I was       |

```
  1    curious because I didn't have a clear picture from the
  2    warrant.  I had a picture and I had a description, but I
  3    wanted to verify that not only did you have that AR-15, but
  4    you had it, what I call, "banana clipped."  And in the
  5    Marine Corps we know what that is:  Two magazines taped
  6    back-to-back so, in combat, you can shove the first
  7    "20 round" in, flip that magazine, flip it upside down, and
  8    we're ready to go with 20 more rounds.
01:37 9         Civilian world, they don't have an idea what I'm
 10    saying, but in the Marine Corps, understand it very well.
01:38 11        And you stored this right next to your bed with
 12    those -- and I said "20" -- I mean, 30-round magazines.  And
 13    then you say and tell Fong [sic] that you "would not
 14    hesitate to shoot a police officer or anyone that was coming
 15    to get you."  And the capability is right beside your bed.
01:38 16        And you'd "kill a police officer on the spot" if
 17    you see "the police officer just doing their job."
01:38 18        I understand that the government wants me to make
 19    a double finding that you're a flight risk, but I also took
 20    into account that any statements about leaving the country
 21    were two and three years in advance; and that was, that you
 22    might go to the Middle East -- it was equivocal -- in two to
 23    three years.  You've got family ties here.  I believe that
 24    all of your activities are either military bases here or
 25    actions here within this country.
```

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

75

```
01:39    1          I find you an extraordinary risk beyond clear and
         2   convincing, in fact, beyond a reasonable doubt, and that
         3   there are no combinations at this time or conditions that
         4   would reasonably address the danger you present.
01:39    5          That's a final determination.
01:39    6          Now, Counsel, let me talk to you about a trial
         7   date.
01:39    8          A bail hearing is just that.  That holds a person
         9   for a period of time, which means that your counsel is
        10   concerned about access.  I have no problem with that.  That
        11   access will provide -- be provided right next door for your
        12   Counsel, Ms. Kenney.  So if she wants access, she can have
        13   it.
01:40   14          I'm tired of this COVID, "We can't get to our" --
        15   she has a constitutional right to consult with you, and the
        16   Court will make certain that that occurs for both of you.
        17   Did that with the Aryan Brotherhood, and we had lengthy
        18   meetings next door.  And that would be a private
        19   conversation at any time.
01:40   20          So, Ms. Kenney, that's open to you.
01:40   21          My question to both of you is, Are we going to
        22   trial on the 25th?  If so, I'm calling for a jury.  If we're
        23   not, then tell me now, and I will not call for a jury.  But
        24   you two -- and this is an order -- get up and go talk to
        25   each other quietly about what your needs are in light of my
```

|       |    | |
|-------|----|-|
|       | 1  | ruling.  Because the Court's ready on the 25th.  That's an |
|       | 2  | order.  Stand up and go have a conversation.  That's an |
|       | 3  | order. |
| 01:40 | 4  | Otherwise, I'm calling for a jury.  But if I do, |
|       | 5  | we're going to trial on the 25th. |
| 01:40 | 6  | *(Government and defense counsel confer.)* |
| 01:41 | 7  | THE COURT:  And defendant is ordered detained |
|       | 8  | pending trial.  No bail. |
| 01:41 | 9  | Once we set this date, Counsel, it's the "dead or |
|       | 10 | dying" rule.  That's the date we go on, so be careful. |
| 01:41 | 11 | MR. TAKLA:  Your Honor -- |
| 01:41 | 12 | THE COURT:  No.  Listen to me carefully:  I don't |
|       | 13 | care what date you both set to accommodate you.  I don't |
|       | 14 | care if it's the 25th of May or at a later time.  But once I |
|       | 15 | set that date, be very careful with that date because I |
|       | 16 | won't be moving it.  You won't be able to make a good-enough |
|       | 17 | record 'cause I'm going to provide all the access Counsel |
|       | 18 | needs. |
| 01:42 | 19 | Have that conversation. |
| 01:42 | 20 | MS. KENNEY:  That's what I'm confused -- |
| 01:42 | 21 | THE COURT:  Counsel, have that conversation now |
|       | 22 | and come up with a date, or I will hold it on the 25th. |
| 01:42 | 23 | *(Government and defense counsel further confer.)* |
| 01:44 | 24 | MR. TAKLA:  Your Honor, I think we've decided on |
|       | 25 | September 21. |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

77

```
01:44    1              THE COURT:  September 21st.  Ms. Kenney, does that

         2    meet with your consent?

01:44    3              MS. KENNEY:  It does.  But I just wanna put on the

         4    record regarding the access to counsel --

01:44    5              THE COURT:  Just a moment.

01:44    6              MS. KENNEY:  Can I at least --

01:44    7              THE COURT:  Watch out.  You're in my court.  Now,

         8    I'm going to interrupt you 'cause you interrupted me one

         9    time.  So I'm just kidding ya.

01:44   10              I will provide you unlimited access.  I will

        11    provide you that access next door so you don't have any

        12    problem with the jail, if you don't have access.

01:44   13              MS. KENNEY:  When you say "next door," I don't

        14    know what you're --

01:44   15              THE COURT:  The courtroom right next door so you

        16    have privacy.

01:44   17              MS. KENNEY:  Okay.  So --

01:44   18              THE COURT:  I'll bring you to court.

01:44   19              MS. KENNEY:  So the courtroom next door where I

        20    can like set up my computer and sit with my client?

01:44   21              THE COURT:  Absolutely.

01:44   22              MS. KENNEY:  And that -- that would be just like

        23    during the Court hours?

01:44   24              THE COURT:  Yes.

01:45   25              MS. KENNEY:  All right.  And how would I schedule
```

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | that?                                                    |
| 01:45  | 2  | THE COURT:  Just call Kelly and tell us that you         |
|        | 3  | need your client brought over.                           |
| 01:45  | 4  | MS. KENNEY:  And my --                                   |
| 01:45  | 5  | THE COURT:  And you -- remember when you said you        |
|        | 6  | were a young lawyer, way back when -- you know, just a   |
|        | 7  | few days ago.  I'm just kidding you.  We spent seven     |
|        | 8  | consecutive weekends on the Aryan Brotherhood case, catching |
|        | 9  | up with 50,000 documents that the FBI just discovered.   |
| 01:45  | 10 | MS. KENNEY:  So is there access on the weekends,         |
|        | 11 | if it's needed?                                          |
| 01:45  | 12 | THE COURT:  If I need to.  If I can open up the          |
|        | 13 | court.                                                   |
| 01:45  | 14 | Now -- now I'm hesitant right now on the weekends        |
|        | 15 | 'cause I don't want that additional time.  We should be able |
|        | 16 | to do this during court hours.                           |
| 01:45  | 17 | MS. KENNEY:  And would that include my paralegal         |
|        | 18 | being able to meet with my client too to review things?  |
| 01:45  | 19 | THE COURT:  I'm not certain about that.  Let me          |
|        | 20 | discuss that with you because I would want to talk with the |
|        | 21 | marshal's first about that.  But I think so.  I think you |
|        | 22 | need that kind of effort and aid.  But this isn't for your |
|        | 23 | convenience.                                             |
| 01:45  | 24 | *(Court and court clerk confer.)*                        |
| 01:45  | 25 | THE COURT:  Oh, I'm not here September 21st.             |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

79

01:46   1              I'm overseas September 21.  Pick another day.

01:46   2              Thank you, Kelly.

01:46   3              MS. KENNEY:  When are you back, Your Honor?

01:46   4              THE COURT:  Not on the record, Counsel.  Just pick

        5    another day.

01:46   6              MS. KENNEY:  October 5th?

01:46   7              THE COURT:  Kelly?

01:46   8              THE CLERK:  That's fine.

01:46   9              THE COURT:  We can.  But be careful with that date

       10    only because, if I'm coming back from someplace in the

       11    world, you might be requesting a jury questionnaire -- I

       12    don't know -- at that time, which I might accede to because

       13    of the inflammatory nature of the charges with some jurors.

01:46  14              I'm going to accommodate that on a murder case we

       15    have coming up with Mr. Weichert and Mr. Wilke, for

       16    instance.  And if you want that, then I don't have that week

       17    before to sort that out with you.  And so if you're

       18    requesting that, I need a period of time where I can go

       19    through those questionnaires, along with you and counsel and

       20    take out those jurors for cause.  So October 5th's fine.

01:47  21              I'm just saying, if -- if you wanted a

       22    questionnaire, I might be amenable to that; and if I was,

       23    then we'd want time to work with the government -- just like

       24    we would on a death penalty case.  Like the AB or the

       25    Mexican Mafia cases, we went through those.  And, actually,

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

80

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | we got a jury in one day.  But we spent a lot of time on |
|       | 2  | those questionnaires.  You knew who they were.           |
| 01:47 | 3  | So to get a fair jury, you want to get rid of            |
|       | 4  | people who, for instance, have hypothetically heard about |
|       | 5  | the Aryan Brotherhood and the racist undertones or the   |
|       | 6  | Mexican Mafia.  So we got rid of those blatant, you know, |
|       | 7  | "for cause" right away.  It took about 300 jurors that we |
|       | 8  | summoned, down to about 140.  Okay?                      |
| 01:47 | 9  | So October 5th's fine.  But then I'm not going to        |
|       | 10 | work with you on a questionnaire.                        |
| 01:48 | 11 | You got time for a story?  See, I'm old now.  I          |
|       | 12 | get to tell stories.                                     |
| 01:48 | 13 | MR. TAKLA:  Of course, Your Honor.                      |
| 01:48 | 14 | THE COURT:  One of my trial judges over in              |
|       | 15 | depart -- when I was over in Department 5, supervising those |
|       | 16 | courts -- that you appeared in for all those years -- got up |
|       | 17 | on a death penalty case and he or she, so I don't designate |
|       | 18 | who, decided they were going to be Mr. or Ms. Efficient. |
|       | 19 | They were going to show all the judges down in the judge's |
|       | 20 | room how quickly they do things.                         |
| 01:48 | 21 | MS. KENNEY:  You won't give the name?                   |
| 01:48 | 22 | THE COURT:  How quickly they could select a jury.      |
| 01:48 | 23 | MS. KENNEY:  You won't give the name?                   |
| 01:48 | 24 | THE COURT:  I won't give the name.  No.                 |
| 01:48 | 25 | And, um, so all the judges gathered.  And normally     |

1    we will go through a Witt-Witherspoon on a death penalty

2    case, and minimally one at a time, but, even if you wanted

3    to take a chance, five, because if somebody said something

4    in the audience with four jurors waiting and there was bias,

5    you could get rid of all of five.

01:48    6    Judge X decided to do about a hundred up in

7    Department 45 at the time -- or 44 or 40 -- I won't tell you

8    which department, the big one up there.  And they asked a

9    juror the following:

01:49    10    "Could you be fair?"

01:49    11    And the juror said, "I don't think so."

01:49    12    And the judge said, "Why?"

01:49    13    And the response was:  "Because anybody who

14    committed this act should be executed 'cause my sister was

15    raped and murdered."

01:49    16    Now, you go down and try to perfect a record of

17    fairness for the District Court -- I mean, the Circuit over

18    here.  How do you clean that up?

01:49    19    A hundred jurors needed to be sent home.  You see

20    what I mean?  That's why those questionnaires can be

21    extraordinarily invaluable.  Because here you may have some

22    things that both of you are very concerned about in terms of

23    fairness.  And a jury questionnaire hopefully will start by

24    sorting those out.

01:49    25    I'm even open to an individual Hovey or

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

82

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | Witherspoon type of questioning.  We can do about 20 to 30 a           |
|       | 2  | day, quite frankly.  Four or five days might be well-taken             |
|       | 3  | to get a fair jury in this period of time.  That's the only            |
|       | 4  | reason I was concerned about October 5th.                              |
| 01:50 | 5  | By the same token, I'm ready to go on May 25th, if                     |
|       | 6  | you want.  That's open to me.                                          |
| 01:50 | 7  | So October?                                                            |
| 01:50 | 8  | MS. KENNEY:  Yes, Your Honor.  'Cause I've not --                      |
|       | 9  | I do not have access right now.                                        |
| 01:50 | 10 | THE COURT:  Okay.                                                      |
| 01:50 | 11 | October and -- time out.  Yes, you do.  You want                       |
|       | 12 | to go on the 25th, I'm ready to go.                                    |
| 01:50 | 13 | Now, hold on.  I can order the marshals to bring                       |
|       | 14 | him over tomorrow.  And they are exuberant --                          |
| 01:50 | 15 | (To U.S. Marshals:) Aren't you?                                        |
| 01:50 | 16 | -- enthused to bring him over.                                         |
| 01:50 | 17 | Look at how enthused they are.                                         |
| 01:50 | 18 | MS. KENNEY:  I would be ineffective if I had to go                     |
|       | 19 | to trial on the date currently set.                                    |
| 01:50 | 20 | THE COURT:  Time out.  I'm not forcing you into                        |
|       | 21 | any trial date.  I'm just not letting you set a record that            |
|       | 22 | you can't get access.  Because you can in my court.                    |
| 01:50 | 23 | MS. KENNEY:  Okay.                                                     |
| 01:50 | 24 | THE COURT:  You can get access as early as                            |
|       | 25 | tomorrow.                                                              |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

83

| 01:51 | 1 | MS. KENNEY: Okay. |

01:51   1          MS. KENNEY:  Okay.

01:51   2          THE COURT:  That's your choice going to the 5th.

        3   But I promise you -- just ask Cori Ferrentino ask Kate --

        4   they sat here on weekends.

01:51   5          Now, I don't have to do that 'cause I think I can

        6   get you in on regular hours.  Access is never gonna be a

        7   problem in my court.  You have the right and I -- I think

        8   the paralegal will work out.  I just wanna talk to you folks

        9   about how to set that up with the marshal's office.  Okay?

01:51  10          MS. KENNEY:  Okay.

01:51  11          THE COURT:  Okay.

01:51  12          So what date do you want?

01:51  13          MR. TAKLA:  October 12th, Your Honor?

01:51  14          THE CLERK:  Hold on.

01:51  15          MS. KENNEY:  Oh, not the 5th?

01:51  16          THE COURT:  No.  October 5th?

01:51  17          MS. KENNEY:  I thought it was October 5th.

01:51  18          THE COURT:  I'm just not going to work with you on

        19   a jury questionnaire the week before.  I'm not here.

01:51  20          MR. TAKLA:  That's why I proposed the 12th,

        21   Your Honor.  But I'll go with what --

01:51  22          THE COURT:  Okay.

01:51  23          Matter's set for October 5th.

01:52  24          THE CLERK:  Status conference?

01:52  25          THE COURT:  I'm not going to have a status

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

84

| | | |
|---|---|---|
| | 1 | conference. |
| 01:52 | 2 | THE CLERK:  No? |
| 01:52 | 3 | THE COURT:  I don't need a status conference.  No. |
| | 4 | They're going to trial on that date.  Set this matter on |
| | 5 | October 5th for trial.  I don't need a status conference |
| | 6 | with you.  If there's a resolution, inform the Court.  But |
| | 7 | we don't need to visit again.  That's the date. |
| 01:52 | 8 | Now, I would order a written Waiver of Excludable |
| | 9 | Time to protect the record. |
| 01:52 | 10 | MR. TAKLA:  We can draft that, Your Honor. |
| 01:52 | 11 | THE COURT:  And I wish you the best. |
| 01:52 | 12 | MR. TAKLA:  Thank you, Your Honor. |
| 01:52 | 13 | THE COURT:  We're in recess. |
| 01:52 | 14 | But I'm going to sit here for the next matter. |
| 01:52 | 15 | *(Proceedings adjourned at 1:52 p.m.)* |
| 01:52 | 16 | -oOo- |
| 01:52 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
01:52   1                          -oOo-

01:52   2

01:52   3                       CERTIFICATE

01:52   4

01:52   5        I hereby certify that pursuant to Section 753,

        6   Title 28, United States Code, the foregoing is a true and

        7   correct transcript of the stenographically reported

        8   proceedings held telephone in the above-entitled matter and

        9   that the transcript page format is in conformance with the

       10   regulations of the Judicial Conference of the United States.

01:52  11

01:52  12   Date:  April 21, 2021

01:52  13

01:52  14
01:52                            /s/ Debbie Gale
01:52  15                        _____
01:52                            DEBBIE GALE, U.S. COURT REPORTER
01:52  16                        CSR NO. 9472, RPR, CCRR

01:52  17

01:52  18

01:52  19

       20

       21

       22

       23

       24

       25
```

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

**ATTACHMENT 4**

KARREN KENNEY, CA. SBN 174872
KENNEY LEGAL DEFENSE
2900 BRISTOL STREET, SUITE C204
COSTA MESA, CA 92626
TELEPHONE: (855) 505-5588
E-MAIL: KARREN.KENNEY@GMAIL.COM

Attorney for Defendant *Jason Fong*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: SACR 20-00146-DOC |
| Plaintiff, | MOTION TO RECUSE THE HONORABLE DAVID O. CARTER; DECLARATION OF COUNSEL |
| vs. | |
| JASON FONG, | DATE: August 23, 2021 |
| Defendants. | TIME: 1:30pm |

Defendant Jason Fong, by and through his attorney of record Karren Kenney, hereby submits this Motion to Recuse the Honorable David O. Carter. This motion is based upon the attached Points and Authorities, Exhibits, Declarations, and any other evidence that may be presented at the hearing on this motion.

DATED: July 25, 2021                         Respectfully submitted,

                                            /s/ *Karren Kenney*
                                            Karren Kenney
                                            Attorney for Jason Fong

# POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO RECUSE

## I. INTRODUCTION

Defendant Jason Fong, respectfully moves to disqualify the Honorable David O. Carter from presiding over this case ("*U.S. v. Fong*"). On October 6, 2020, a single count Complaint was filed in the United States District Court for the Central District of California, Southern Division against Fong for violation of 18 U.S.C. § 2339C (c): Concealing the Provision of Material Support and Resources and Funds. The charged conduct concerned a fundraising link related to the Foreign Terrorist Organization (FTO), Hamas, sent by the defendant in a group chat at the request of a government operative.

By way of background, Fong previously served for the United States Marine Corps. (USMC), which he joined in July of 2014. His Marine Corps. Records noted that he was extremely intelligent, determined, and had an enormous potential for growth as a Marine. (See Government Under Seal Filing in Document No. 58 incorporated herein by reference). Fong was working as an Avionics Maintenance Technician for the Marines up until July of 2020, when he declined to re-enlist for active duty and instead became a Reserve Marine. Fong left the Marine Corps. because he became frustrated with the people and structure of the military. He often made derogatory comments about the intelligence of the people in the Marines and the organization as a whole. December of 2020, Fong was administratively discharged (Other than Honorable) for misconduct from the USMC, due to the pending charges against him.

The Honorable Judge Carter is a former U.S. Marine who served from 1967-1969. *United States. Congress. Senate. Committee on the Judiciary. Confirmation Hearings*

*on Federal Appointments: Hearings before the Committee on the Judiciary, United States Senate, One Hundred Fifth Congress, Second Session, on Confirmation of Appointments to the Federal Judiciary. U.S. G.P.O., 1998.* Judge Carter is a Vietnam war veteran who fought in the infamous battle of Khe Sanh. Baroni, Michael L., *Judge Carter: Fighter on a Hill*, OC Bar President's Page (2017). He was medically discharged as a First Lieutenant after being wounded by a grenade blast, shot in the arm, and struck by flying shrapnel during battle. *Id.* He received a Bronze Star medal and two Purple Hearts for his service. Judge Carter is a proud veteran and patriot. *Id.* In a showcase piece of Judge Carter, Michael Baroni of the Orange County Bar Association described Judge Carter's chamber's as "a showcase of patriotism, no-nonsense bravery, and daring adventures. Military memorabilia abounds...." *Id.*

Movant applauds and thanks Judge Carter for his honorable service. However, under these circumstances, 28 U.S.C. § 455(a) requires Judge Carter's recusal from *this case.* This motion is based on statements by Judge Carter made during the April 2, 2021 hearing for review of the magistrate court's order setting bond conditions, and the apparent bias towards Mr. Fong given the defendant's alleged conduct. This coupled with Judge Carter's military history, an observer could reasonably question Judge Carter's impartiality in presiding over this case. *See U.S. v. Nelson,* 718 F.2d 315, 321 (9th Cir.1983). Due process entitles Jason Fong to a "proceeding in which he may present his case with assurance" that no member of the court is "predisposed to find against him." *See Williams v. Pennsylvania,* 136 S.Ct. 1899, 1910 (2016); *Citing Marshall v. Jerrico,* Inc., 446 U.S. 238, 242 (1980).

/ / /

II. <u>DISQUALIFICATION UNDER SECTION 455:</u>

    A.  <u>28 U.S.C. §455(a):</u>

Section 455(a) states that "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality may be reasonably questioned." 28 U.S.C. §455(a). The legal standard is an objective one which involves determining "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Nelson*, 718 F.2d at 321. Judicial rulings alone do not meet the threshold for recusal **unless they are accompanied by surrounding opinions and comments or "they evidence such deep-seated favoritism or antagonism as would make a fair judgement impossible**." *Liteky v. U.S.*, 510 U.S. 540, 541 (1994) [emphasis added].

    B.  <u>28 U.S.C. 455(b):</u>

Section 28 U.S.C. 455(b) lists five specific circumstances in which recusal is required. One of these circumstances requires a judge to disqualify himself when he has "a personal bias or prejudice concerning a party." 28 U.S.C. 455(b)(1). A personal bias is distinguishable from a judicial bias, personal bias must "arise out of the judge's background and association and not from the judge's view of the law." *U.S. v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1983). It has been defined as a bias that is "more particularized" than the normal, general opinions held by society. *See Mims v. Shapp*, 541 F.2d 415, 417 (3d Cir. 1976). Under Section 455**b) the appearance of partiality is sufficient to establish grounds for recusal under 455(a) absent actual bias.** *See U.S. v. Sibla*, 624 F.2d 864, 867 (9th Cir. 1980) [emphasis added].

III. <u>DISCUSSION</u>

A. Biased Statements Made by Judge Carter Toward Fong

On April 2, 2021 a hearing for the review of the magistrate's order was held to discuss Jason Fong's eligibility for bail. Throughout the hearing, Judge Carter made hostile comments that revealed his personal bias against the defendant and his lack of impartiality due to his military background. [See attached **Exhibit A** – April 2, 2021 Reporter's Transcript (RT)].

During the April 2, 2021 hearing, Judge Carter stated the following:

"First of all, you should be extremely proud of your service in the United States Marine Corps. But, as such, you represent that unique American who may've entered under patriotic desire on behalf of our country. But any Marine is extraordinarily well-trained in combat. If you recall your heritage, it's that you're an infantry person first, no matter what MOS is designated for you. You can be a cook and, unlike any other branch of the service, you're still called upon to defend that perimeter as a rifleman, so there's no specialization. And therefore, you're an excellent marksman. You're trained in bomb techniques. You're trained in putting together an IED or a bomb. You represent that unique ability, quite frankly, to turn that corner, and rightfully so, on behalf of the country when it's called upon, from that of an ordinary system [sic], into a person of extreme violence. You're to be commended for your service. By the same token, you represent an extraordinary combination of combat skills that the average American exercising their First Amendment rights don't have." (April 2, 2021 RT 62:4-23.)

/ / /

Judge Carter continued by stating:

 And you planned on leaving the military, which you're entitled to do --- because the U.S. Army are terrorists, and so are the Marines." (RT 66:13-15.)

This commentary by Judge Carter directed at Fong was in reference to a comment Fong previously made in a group chat (which was produced in discovery and provided to Judge Carter in the Government's filings) that equated the Marines to terrorists. These comments by Judge Carter were not due to reading from an exhibit presented before the court, but rather from the Judge looking at the defendant during the hearing, and mocking the defendant's opinion as stated in chats contained in the Government's discovery. Judge Carter's attitude towards the defendant belies a hostility that a "fair-minded person could not entirely set aside". *U.S. v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980). Even if Judge Carter's comments do not rise to the level of actual bias, appearance of partiality "is as dangerous as the fact of it." *Herrington v. Sonoma Cnty.*, 834 F.2d 1488, 1502 (9th Cir. 1987).

Throughout the remainder of the hearing Judge Carter made statements while looking directly at Mr. Fong, that clearly establish his military-based bias. As an example, Judge Carter stated at one point during the hearing:

"On April 1st, 2020, you posted to mujahideen in America, once again, regarding the making of chemical weapons and improvised explosive devises, and this included instructions on "how to make mortar scrap mines, nail grenades" -- Unfortunately, the Court understands that very, very well. "-- sodium chlorate and sugar or aluminum explosives" -- Now, this isn't some farfetched recipe. This is right down the line with military training. This isn't fiction." (RT 71:13-23.)

This was followed by:

 "Not in the military, might think this is fiction. But for anybody in the military, you've got the rare combination of knowledge and capability. (RT 72:6-9.)

Judge Carter further commented:

"I was curious because I didn't have a clear picture from the warrant. I had a picture and I had a description, but I wanted to verify that not only did you have that AR-15, you had it, what I call, "banana clipped." And in the Marine Corps we know what that is: : Two magazines taped back-to-back so, in combat, you can shove the first "20 round" in, flip that magazine, flip it upside down, and we're ready to go with 20 more rounds. Civilian world, they don't have an idea what I'm saying, but in the Marine Corps, understand it very well." (RT 73:25-74:10.)

Judge Carter views Fong through a lens of his personal military experience, not an impartial trial judge. This is a biased viewpoint, seeing as the defendant (who is charged with terrorism) and Judge Carter served in the Marine Corps. at very different times in history. Instead of confirming with Fong whether he knew these statements to be true based on his Marines experience, he instead stated, "I don't want you to speak to me." (RT 66:11-12.).  Judge Carter reached conclusions about the dangerousness of the defendant based on his personal disposition. Personal bias has been defined as arising out of a "judge's background and association." *Story*, 716 F.2d at 1090. It is clear that Judge Carter's Marines background and military ties predispose him to view Fong and his alleged conduct in a partisan manner.

Finally Judge Carter concluded the hearing by stating directly to Fong:

"I find you an extraordinary risk beyond clear and convincing, in fact, beyond a reasonable doubt, and that there are no combinations at this time or conditions that would reasonably address the danger you present" (RT 75:1-4).

Judge Carter's comments towards Fong would sway a reasonable average person to question on the basis of appearances, whether the final result in the present action is foreordained. He went beyond the culpability level necessary for the hearing before him. Judge Carter claimed that Fong was a dangerous risk with the highest legal standard in the American judicial system, clearly convicting Fong before he even has a jury trial. It is hard to see how Fong could obtain an impartial trial in which the trial judge is empowered to render evidentiary rulings, after the judge has already convicted him "beyond a reasonable doubt" as to his alleged dangerousness. Judge Carter asserted there were no conditions that would address the danger Fong presents. However, the Ninth Circuit recently reversed Judge Carter's detention order explaining that Judge Carter failed to make clear why specific pretrial conditions were inadequate. (See **Exhibit B** – Ninth Circuit Order). His lack of an explanation to the Ninth Circuit further demonstrates the personal military-based bias Judge Carter possesses towards Fong.

In light of Judge Carter's background, extrajudicial military knowledge, and remarks made specifically to Fong during the hearing for the review of the magistrate's order setting bond conditions, a reasonable observer would conclude that Judge Carter is biased towards Fong. He has shown a high degree of antagonism against the defendant and his alleged crimes that would make a fair judgement clearly impossible. *See Liteky*, 510 U.S. at 541. As in *In re Marshall*, "if the appearance of bias or prejudice is a close call, recusal is appropriate." *In re Marshall*, 403 B.R. 668, 679 (C.D. Cal

2009). This is not a close call. Fong is entitled to present his defense with the assurance that the judicial officer presiding over the matter is not predisposed to find against him. *See Williams*, 136 S.Ct. at 1910.

## **CONCLUSION**

Based upon the foregoing, Mr. Fong's due process rights, including the right to a fair and impartial judge, would be violated if Judge Carter remains on this case. Therefore, Fong respectfully requests Judge Carter be recused from further proceedings on this case.

DATED: July 25, 2021                    Respectfully submitted,

*Karren Kenney*
**Karren Kenney**
Attorney for Jason Fong

# DECLARATION OF COUNSEL

I, Karren Kenney, declare the following:

1.  I am the attorney of record for Jason Fong in this matter.

2.  Attached hereto as Exhibit A is a true and correct copy of the Reporter's Transcript for the April 2, 2021 proceedings referenced in the motion.

3.  Attached hereto as Exhibit B is a true and correct copy of the Ninth Circuit Court of Appeal's July 21, 2021 Order reversing and remanding Judge Carter and his detention order.

I declare under penalty of perjury, under the laws of the United States that the foregoing is true and correct.

DATED: July 25, 2021


*Karren Kenney*
**Karren Kenney**

EXHIBIT A

1       **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5  UNITED STATES OF AMERICA,          )
                                      )       **CERTIFIED**
6            Plaintiff,                )
                                      )
7        vs.                          )  No. 8:20-cr-00146-DOC-1
                                      )     Item Number 1
8  JASON FONG, also known as          )
   asian_ghazi,                       )
9                                      )
             Defendant.                )
10 _____)

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16  Government's Request [41] for Review of Magistrate Order

17               Santa Ana, California

18               Friday, April 2, 2021

19

20

21

22  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
23  United States District Court
    411 West 4th Street, Room 1-053
24  Santa Ana, California 92701
    (714) 558-8141

25

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

**APPEARANCES OF COUNSEL:**

FOR THE UNITED STATES OF AMERICA:

     DEPARTMENT OF JUSTICE
     OFFICE OF THE UNITED STATES ATTORNEY
     Terrorism and Export Crimes Section
     BY:  Mark P. Takla
        Assistant United States Attorney
     411 West 4th Street
     8th Floor
     Santa Ana, California 92701
     714-338-3591
     mark.takla@usdoj.gov

FOR DEFENDANT JASON FONG, also known as asian_ghazi:

     Karren Kenney (retained)
     KENNEY LEGAL DEFENSE CORPORATION
     5000 Birch Street - West Tower Suite 3000
     Newport Beach, California 92660
     855-505-5588
     karren.kenney@gmail.com

ALSO PRESENT:

     Terry Ginsburg, Supervising Probation Officer

     Nicholas Walker, Probation Officer

1                        **I N D E X**

2    **PROCEEDINGS**                                    **PAGE**

3    REVIEW OF MAGISTRATE ORDER
     PURSUANT TO GOVERNMENT REQUEST [41]
4

5    Appearances                                        4

6    Initial Remarks by the Court                       5

7    Government's Position                              5

8    Defense position                                  19

9    Court's findings                                  60

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

| | 1 | **SANTA ANA, CALIFORNIA, FRIDAY, APRIL 2, 2021** |
|---|---|---|
| | 2 | **Item Number 1** |
| | 3 | (11:28 a.m.) |
| 11:34 | 4 | THE COURT:  Call the matter of 20-00146, |
| | 5 | United States v. Jason Fong. |
| 11:34 | 6 | **APPEARANCES** |
| 11:34 | 7 | THE COURT:  And we'll begin with the government's |
| | 8 | appearance. |
| 11:34 | 9 | Mr. Takla. |
| 11:34 | 10 | MR. TAKLA:  Good morning, Your Honor.  Mark Takla |
| | 11 | on behalf of the United States. |
| 11:34 | 12 | THE COURT:  Ms. Kenney. |
| 11:34 | 13 | MS. KENNEY:  Good morning, Your Honor.  Karren |
| | 14 | Kenney on behalf of Mr. Fong.  He's present in court in |
| | 15 | custody. |
| 11:35 | 16 | Also present is my client's -- |
| 11:35 | 17 | THE COURT:  Have a seat for just a moment.  That's |
| | 18 | an order.  Sit down.  And then move the microphones closer |
| | 19 | to you.  And we'll just use it as a state court process |
| | 20 | because when you stand -- I appreciate the courtesy, but I'm |
| | 21 | going to change my whole courtroom around concerning COVID. |
| | 22 | So by staying seated, Debbie can hear you.  You don't have |
| | 23 | to go to the lectern, and we can clean the microphone each |
| | 24 | time for the next party. |
| 11:35 | 25 | So pretend we're back in state court.  Okay? |

| | | |
|---|---|---|
| 11:35 | 1 | MS. KENNEY:  Thank you, Your Honor. |
| 11:35 | 2 | Karren Kenney on behalf of Jason Fong.  He's |
| | 3 | present in court in custody.  Also present is my client's |
| | 4 | family:  His father, his mother and his sister. |
| 11:35 | 5 | And I do wanna make, uh -- for the record, there |
| | 6 | apparently seems to be several agents that are also present |
| | 7 | that were involved in this case, that are sitting on -- to |
| | 8 | my right. |
| 11:35 | 9 | THE COURT:  All right. |
| 11:35 | 10 | And I've read it before, but we're gathering the |
| | 11 | search warrant, once again, as we speak. |
| 11:36 | 12 | **INITIAL REMARKS BY THE COURT** |
| 11:36 | 13 | THE COURT:  I've already made a determination that |
| | 14 | Mr. Fong does not present a flight risk.  But now we're on |
| | 15 | the dangerousness aspect.  So I don't care which counsel |
| | 16 | addresses the Court.  We're going to have a number of |
| | 17 | rounds, and you can call witnesses, if you'd like to. |
| 11:36 | 18 | MR. TAKLA:  Your Honor, I'll start since it's my |
| | 19 | motion. |
| 11:36 | 20 | THE COURT:  Please. |
| 11:36 | 21 | **GOVERNMENT'S POSITION** |
| 11:36 | 22 | MR. TAKLA:  Your Honor, the government strongly |
| | 23 | believes that the defendant is a danger to the community. |
| | 24 | He's exhibited all the warning signs of violence. |
| 11:36 | 25 | On February 13, before COVID even -- |

| 11:36 | 1 | THE COURT: Now, I'm going to slow you way down |
| | 2 | Okay? |
| 11:36 | 3 | All right. Thank you. February 13th. |
| 11:36 | 4 | MR. TAKLA: Before -- before COVID started, he |
| | 5 | stated: |
| 11:36 | 6 | "I have the money saved for equipment |
| | 7 | because I planned on dying here |
| | 8 | violently." |
| 11:36 | 9 | THE COURT: Now, I want you to get that document |
| | 10 | that you -- because we've got a myriad of documents now. |
| 11:36 | 11 | Show that to me. |
| 11:36 | 12 | MR. TAKLA: Your Honor, that's in the search |
| | 13 | warrant affidavit, which is Exhibit A. |
| 11:36 | 14 | THE COURT: Okay. Now, just a moment. |
| 11:36 | 15 | We're going to pull that up, Kelly. And while |
| | 16 | we're doing that, I've looked at it before, and read it off |
| | 17 | the record. Now I'm going to get a paper copy and you're |
| | 18 | going to show me the page in just a moment. |
| 11:37 | 19 | THE CLERK: It's 65 pages. |
| 11:37 | 20 | THE COURT: It can be 5,000 pages. |
| 11:37 | 21 | THE CLERK: Just give me a minute. |
| 11:37 | 22 | THE COURT: Kelly, give me the first portion as it |
| | 23 | comes off the press. |
| 11:38 | 24 | *(Documents provided to the Court.)* |
| 11:39 | 25 | THE COURT: Thank you, Kelly. |

| | | |
|---|---|---|
| 11:39 | 1 | I want to ask, Mr. Walker, if he's submitted any |
| | 2 | additional paperwork. |
| 11:39 | 3 | P.O. WALKER: Good morning, Your Honor. Pretrial |
| | 4 | Services has not submitted any additional paperwork. |
| 11:41 | 5 | THE COURT: Thank you. All right. |
| 11:53 | 6 | All right. Counsel, thank you. |
| 11:53 | 7 | I have read this a number of times off of the |
| | 8 | site, but I wanted to get a paper copy. And in particular, |
| | 9 | amongst other pages, I finally found what I was looking for. |
| 11:53 | 10 | It's going to be on page 28, and one of the many |
| | 11 | statements I'm going to focus on is the February 13, 2020, |
| | 12 | Instagram group chat where Fong posted, quote: |
| 11:53 | 13 | "I have money saved up for equipment I |
| | 14 | need because I plan on dying here |
| | 15 | violently, initially." |
| 11:54 | 16 | Still not opposed to it. I still hold to my |
| | 17 | finding that he's not a flight risk. Everything that I've |
| | 18 | read in these documents, Counsel, indicated he was staying |
| | 19 | in the United States, and whatever activity he was going to |
| | 20 | be involved in was in the United States, although there's |
| | 21 | indication of training in Syria or going overseas. I don't |
| | 22 | see the further act of completion, like Badawi or Elhuzayel, |
| | 23 | going to the airport or purchasing tickets. |
| 11:54 | 24 | I am extraordinarily concerned about the |
| | 25 | dangerousness aspect. So on the defense side, I'm going to |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | have quite a few questions especially in light of the last   |
|       | 2  | question I asked; and that is, at the time of apprehension,  |
|       | 3  | he was found, I believe, with an AR-15 or assault rifle that |
|       | 4  | was loaded.                                                  |
| 11:54 | 5  | All right. Counsel, please continue on behalf of             |
|       | 6  | the government.                                              |
| 11:54 | 7  | MR. TAKLA: Thank you, Your Honor.                            |
| 11:54 | 8  | Additionally, in addition to that statement, he             |
|       | 9  | stated, with respect to the LGBTQ community: They must be   |
|       | 10 | eradicated.                                                 |
| 11:55 | 11 | He also stated he wanted to hunt down a teacher             |
|       | 12 | that he thought was a pedophile. He stated --               |
| 11:55 | 13 | THE COURT: I want a better record of this. I                |
|       | 14 | want the page that you're referring to and the warrant or   |
|       | 15 | where I would find that information.                        |
| 11:55 | 16 | I've read it now three times.                               |
| 11:55 | 17 | MR. TAKLA: Yes, Your Honor.                                 |
| 11:55 | 18 | THE COURT: Doesn't mean I can rapidly find it in            |
|       | 19 | a 60-page warrant.                                          |
| 11:55 | 20 | Slow down. Go back and give me the page numbers.            |
| 11:55 | 21 | MR. TAKLA: Yes, Your Honor. And I'munna be re --            |
|       | 22 | relying on, uh, the right-hand, bottom page numbers since   |
|       | 23 | there're --                                                 |
| 11:55 | 24 | THE COURT: Thank you.                                       |
| 11:55 | 25 | MR. TAKLA: -- multiple page numbers.                        |

| | | |
|---|---|---|
| 11:55 | 1 | So for those three statements that I just made, |
| | 2 | that is on page 28. |
| 11:55 | 3 | THE COURT:  All right. |
| 11:55 | 4 | So would that be subsection (b), that: |
| 11:55 | 5 | "DT stated that Fong was prepared |
| | 6 | document defend him if people started |
| | 7 | rioting or the government failed.  And |
| | 8 | DT stated that Fong had loaded weapons |
| | 9 | next to his bed and had told or |
| | 10 | explained to DT that he had them in case |
| | 11 | he needed to respond quickly." (As |
| | 12 | read.) |
| 11:56 | 13 | MR. TAKLA:  Actually, no, Your Honor. |
| 11:56 | 14 | THE COURT:  Just a moment, Counsel. |
| 11:56 | 15 | "DT observed several weapons in Fong's |
| | 16 | bedroom at his home in Irvine, |
| | 17 | California.  DT knew Fong stored his |
| | 18 | AR-looking rifle in -- on a mount next |
| | 19 | to his bed with a magazine loaded into |
| | 20 | the weapon.  Fong stated he had 30-round |
| | 21 | magazines for his AR-15 that were |
| | 22 | non-California compliant." |
| 11:56 | 23 | So let me go back to my questions now. |
| 11:56 | 24 | I want to hear again a description of what was |
| | 25 | found in the bedroom and in what condition and where this |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | was located.                                                 |
| 11:56 | 2  | MR. TAKLA:  Yes, Your Honor.                                 |
| 11:56 | 3  | That is on page 35 of the search warrant --                  |
| 11:56 | 4  | THE COURT:  Okay.  Just --                                   |
| 11:56 | 5  | MR. TAKLA:  -- the search warrant affidavit, using           |
|       | 6  | the bottom --                                                |
| 11:56 | 7  | THE COURT:  Thank you.                                        |
| 12:00 | 8  | MR. TAKLA:  -- right-hand numbers.                            |
| 11:56 | 9  | THE COURT:  Thank you.                                        |
| 11:56 | 10 | MR. TAKLA:  So in --                                          |
| 11:56 | 11 | THE COURT:  Thank you, Counsel.  That means stop.            |
|       | 12 | I'll tell you when to speak again.                           |
| 12:00 | 13 | All right.  On page 33 -- I didn't have the                  |
|       | 14 | warrant in front me on the last occasion, which is why I     |
|       | 15 | struggled with the exact condition of the bedroom.  And this |
|       | 16 | was shown to me -- thank you -- on the last occasion.        |
| 12:00 | 17 | It states, in Paragraph 29, subsection (a):                  |
| 12:00 | 18 | "In Fong's bedroom, law enforcement                          |
|       | 19 | found an un-serialized AR-15 assault                         |
|       | 20 | rifle, a bolt action rifle with a scope,                     |
|       | 21 | two handguns, nine high-capacity handgun                     |
|       | 22 | and rifle magazines and several thousand                     |
|       | 23 | rounds of ammunition.  The AR-15 type                        |
|       | 24 | assault rifle was found on an improvised                     |
|       | 25 | rifle rack on the side of [the] bed."                        |

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | (As read.)                                                |
| 12:01 | 2  | Now, just one moment.  There it is.  And it goes          |
|       | 3  | on to state that it was,                                  |
| 12:01 | 4  | "-- loaded with a round in the chamber                    |
|       | 5  | and a high-capacity magazine with a                       |
|       | 6  | second high-capacity magazine taped to                    |
|       | 7  | it."                                                      |
| 12:01 | 8  | Which must've caused extreme concern because of           |
|       | 9  | his willingness or statements to kill a police officer on |
|       | 10 | the spot, and also the capability of violence because these |
|       | 11 | weapons are locked and loaded and ready to go.            |
| 12:01 | 12 | Now, just a moment.                                       |
| 12:01 | 13 | So what I'm going to assume is this:  In those two        |
|       | 14 | magazines -- were they taped back to back?                |
| 12:02 | 15 | On an AR-15 or an old M16.  You can take those            |
|       | 16 | magazines and tape them so it gives 20 plus 20, if you spin |
|       | 17 | it quickly.                                               |
| 12:02 | 18 | Is that what was occurring here?                          |
| 12:02 | 19 | MR. TAKLA:  Your Honor --                                 |
| 12:02 | 20 | THE COURT:  What was the capability?  Did he have         |
|       | 21 | 40 rounds ready to go, two magazines of approximately 20  |
|       | 22 | each?                                                     |
| 12:02 | 23 | MR. TAKLA:  Correct.  And I need to check with --         |
| 12:02 | 24 | THE COURT:  Thank you.  The answer's yes.                 |
| 12:02 | 25 | All right.  Counsel, please continue.  I'll turn          |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | it back to you now.                                        |
| 12:02 | 2  | MR. TAKLA:  Thank you, Your Honor.                         |
| 12:02 | 3  | Again, going back to the defendant's statements --         |
|       | 4  | and this is on page 15 of the search warrant affidavit -- he |
|       | 5  | stated that dying like a martyr sounded better than an     |
|       | 6  | earthly marriage.                                          |
| 12:02 | 7  | Also, on page 15, he said:                                 |
| 12:02 | 8  | "I pray to Allah every night that I                        |
|       | 9  | can become *shaheed* instead of die                        |
|       | 10 | peacefully."                                               |
| 12:03 | 11 | On page 29, he stated:                                     |
| 12:03 | 12 | "I am done [sic].  I am only here in                       |
|       | 13 | America for the violence right now."                       |
| 12:03 | 14 | On page 29, he stated:                                     |
| 12:03 | 15 | "Time to remove our government.  I                         |
|       | 16 | would actually wage *jihad* against the                    |
|       | 17 | United States [sic]."  (As read.)                          |
| 12:03 | 18 | Also on page 29, referring to the company that he          |
|       | 19 | worked for, because he missed prayer:                      |
| 12:03 | 20 | "F this place.  I am going to kill                         |
|       | 21 | these Fs."  (As read.)                                     |
| 12:03 | 22 | And on page 31, he told a Marine Corps associate           |
|       | 23 | he would not hesitate to shoot a police officer who was just |
|       | 24 | doing his job.                                             |
| 12:03 | 25 | Now, as the Court is concerned, Your Honor, the            |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | government is also concerned that this rhetoric is very,     |
|        | 2  | very scary.  It's particularly scary when it comes from a    |
|        | 3  | U.S. service member who's been trained in combat.            |
| 12:03  | 4  | The fact that the defendant had a ghost gun, which           |
|        | 5  | was untraceable, that he built himself, and illegal under    |
|        | 6  | state law is also very concerning.  He had nine              |
|        | 7  | high-capacity magazines, which were also illegal under state |
|        | 8  | law.                                                         |
| 12:04  | 9  | And the removal of the guns from his house and               |
|        | 10 | firearm restrictions are just not enough for this case,      |
|        | 11 | because defendant has demonstrated an ability to be able to  |
|        | 12 | purchase an untraceable ghost gun and make it into a         |
|        | 13 | California illegal assault rifle.                            |
| 12:04  | 14 | Firearm restrictions only work if there's trust in           |
|        | 15 | the defendant that he's not gonna violate those              |
|        | 16 | restrictions.  And searches all day long are not gonna       |
|        | 17 | protect the public if the defendant chooses to build another |
|        | 18 | ghost gun that's untraceable and keep it.                    |
| 12:04  | 19 | Defendant also had a gas mask and body armor in              |
|        | 20 | his bedroom.  The argument that those are souvenirs is       |
|        | 21 | absurd 'cause the Marine Corps doesn't allow service members |
|        | 22 | to keep body armor and gas masks.                            |
| 12:05  | 23 | What the government submits is that is in keeping            |
|        | 24 | with his very first statement on February 13th, when he      |
|        | 25 | said:                                                        |

| | | |
|---|---|---|
| 12:05 | 1 |     "I have money saved for equipment |
| | 2 | because I planned on dying here |
| | 3 | violently." |
| 12:05 | 4 |     That's the type of equipment somebody might want |
| | 5 | to get. |
| 12:05 | 6 |     Your Honor, there's also some evidence that the |
| | 7 | **defendant has an inability to cope with negativity.  When he** |
| | 8 | **was restricted from being able to pray, his response was,** |
| | 9 | **"I'm going to kill these Fs."**  That's not a normal response. |
| 12:05 | 10 |     His Marine Corps associate also said he had anger |
| | 11 | issues.  And, Your Honor, there's additional evidence that's |
| | 12 | not in the search warrant affidavit that I do wanna proffer |
| | 13 | that I think is important on this issue because, in 2017, |
| | 14 | defendant's family called the Irvine Police Department |
| | 15 | because they were concerned with defendant's activities. |
| 12:06 | 16 |     MS. KENNEY:  Your Honor, I'm sorry.  At this |
| | 17 | point, I'munna have to at least lodge an objection for |
| | 18 | purposes of making a clean record. |
| 12:06 | 19 |     This information that's now being proffered by the |
| | 20 | government was not provided.  I don't have anything from the |
| | 21 | Irvine Police Department in regards to a 2017 call. |
| 12:06 | 22 |     THE COURT:  Thank you. |
| 12:06 | 23 |     Please continue. |
| 12:06 | 24 |     MR. TAKLA:  Thank you, Your Honor. |
| 12:06 | 25 |     And that, uh, was disclosed in the discovery. |

| | |
|---|---|
|12:06| 1    But in 2017, defendant's sister called the Irvine |
| | 2 Police Department because he had punched two holes in two |
| | 3 doors at their residence.  Defendant's sister was so |
| | 4 concerned about it that she waited to call the police at a |
| | 5 time when the defendant was not in the residence. |
|12:06| 6    The sister reported that, "When defendant gets |
| | 7 angry, he goes to his room and loads and unloads firearms to |
| | 8 calm down."  His family reported he's got anger management |
| | 9 issues.  And his mother reported that she did not approve of |
| | 10 weapons in the house in 2017. |
|12:07| 11    Now, they declined to press charges and the Irvine |
| | 12 Police Department just reported it and took some pictures. |
| | 13 But what this shows, Your Honor, is that defendant's house |
| | 14 is probably not the best place for him.  His parents don't |
| | 15 have an ability to control him. |
|12:07| 16    There is a real danger here, Your Honor.  From the |
| | 17 defendant's rhetoric, these are all the warning signs.  I |
| | 18 hesitate to say his family's in danger, but there is a |
| | 19 history.  And this household seems to intensify his anger. |
|12:07| 20    I also note, Your Honor, that defendant's fellow |
| | 21 service members could be in danger here too.  He stated that |
| | 22 he believes that the Marines and the Army were terrorists. |
| | 23 And despite the fact that he's no longer in the Marine |
| | 24 Corps, it's not difficult to get on a military base without |
| | 25 a military ID. |

| | | |
|---|---|---|
| 12:08 | 1 | Now, Your Honor, I want to clarify one question |
| | 2 | I -- that you had last time for me about his contact with |
| | 3 | individuals overseas.  Uh, he did report to other people in |
| | 4 | the group chat that he'd been offered a position as a |
| | 5 | trainer. |
| 12:08 | 6 | THE COURT:  Trainer.  Right. |
| 12:08 | 7 | MR. TAKLA:  That's on page 20 of the search |
| | 8 | warrant affidavit. |
| 12:08 | 9 | Now, ultimately, the FBI did not find any |
| | 10 | corroboration of that.  But they did find that the defendant |
| | 11 | had deleted some chats and deleted some messaging apps, and |
| | 12 | so we think that was correct.  Uh, we just didn't find any |
| | 13 | independent evidence of it. |
| 12:08 | 14 | And I haven't even got to the most important |
| | 15 | chargeable conduct yet, Your Honor, and that's defendant's |
| | 16 | distribution of IED-making instructions to people who he |
| | 17 | thought were gonna engage in bad actions.  And this is on |
| | 18 | page 25 and 26 of the search warrant affidavit.  I'm gonna |
| | 19 | walk through the timeline. |
| 12:09 | 20 | On March 4th, the minor stated he was gonna go |
| | 21 | fight for a foreign terrorist organization.  That |
| | 22 | organization is HTS. |
| 12:09 | 23 | On March 17th, two weeks later, the defendant |
| | 24 | provided to the individuals in the group chat, including |
| | 25 | that minor, information to make IED's and chemical weapons. |

| 12:09 | 1 | One week later, the minor stated he was planning |
| | 2 | on blowing up Kessler Air Force Base in Alabama.  And |
| | 3 | immediately the defendant provided to the minor and |
| | 4 | individuals in the group chat tactical information on |
| | 5 | entering buildings.  So when you walk up to a building, how |
| | 6 | to use the door and the building to shield yourself when you |
| | 7 | enter. |
| 12:09 | 8 | Now, defendant later stated he thought the minor |
| | 9 | was joking.  But he also stated that, if the minor wanted to |
| | 10 | commit an attack in the United States, he would not do |
| | 11 | anything; he would stand back. |
| 12:10 | 12 | Now, I want to stop right here, Your Honor. |
| 12:10 | 13 | Defendant's the adult.  He was 24 years old.  He's |
| | 14 | a U.S. service member.  And a minor says, "I'm going to blow |
| | 15 | up an Air Force Base."  And he's not sure whether the |
| | 16 | minor's joking.  Defendant does nothing to dissuade the |
| | 17 | minor; and instead, five days later, again provides |
| | 18 | IED-making information to the minor and other people on that |
| | 19 | group chat.  And he said, "We're gonna keep this information |
| | 20 | on this chat as a library." |
| 12:10 | 21 | Now, ultimately when interviewed by law |
| | 22 | enforcement, defendant stated that he thought the |
| | 23 | information -- the IED-making information and chemical |
| | 24 | weapons information -- would be used by the minor in Syria |
| | 25 | in favor of a foreign terrorist organization, HTS, to commit |

|  |  |  |
|---|---|---|
|  | 1 | ambushes.  So when he sent that information, he thought that |
|  | 2 | information was gonna be used on behalf of a foreign |
|  | 3 | terrorist organization. |
| 12:11 | 4 | And then we get to the charged conduct here, |
|  | 5 | Your Honor, which is arguably the most minor of the stuff |
|  | 6 | that I've spoken about already, particularly on the issue of |
|  | 7 | danger, where he sent out a solicitation link to several |
|  | 8 | **individuals on a** group chat, a link where they can donate to |
|  | 9 | Hamas, which is another foreign terrorist organization.  He |
|  | 10 | said the money would be used to fight Israel. |
| 12:11 | 11 | And when he was interviewed by law enforcement, he |
|  | 12 | admitted to saying -- to researching Hamas, knowing Hamas |
|  | 13 | was a foreign terrorist organization, and wanted to solicit |
|  | 14 | money for Hamas so that they could fight Israel. |
| 12:11 | 15 | Your Honor, these aren't normal statements people |
|  | 16 | make, even in the time of COVID, and it's certainly not |
|  | 17 | normal for a U.S. service member who's been trained in |
|  | 18 | combat, to do. |
| 12:12 | 19 | Defendant is absolutely dangerous.  He's a trained |
|  | 20 | marine who believes that the Marines are the terrorists. |
|  | 21 | And he's expressed hatred and violence against various parts |
|  | 22 | of the community, including the U.S. Government, the LGBTQ |
|  | 23 | community, a high school teacher, and law enforcement. |
| 12:12 | 24 | Defendant's danger is not possible to mitigate |
|  | 25 | with conditions.  The ability to get an untraceable firearm |

|  | 1 | is not something that a condition can prevent.  And |
|  | 2 | defendant expressed an interest in dying violently. |
| 12:12 | 3 | Unlike the Badawi and Elhuzayel case, Your Honor, |
|  | 4 | those defendants were planning on committing acts abroad. |
|  | 5 | And in that scenario, the FBI has a little bit more liberty |
|  | 6 | to be able to catch them at the airport, wait till they buy |
|  | 7 | plane tickets, um, wait till they go ahead and do the steps |
|  | 8 | that they need in order to commit their activities, because |
|  | 9 | the conduct that they're worried about is going to be |
|  | 10 | abroad. |
| 12:13 | 11 | Defendant's conduct is here.  And those aren't |
|  | 12 | steps that the FBI and Pretrial Services can mitigate. |
|  | 13 | Because if defendant wants to commit an act, he can do it. |
|  | 14 | He's got the training, the background.  And, unfortunately, |
|  | 15 | even in the last few weeks, we've seen a lot of gun |
|  | 16 | violence.  These are the warning signs, Your Honor. |
| 12:13 | 17 | And for those reasons, the government believes |
|  | 18 | he's a danger. |
| 12:13 | 19 | THE COURT:  All right.  Thank you. |
| 12:13 | 20 | Let me turn to the defense, please. |
| 12:13 | 21 | Ms. Kenney. |
| 12:13 | 22 | MS. KENNEY:  Yes, Your Honor. |
| 12:13 | 23 | **DEFENSE POSITION** |
| 12:13 | 24 | MS. KENNEY:  I would just like to start with |
|  | 25 | stating that I believe Judge Scott properly granted bond for |

| | |
|---|---|
| | 1 |

Mr. Fong.  And the information that I provided to her in the
February 26th, '21 hearing, I'm assuming the Court has also
reviewed.

12:14      Your Honor, in regards to the burden of
establishing dangerousness that the government has, at this
point I think the government is overreaching and taking
things out of context.  They're relying on a search warrant
that contains multiple levels of hearsay, without actually
referencing any of the specific chats and any of the actual
transcripts of these interviews that they're claiming
support what they're saying.

12:14      I keep saying this:  Things are being taken out of
context.

12:14      I've objected to just the information in the
search warrant because it contains multiple layers of
hearsay.  They're relying on an interview that an officer
did of someone who was an associate of Mr. Fong's, and
they're relying on chats, some of which were in Russian --
and somebody apparently tried to transcribe them and put
their transcriptions in the pictures of the chats.

12:15      Again, I object.  I don't -- I don't know how
valid those transcriptions are.  I do know, 'cause I have
come from Russian descent, Russian does not translate
word-for-word into the English language.  There's some sort
of -- the person translating it has to, uh, decide exactly

|        |    |                                                             |
|--------|----|-------------------------------------------------------------|
|        | 1  | what's being said in terms of putting it from Russian to    |
|        | 2  | English.  So I don't agree with all of these translations.  |
| 12:15  | 3  | I don't have somebody that I can, um, bring in              |
|        | 4  | to -- bring into this Court, at least for purposes of this  |
|        | 5  | hearing, to tell the Court if they're valid or not.  So I at|
|        | 6  | least want that on the record.  I'm not agreeing that the   |
|        | 7  | translations that they're relying upon that were in Russian |
|        | 8  | are actually what was said.                                 |
| 12:16  | 9  | Your Honor, the Court requested my client's                 |
|        | 10 | military record.  I'm assuming that the Court had the       |
|        | 11 | ability to review that.  And he had great marks when he did |
|        | 12 | serve our country.  One of his supervisors, as of           |
|        | 13 | November 2019, had stated that he had a -- Mr. Fong has     |
|        | 14 | enormous potential for growth as a Marine, and during his   |
|        | 15 | training period he oversaw the completion of multiple --    |
| 12:16  | 16 | *(Court reporter requests clarification for the*            |
|        | 17 | *record.)*                                                  |
| 12:16  | 18 | MS. KENNEY:  Judge, can I take my mask off?                  |
| 12:16  | 19 | THE COURT:  You can, if you'd like to.  And if              |
|        | 20 | you'd like to have Mr. Fong separated from you, you --      |
| 12:16  | 21 | MS. KENNEY:  That's fine.  I've been vaccinated.            |
| 12:16  | 22 | THE COURT:  We have also.  But I always want a              |
|        | 23 | record of that.  But to be heard better, if you would like  |
|        | 24 | your mask off, I will consent to that.                      |
| 12:17  | 25 | MS. KENNEY:  Okay.  Thank you.                              |

| | | |
|---|---|---|
| 12:17 | 1 | His supervisor also stated that he was pursuing |
| | 2 | higher education at Irvine Valley College.  He had a |
| | 3 | 3.62 GPA, and he, um, was recommended for professional |
| | 4 | military education, retention, and promotion. |
| 12:17 | 5 | A second supervising officer also concurred with |
| | 6 | the assessment and said that:  (Reading:) |
| 12:17 | 7 | "Mr. Fong is an ambitious, efficient, |
| | 8 | and highly intelligent avionics |
| | 9 | technician, whose performance, |
| | 10 | singularly and collectively, has been |
| | 11 | outstanding.  He's dedicated NCO who |
| | 12 | constantly mentors and trains his |
| | 13 | subordinates to ensure they keep up with |
| | 14 | current requirements and reach their |
| | 15 | full potential.  These traits have |
| | 16 | earned him the respect of his seniors, |
| | 17 | his peers, and junior marines alike.  He |
| | 18 | was also recommending him for |
| | 19 | promotion." (As read.) |
| 12:18 | 20 | Your Honor, I looked through his entire military |
| | 21 | record, there was not one negative thing. |
| 12:18 | 22 | As the Court knows, Mr. Fong grew up here locally |
| | 23 | in Irvine.  His family is present.  I think that his Marine |
| | 24 | record speaks volumes of his character, Your Honor. |
| 12:18 | 25 | In addition, I want to make a comment about the |

|  | 1 | interview that was -- was being relied upon, from the person |
|---|---|---|
|  | 2 | called "DT," somebody who was in the Marines with my client. |
| 12:18 | 3 | I don't know if the Court had opportunity to |
|  | 4 | actually see the transcript of DT's interview that was |
|  | 5 | provided, I believe, in Exhibit B. There was voluminous |
|  | 6 | materials that the Court was provided. I'm not sure exactly |
|  | 7 | what the Court was able to get through. |
| 12:18 | 8 | But in regards to DT's interview -- and I'm not |
|  | 9 | taking this from a search warrant. I'm taking this from the |
|  | 10 | actual transcript, or text, when I'm referring to things. |
| 12:19 | 11 | DT told the supervise -- or the interviewing |
|  | 12 | officer that my client was a firearms instructor, um, in the |
|  | 13 | past, and he worked at a range in Orange. So he had a |
|  | 14 | liking for guns before this incident happened. He was in |
|  | 15 | the Marines. He's just -- there's people that just enjoy |
|  | 16 | guns, that are huge proponents of the Second Amendment. And |
|  | 17 | that is one of the Constitutional rights, at least for now, |
|  | 18 | that we still have as Americans -- although it is currently |
|  | 19 | under attack. |
| 12:19 | 20 | He was asked -- DT was asked, um, about the |
|  | 21 | instructor status of Mr. Fong, and said that he was a |
|  | 22 | civilian instructor in the City of Orange. And my client |
|  | 23 | actually would take trips out to Arizona to shoot his gun |
|  | 24 | because there was more open area. And, as we all know, |
|  | 25 | Arizona's really relaxed when it comes to respecting the |

|        |    |                                                                     |
|--------|----|---------------------------------------------------------------------|
|        | 1  | Second Amendment.                                                   |
| 12:20  | 2  | Um, he didn't do any competitions.  DT told them                    |
|        | 3  | that he thought my client was an expert, was not sure about         |
|        | 4  | that.  And, um, at the end of the interview, the                    |
|        | 5  | interviewing officers -- and let's -- let's place the               |
|        | 6  | scenario of how DT was being interviewed.                           |
| 12:20  | 7  | I believe it was an NCIS person that showed up to                   |
|        | 8  | interview him, which puts on an extra added layer of                |
|        | 9  | pressure, when you're in the Marines, to speak.  So he was          |
|        | 10 | being questioned by the authorities, in addition to the NCIS        |
|        | 11 | people.  And one of the interviewing officers said:                 |
| 12:20  | 12 | "That's our whole concern, David, is                                |
|        | 13 | like -- is this kid someone potentially                             |
|        | 14 | planning something methodically?  Is he                             |
|        | 15 | gonna -- is he kind of like hiding                                  |
|        | 16 | behind a computer screen?  You know what                            |
|        | 17 | I mean?  Put yourself in our shoes.                                  |
|        | 18 | People's safety.  Community safety."                                 |
| 12:21  | 19 | And then in response to that, DT said:                              |
| 12:21  | 20 | "Personally, I can't really see him                                 |
|        | 21 | doing any of that -- whether or not,                                |
|        | 22 | like, he were to go to the edge, there's                            |
|        | 23 | been plenty of times where he could                                 |
|        | 24 | have, but hasn't."                                                  |
| 12:21  | 25 | And that's DT's interview, page 55.  The Bates                      |

```
      1   stamp number is ending '2809.

12:21 2           DT went on to also tell the interviewing officers:
12:21 3            "As far as him actually going out and
      4   doing anything, I really don't think he
      5   would.  His primary goal is to have his
      6   own property and be away from people."
12:21 7           So with that mindset, I don't really see him going
      8   to kill a bunch of people because of hate.  I think he's
      9   leaning more towards like "I'm gonna get away from people
     10   because I hate them."
12:22 11          And there are people that -- you know, society
     12   today -- and I'm sure the Court would agree, it's complete
     13   chaos, and there's a lot of hate in the world.  And
     14   especially for now, which is relevant to my client and his
     15   family, Your Honor, with the Asian -- rise in Asian hate,
     16   it's -- it's really bad.  My client has seen his family,
     17   um -- the product of bullying in the City of Irvine, and
     18   certain things -- certain statements being made to his
     19   mom -- to "Go back to China" and things like that -- I mean,
     20   it's real and this whole family has experienced it.
12:22 21          So I can understand why Mr. Fong would wanna be
     22   away from people, especially in today's world.
12:23 23          In addition, Your Honor, the dangerousness that
     24   we're talking about would be -- be "now" -- his -- dangerous
     25   now.  Is he dangerous if we let him out today?
```

12:23  1         Remember, Your Honor, he was arrested back in May

2    of 2020.  And it was at -- the timing was a little weird,

3    'cause he'd already stopped the group chats, and he kicked

4    out one of the -- I believe the operatives.  There was three

5    government operatives in this very small group.  And I'll

6    get to the prodding that they were doing so you can put this

7    into context.

12:23  8         But, remember, his conduct happened between

9    February and April.  That is at the height of when the world

10   shut down.  We're in the middle of this international

11   pandemic.  People were scared.  I was scared.  People were

12   afraid of civil war.  Everyone's just existing.  And we lost

13   the last year of our lives.  And I look back and, just, it

14   feels like a nightmare that just wouldn't end.

12:24 15         People were afraid.  People became "preppers."

16   And I'm sure Your Honor knows what that is:  When you're

17   afraid that groups are gonna take over the government.

18   We've seen that stuff nationwide with the crazy protesting

19   going on, the people that went to the Capitol.  There's just

20   a lot of crazy -- is as if it's the end times.  It's crazy.

12:24 21         So I think we have to keep that in mind when we're

22   looking at this.  'Cause had this happened five years ago,

23   it would be more concerning.  But because of the time frame

24   that this is occurring in, and the context that it's in,

25   some of this is understandable.

| 12:25 | 1 | Mr. Fong was more of a prepper. And with the |
| | 2 | Asian hate, you know, he just wanted to be ready to defend |
| | 3 | his family. And that is in the actual text in these groups. |
| 12:25 | 4 | In regards to -- you know, people were paranoid, |
| | 5 | obviously, because of hate and during the pandemic. But |
| | 6 | even as the Court pointed out at the last hearing, there's |
| | 7 | no evidence that he had plans to travel anywhere. He didn't |
| | 8 | make any specific threats to anyone. I know Mr. Takla's |
| | 9 | claiming "from the search warrant," but I'll get to that. |
| | 10 | There was no bomb-making materials found at his house. |
| | 11 | There was no direct communications with any terrorist |
| | 12 | groups. |
| 12:25 | 13 | He's been in custody since May, Your Honor. |
| | 14 | There's no jail letters like claiming allegiance to Allah or |
| | 15 | talking about terrorist activities -- which I think is huge |
| | 16 | because they did have a mail cover on him. He was writing |
| | 17 | his sister. He was writing his mom. His parents have been |
| | 18 | a part of the church that I belong to: Saddleback Church, |
| | 19 | which is in South County. Mom would continuously send him |
| | 20 | things from, you know, *Daily Hope* and Pastor Rick and things |
| | 21 | Christian-based because Jason grew up as a Christian, and at |
| | 22 | some point was looking for more. And I won't get into a |
| | 23 | sidetrack of the -- Saddleback is a seeker church and some |
| | 24 | people seek deeper connection. |
| 12:26 | 25 | THE COURT: Well, they have an excellent |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | counseling program out there also.                           |
| 12:26 | 2  | MS. KENNEY:  Yes.  Celebrate Recovery.                       |
| 12:26 | 3  | And he was looking for more substance.  And                  |
|       | 4  | unfortunately -- the devil works in the ways he works -- he  |
|       | 5  | got taken to a different route and he started getting        |
|       | 6  | involved in Islam.  And for him, personally, that's what he  |
|       | 7  | believed was filling his void.  He was able to go to the     |
|       | 8  | church and actually volunteer his time for security.  He     |
|       | 9  | didn't formally convert until January of 2020, Your Honor.   |
| 12:27 | 10 | But before that time, after seeing the Christ                |
|       | 11 | Church massacre, which I'm sure Your Honor's well-aware of,  |
|       | 12 | he was extremely disturbed and volunteered his time at the   |
|       | 13 | mosque in Irvine as security.                                |
| 12:27 | 14 | THE COURT:  I see.                                            |
| 12:27 | 15 | MS. KENNEY:  I tried to get a letter from the                |
|       | 16 | person in charge of that mosque through his mother's help,   |
|       | 17 | but they were uneasy about getting involved in anything      |
|       | 18 | because of, you know, the way people view Muslims,           |
|       | 19 | unfortunately.  They didn't want to get involved.  But my    |
|       | 20 | client did disclose that to me, and his parents did confirm  |
|       | 21 | it.                                                          |
| 12:28 | 22 | In addition, Your Honor, there's no jail calls of            |
|       | 23 | him claiming allegiance to any terrorist organization.  I   |
|       | 24 | just think this whole thing, which happened in a matter of   |
|       | 25 | like three months, has been completely blown out of         |

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:28 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| 12:29 | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| 12:29 | 18 |
| | 19 |
| | 20 |
| | 21 |
| 12:29 | 22 |
| 12:29 | 23 |
| | 24 |
| | 25 |

1  proportion.  And the things that have been presented to the
2  Court have been cherrypicked to make it look like something
3  that it's really not when you look at the big picture and
4  the actual evidence, not just a search warrant.
5          Your Honor, I do wanna make a comment that, during
6  the time they were executing the warrant, one of the
7  officers -- who's not here -- was from Irvine Police
8  Department.  His name is Michael Moore.  And I don't know if
9  he realized his mic was still on, but there is a transcript
10 of my client's statement and all the officers who were there
11 that had their microphones on -- so even if they got out of
12 the presence of my client, they were still being recorded.
13         There's one point in the interview where Michael
14 Moore steps away and he's talking to, I believe -- let me --
15 I don't wanna get this wrong.  It just says an "Unidentified
16 Male Number 3" in the transcript.  But Michael Moore is in,
17 I guess, a side room -- I can only guess -- and he says:
18         "On charges so, um, but we were not --
19         based on pictures we saw, we couldn't
20         tell if he had more than that or not,
21         um --"
22 And then the unidentified male says:
23         "The upstairs, I know they're looking
24         now.  They only had -- there was only an
25         AR that I saw."

| 12:30 | 1 | "MICHAEL MOORE:" -- the investigator -- "Right. |
| | 2 | Now he's saying he just has the one." |
| 12:30 | 3 | "UNIDENTIFIED MALE. Okay." |
| 12:30 | 4 | "MICHAEL MOORE: So which sucks." |
| 12:30 | 5 | So we've got a main investigator that's sitting |
| | 6 | here thinking he's going to find some huge arsenal. And |
| | 7 | they didn't. And it was based on all of, you know, pictures |
| | 8 | or YouTube videos that are being shared. And it just |
| | 9 | completely like grew. And it just got so big -- and it's |
| | 10 | like they get there and they're disappointed in what they |
| | 11 | found. |
| 12:30 | 12 | But Michael Moore didn't stop there, Your Honor. |
| | 13 | And I know Your Honor's gonna understand where I'm going |
| | 14 | 'cause I'm gonna bring in the relevance of the state court |
| | 15 | action. And Your Honor was a state court judge I appeared |
| | 16 | in front of when I was a baby lawyer -- and you probably |
| | 17 | wouldn't remember that -- in C5. |
| 12:31 | 18 | So in state court, he's charged with a total of |
| | 19 | 10 counts. Your Honor, they are all wobblers. Penal Code |
| | 20 | section -- the only weapon's charges, Penal Code |
| | 21 | Section 30605, possession of an assault weapon. That |
| | 22 | carries a three-year max, as the Court knows. |
| 12:31 | 23 | The additional charges, all which are wobblers, |
| | 24 | are for large-capacity magazines, Penal Code Section 32310. |
| | 25 | You, uh -- you have to, um -- figuring out the max |

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | sentencing, eight months for each, his max on a state case  |
|       | 2  | is 9 years.  They're all wobblers.                          |
| 12:31 | 3  | Michael Moore -- and I'm assuming it was through            |
|       | 4  | the assistance of the government and their whole team --    |
|       | 5  | submitted a declaration under seal, which I was able to     |
|       | 6  | obtain from state court, claiming, from some of the         |
|       | 7  | information that Mr. Takla's presented this Court --         |
|       | 8  | claiming that my client threatened his teacher, was wanting |
|       | 9  | to, um, eradicate "LGBT," admitting to fund-raising for     |
|       | 10 | Hamas.  And a state court judge sees this, and              |
|       | 11 | Investigator Moore had the nerve to ask the Court to set the|
|       | 12 | bail at a million dollars.                                  |
| 12:32 | 13 | My client could've murdered someone and got the             |
|       | 14 | same bail, as the Court knows.  The Orange County bail      |
|       | 15 | schedule for what he's being charged with is $20,000.  So   |
|       | 16 | this overreaching by this entire team of the government is  |
|       | 17 | just beyond me, especially now that I know Michael Moore    |
|       | 18 | was, on his hot mic, upset that he only found one gun.      |
| 12:33 | 19 | You know, moving -- moving on to the specifics              |
|       | 20 | that Mr. Takla had stated.  The first one -- and it was also|
|       | 21 | in Moore's declaration -- the former teacher threat.        |
| 12:33 | 22 | Looking at the actual transcript of my client's             |
|       | 23 | interview, not the search warrant, at page 105, my client   |
|       | 24 | told Investigator Moore that he had no intentions of hurting|
|       | 25 | anyone.  Referring to his former teacher, when they asked   |

```
 1   him about it, Mr. Fong said, in high school, he observed the
 2   teacher look down the shirts of underage girls in his
 3   classes.  And this is something that all the students would
 4   talk about.  And that was the main reason he didn't like
 5   'em:  Pedophile activity or pedophile -- pedophilia conduct,
 6   which most people would agree.
```

```
12:34    7          But he told them during his interview that he
 8   didn't have any plans to track him down.  There was nothing
 9   on his computer trying to figure out where the teacher lived
10   or any type of commentary anywhere that he was gonna track
11   this -- this teacher down and kill 'em.  Again, it's -- it's
12   taken out of context.
```

```
12:34   13          In addition, Your Honor, in regards to
14   eradicating -- the statement about eradicating the "LGBT"
15   community.  And I'm looking again at the transcript of my
16   client's interview.  And this is at page 137 of the
17   transcript:
```

```
12:35   18              "I just think that LGBTQ and stuff
19               like that is wrong.  I just think it
20               largely -- from my viewpoint, it is not
21               normal, per se.  They're contributing to
22               the death of the family structure, and
23               that's what I said."  (As read.)
```

```
12:36   24          So again, there's no plans for him to do anything
25   to target any specific LGBTQ groups.
```

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

12:35    1        There's a lot of people that follow the Christian

2    faith, Islam, the Catholic faith, the Jewish faith that

3    would agree with that statement, Your Honor.  They wouldn't

4    necessarily say it pubic -- publically for being -- fear of

5    being canceled, especially in today's "cancel culture."  But

6    I would surmise to say the majority of Americans probably

7    feel the same way.

12:36    8        I don't think that's something that should be used

9    against him, to keep him in jail, without bond, for a case

10    that -- he needs to help me on the outside and figure this

11    out and prepare for trial, given the access to counsel

12    issues.

12:36    13        In regard to admitting to fundraising for Hamas,

14    in this link that we've heard about, Your Honor -- again,

15    I'm looking at the transcript, not a search warrant,

16    page 74.  My client told Investigator Moore that his

17    whole -- his whole intent was like humanitarian purposes of

18    giving to the Palestinian people.  He was never intending to

19    support terrorism.  He never says that.

12:36    20        In fact, in his texts that are in the chats, as

21    well as in his interview, he makes it clear he does not

22    support terrorism.  He even says,

12:37    23          "I'm not really versed in Hamas, as a

24          whole.  I just figured I found this

25          organization and figured they were for

|        |    |                                                     |
|--------|----|-----------------------------------------------------|
|        | 1  | Palestinian people.  That's kind of why             |
|        | 2  | I just -- I wasn't aware of that                    |
|        | 3  | designation of a terrorist group in                 |
|        | 4  | terms of like ISIS or al-Qaeda.  I just             |
|        | 5  | thought it was like a militia for --                |
|        | 6  | standing for the Palestinians.  I                   |
|        | 7  | thought it would be more of like                    |
|        | 8  | humanitarian."                                      |
| 12:37  | 9  | And then we -- he was asked where he found the      |
|        | 10 | link, and he said, "Largely, it was just kind've like an |
|        | 11 | Internet search."                                   |
| 12:37  | 12 | It wasn't like he was, "Hey, I'm part of this       |
|        | 13 | group and I'm gonna fund-raise, and we've got this link. |
|        | 14 | We're gonna -- you know, we're gonna have meetings with the |
|        | 15 | people that we're sending the money to, and we're really |
|        | 16 | gonna fund-raise."                                  |
| 12:38  | 17 | It was more of just in haste, which obviously was   |
|        | 18 | a bad decision.  But it wasn't as calculated as the |
|        | 19 | government's tryin'a lead the Court to believe.     |
| 12:38  | 20 | Again, later on in his interview, the               |
|        | 21 | investigator's literally trying to put words in his mouth. |
|        | 22 | And at some point, my client says, "Everyone has a right to |
|        | 23 | their opinion."                                     |
| 12:38  | 24 | And, Your Honor, my client was completely           |
|        | 25 | respectful during any entire interview, probably because of |

|       |    |                                                    |
|-------|----|----------------------------------------------------|
|       | 1  | his training as a Marine.  I was very impressed with how he |
|       | 2  | held his composure and how respectful he was to the |
|       | 3  | investigating officers.  But he said, |
| 12:38 | 4  | "Everyone has a right to their |
|       | 5  | opinion.  You know, that's kind of just |
|       | 6  | the way I like to look at it.  But as -- |
|       | 7  | per support -- telling them to support, |
|       | 8  | I mainly -- my intention was mainly |
|       | 9  | humanitarian."  (As read.) |
| 12:38 | 10 | He even told them: |
| 12:38 | 11 | "I didn't really know too much |
|       | 12 | about -- um, Hamas.  I support |
|       | 13 | Palestine, especially in a time like |
|       | 14 | Ramadan to kind of give aid to people we |
|       | 15 | care about on the other side of the |
|       | 16 | world."  (As read.) |
| 12:39 | 17 | "Regarding what I thought about |
|       | 18 | Hamas -- and, of course, now I know" -- |
| 12:39 | 19 | He says, now he knows, after he's -- after he sent |
|       | 20 | that link, they found stuff on his phone.  Then he starts |
|       | 21 | researching:  Oh, Hamas. |
| 12:39 | 22 | He didn't do the research before he sent that |
|       | 23 | link, Your Honor.  It was done after the fact, after he |
|       | 24 | pressed "send" and a link goes on out.  But he wasn't |
|       | 25 | actively fund-raising for them. |

| | | |
|---|---|---|
| 12:39 | 1 | Your Honor, just, in -- in addition, to the |
| | 2 | fund-raising issue, was the sharing of that link negligent? |
| | 3 | I think we would agree on that.  But there was no criminal |
| | 4 | intent behind that because he was unaware of the risks |
| | 5 | associated with sharing this link that -- and look where |
| | 6 | he's at now because of it.  Um, it was done in haste.  He |
| | 7 | was looking for a way to give charity and humanitarian |
| | 8 | support during Ramadan.  And it was two of the government |
| | 9 | operatives, Your Honor, that were prodding my client and |
| | 10 | wanting to know how they could donate. |
| 12:40 | 11 | And that leads us to the government prodding.  One |
| | 12 | of the operatives asked my client to teach him to shoot. |
| | 13 | There's a text message, and this is in Russian -- and this |
| | 14 | is just taking their interpretation of the Russian, which I |
| | 15 | don't know if it's accurate, but one of the operatives says, |
| | 16 | "I wanted you to teach me how to shoot." |
| 12:40 | 17 | On another one, the operative asks my client to |
| | 18 | teach him how to organize and assemble a weapon.  "Will you |
| | 19 | train me how to organize and assemble a weapon?"  This is at |
| | 20 | Bates stamp number ending '1021.  Again, it's the government |
| | 21 | operatives in this group that are trying to lead my client |
| | 22 | down some rabbit hole and -- excuse my language -- screw 'em |
| | 23 | over.  And here he is. |
| 12:41 | 24 | They were the ones prodding him, Your Honor.  This |
| | 25 | wasn't him doing this on his own and pressuring people to do |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | this.  This is in response to them asking for this.          |
| 12:41  | 2  | One of the -- the same operative says, "And I want           |
|        | 3  | you to teach me to shoot."  And if -- my client says, "Of    |
|        | 4  | course," 'cause he started this group.                       |
| 12:41  | 5  | THE OPERATIVE:  "I wanna learn.  AR-1 I liked                 |
|        | 6  | more."                                                        |
| 12:41  | 7  | He wants to learn how to assemble guns.  In                  |
|        | 8  | another one, he asks, "I wanna learn how to make an IED."    |
| 12:42  | 9  | That's coming from the government operative,                 |
|        | 10 | Your Honor.  The government operative's asking my client,    |
|        | 11 | "Hey, teach me how to make an IED."                          |
| 12:42  | 12 | It's not my client saying, "Hey, today's lesson is           |
|        | 13 | going to be how to make an IED."  My client didn't -- didn't |
|        | 14 | bring that up.  This was always in response to government    |
|        | 15 | prodding.                                                    |
| 12:42  | 16 | After the operative asks my client -- like he                |
|        | 17 | want -- or tells him that he wants to learn how to make an   |
|        | 18 | IED, then he says, "and car bombs."                          |
| 12:42  | 19 | So my client says, "Well, these are only against             |
|        | 20 | aggressors."  Like, my client's making sure that this isn't  |
|        | 21 | for any type of terrorist-related activity.  And he made it  |
|        | 22 | clear in his chats that he was not supporting terrorism in   |
|        | 23 | any way.                                                     |
| 12:43  | 24 | Going to some of the specific chats, Your Honor.             |
|        | 25 | The chat groups my client created were a result of a         |

|   |   |
|---|---|
|        | 1  | culmination of different things.  One, the Christ Church |
|        | 2  | massacre that he actually saw the video of, which was very |
|        | 3  | disturbing.  I personally have not watched it.  He's a huge |
|        | 4  | supporter of his constitutional rights:  Obviously, free |
|        | 5  | speech, bearing arms, and his freedom of religion. |
| 12:43  | 6  |         His group was focused on learning defense -- |
|        | 7  | defensive tack-ics -- tactics, basic firearm safety, um, |
|        | 8  | religious small talk for a group, politics, inventing.  It |
|        | 9  | was -- whenever they talked about *jihad* in this group, it |
|        | 10 | was for offensive *jihad*, Your Honor. |
| 12:43  | 11 |         And I don't know if the Court's familiar, |
|        | 12 | there's -- in the Islam region -- I had to look this up -- |
|        | 13 | what?  I'm sorry.  Defensive *jihad*, not offensive. |
| 12:44  | 14 |         There's three types of *jihad*.  There's offensive, |
|        | 15 | **defensive, and spiritual.  My client's group was focused on** |
|        | 16 | **the defensive perspective in terms of protecting family and** |
|        | 17 | **community.  That's why he taught, um, firearms safety.** |
| 12:44  | 18 |         There was a truth movement he was interested in. |
|        | 19 | He was never trying to get any of the members to take on any |
|        | 20 | type of terroristic ideals. |
| 12:44  | 21 |         He wanted people to stay in America, protect their |
|        | 22 | families, live a normal life, but practice the |
|        | 23 | Second Amendment coupled with, you know, their religious |
|        | 24 | beliefs and practicing those as well.  He wanted a group to |
|        | 25 | be able to preserve their families in times like this: |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
|       | 1  | Again, the pandemic and how crazy it's been over the past    |
|       | 2  | year.                                                        |
| 12:44 | 3  | When the government, um, operative -- one of the             |
|       | 4  | government operatives asked about my client's military unit, |
|       | 5  | he just said that they were on standby, and he would         |
|       | 6  | probably, uh -- he was concerned with reinforcing auth --    |
|       | 7  | the issue of authera -- authoritarianism -- sorry.  That's a |
|       | 8  | mouthful.  He gave directions on basics survival skills.     |
| 12:45 | 9  | Um, the group chats.  He never intended to wade --           |
|       | 10 | wage any *jihad* on the American government.  Again, it was  |
|       | 11 | for defensive purposes only.                                 |
| 12:45 | 12 | And I know, at least in terms of the general                 |
|       | 13 | public, you hear the term *"jihad*," you just automatically  |
|       | 14 | think terrorism, which that's not true.  Like I said,        |
|       | 15 | there's three different types of *jihad* within the Islam    |
|       | 16 | religion.                                                    |
| 12:45 | 17 | THE COURT:  The Christ Church massacre, was that             |
|       | 18 | submitted to the Court?  'Cause I just tried to pull that up |
|       | 19 | on the Internet.  In other words, you referred to that.  I   |
|       | 20 | didn't see that in any exhibit.  And I tried to read         |
|       | 21 | hundreds of pages on this.                                   |
| 12:46 | 22 | Was that submitted to the Court.                             |
| 12:46 | 23 | MR. TAKLA:  Not by the government, Your Honor.               |
| 12:46 | 24 | THE COURT:  And here's why I'm asking:  I don't              |
|       | 25 | recall -- 'cause I follow attacks across the world -- I      |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | don't recall explicit video of the Christ Church massacre.   |
|       | 2  | It was the response to the massacre.  And it was a response  |
|       | 3  | by the police.  But inside the, um, massacre itself, I don't |
|       | 4  | recall seeing person's executed.                             |
| 12:46 | 5  | MS. KENNEY:  Your Honor, my client stated that               |
|       | 6  | there was a video posted right after it happened that he saw |
|       | 7  | that was taken down.                                         |
| 12:46 | 8  | THE COURT:  I -- I don't have that.                          |
| 12:46 | 9  | I have -- what we know so far:  Christ Church                |
|       | 10 | shooting from the *Guardian*, and "New footing emerges moments |
|       | 11 | after the Christ Church" -- so you can see me up here on     |
|       | 12 | YouTube, because I didn't see any of that.  And I want to    |
|       | 13 | disclose that I just looked.  But I don't have some of those |
|       | 14 | massacre films that, unfortunately, I'm used to dealing with |
|       | 15 | in another unrelated effort.                                 |
| 12:47 | 16 | MS. KENNEY:  Your Honor, I don't --                          |
| 12:47 | 17 | THE COURT:  -- unrelated to this Court action.               |
| 12:47 | 18 | MS. KENNEY:  I don't think it's available.                   |
| 12:47 | 19 | **THE COURT:  Well, I'll disclose to you:  You**             |
|       | 20 | **know -- you both know I go across the world in terms of some** |
|       | 21 | **of these incidences in Afghanistan, Pakistan and Indonesia,** |
|       | 22 | **Sri Lanka.  In fact, they bombed the church I was at in**  |
|       | 23 | **Sri Lanka short time after I was there -- not connected to** |
|       | 24 | **me, Counsel -- but when you read "across" that massacre,** |
|       | 25 | **that was the hotel -- not church -- that was the hotel I** |

|  |  |
|---|---|
|  | 1 |
| 12:47 | 2 |
| 12:47 | 3 |
|  | 4 |
| 12:47 | 5 |
|  | 6 |
| 12:48 | 7 |
|  | 8 |
|  | 9 |
|  | 10 |
|  | 11 |
|  | 12 |
| 12:48 | 13 |
|  | 14 |
| 12:48 | 15 |
| 12:48 | 16 |
|  | 17 |
| 12:48 | 18 |
| 12:48 | 19 |
|  | 20 |
|  | 21 |
|  | 22 |
|  | 23 |
|  | 24 |
|  | 25 |

1 would normally stay in, so I missed it by a week.

2 MS. KENNEY: That's scary.

3 THE COURT: That was the Easter attack on that

4 same hotel.

5 Um, but I -- unfortunately, have to follow that

6 because of some things I do on behalf of our government.

7 And I don't recall in the Christ Church massacre,

8 as I did on the London attack, for instance, or on the tower

9 bridge attack -- I don't recall that specific footage.

10 Everything I watched, in terms of some of the French, Paris

11 attacks, *et cetera* -- uh, and the Christ Church massacre, it

12 was a response to that.

13 So that's why -- I'm not questioning the integrity

14 of that. I'm not questioning --

15 MS. KENNEY: Right.

16 THE COURT: -- if something was taken down. I

17 just --

18 MS. KENNEY: I believe it was taken down.

19 THE COURT: I've just followed, unfortunately, and

20 have to, because of some counterterrorism efforts across the

21 world. And I didn't recall that. So I'm not questioning

22 credibility. It could be taken down. I'm not aware of it

23 nor, in going through the record, did I see any, um --

24 anything in the record that, uh -- of what he would've

25 viewed. Not that I know that that's germane. I just want

```
          1    to disclose to you why I was up here typing on the Internet
          2    for a moment.
12:49     3            MS. KENNEY:  And, Your Honor, going back to the
          4    actual chats, and not search warrant, my client stated in
          5    one of his chats that, um:
12:49     6               "I'm just ready to defend my family,
          7               my community, secure my future."
12:50     8            He also stated --
12:49     9            THE COURT:  Just one moment.
12:49    10            Off the record.
12:49    11         (Court and clerk confer.)
12:49    12            THE COURT:  All right.
12:49    13            Now, please continue, Counsel.
12:49    14            MS. KENNEY:  He also stated, um, that he was
         15    talking to one of, I believe, the operatives.  There was --
         16    saying that, uh -- my client was saying that, "Muslim men
         17    are to defend" --
12:49    18            THE COURT:  Slower.  Slower.  We need a record.
         19    Start again.
12:49    20            MS. KENNEY:  Uh-huh.
12:49    21               "Muslim men are to defend their homes
         22               from encroachment like Native American's
         23               initially did.  I told 'em a handgun
         24               arguably isn't a priority.  Rifle and
         25               chest rigs or armor --"
```

| 12:50 | 1 |     *(Court reporter requests clarification for the* |
| | 2 |     *record.)* |
| 12:50 | 3 |       MS. KENNEY:  (Reading continued:) |
| 12:50 | 4 |       "I like chest rigs because you can |
| | 5 |     throw them on easily, and they're good |
| | 6 |     for reduce [sic]." |
| 12:50 | 7 |       "I told them the white nationalists |
| | 8 |     and other pro-Trump ignorance are ready |
| | 9 |     to harm -- to bring harm to you and your |
| | 10 |     families." |
| 12:50 | 11 |       So again, Your Honor, when you put it in context, |
| | 12 | **it's in terms of like the civil -- civil unrest that people** |
| | 13 | **were expecting during the pandemic.** |
| 12:50 | 14 |       There's also a chat that was cut off in the next |
| | 15 | page in discovery -- didn't actually have what he said -- |
| | 16 | but he did make a statement that he was vetting, you know, |
| | 17 | people in the group because he wasn't supporting any type of |
| | 18 | terrorism activity. |
| 12:51 | 19 |       My client said, um: |
| 12:51 | 20 |       "I would like to know if you view or |
| | 21 |     believe ISIS to be a true *caliphate*." |
| 12:51 | 22 |       And *"caliphate"* meaning in the historical sense -- |
| | 23 | not in the sense of the terrorist group -- |
| 12:51 | 24 |       "I believe them to be terrorists. |
| | 25 |       This is true.  And I do not support |

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | them."                                                   |
| 12:51  | 2  | So he's saying this in his group chats:  That he         |
|        | 3  | does not support terrorism.  We cannot kill innocents.   |
| 12:51  | 4  | And in regards to, um, a comment that is blocked         |
|        | 5  | out in this chat -- I don't know why it's blocked out; it's |
|        | 6  | redacted -- my client said,                              |
| 12:51  | 7  | "If they wanna blow themselves up in                     |
|        | 8  | Syria, I don't even know why I'm                         |
|        | 9  | training them.  I'm not training                         |
|        | 10 | terrorists or suicide bombers.  I'm                      |
|        | 11 | training soldiers:  Soldiers who love                    |
|        | 12 | life and wanna win and nothing more."                    |
| 12:52  | 13 | And then, when asked if somebody was planning            |
|        | 14 | anything in the U.S., by an operative, um, my client said. |
| 12:52  | 15 | "Planning an attack is not needed and                    |
|        | 16 | not thoughtful."                                         |
| 12:52  | 17 | Again, my client's making it clear he does not           |
|        | 18 | support terrorism.                                       |
| 12:52  | 19 | There was even one part, Your Honor -- or one            |
|        | 20 | point in the time frame where my client kicked people out |
|        | 21 | that he thought were radicals.  And he posted an explanation |
|        | 22 | to his new group explaining, um, why he had kicked them out. |
|        | 23 | And again, it -- it goes in line with:  He was not gonna |
|        | 24 | tolerate people who were just interested in terroristic  |
|        | 25 | activities.                                              |

| | | |
|---|---|---|
| 12:52 | 1 | At one point my client says, in one of the chats, |
| | 2 | that he's not even sure about HTS, "to be honest, because |
| | 3 | they fight against ISIS.  But I'm not sure if they fully |
| | 4 | follow the Quran." |
| 12:53 | 5 | So my client was always interested in following |
| | 6 | the actual Islam religion and the Quran -- not the extremism |
| | 7 | that some people engage in, but true Islam. |
| 12:53 | 8 | He stated in another text: |
| 12:53 | 9 | "My goal is to get married and have |
| | 10 | kids and own my business and make |
| | 11 | *halal*." |
| 12:53 | 12 | And I don't know if the Court knows what *halal* is, |
| | 13 | but it's -- |
| 12:53 | 14 | THE COURT:  I do. |
| 12:53 | 15 | MS. KENNEY:  -- it's making money from good |
| | 16 | intentions not poor intentions. |
| 12:53 | 17 | When he was questioned, he told one of the |
| | 18 | investigating officers -- |
| 12:53 | 19 | THE COURT:  Just a moment. |
| 12:53 | 20 | He also lied.  He initially denied -- so let's |
| | 21 | make this complete for both sides, 'cause I was about to |
| | 22 | discuss that with you -- he had to eventually be confronted |
| | 23 | before he stated what his actions were. |
| 12:54 | 24 | Go to the page, Counsel -- I'll read to you. |
| 12:54 | 25 | MS. KENNEY:  Wait.  I'm not following. |

12:54   1          THE COURT:  So you're not caught shortsighted --

         2  let me find that on page --

12:54   3          MR. TAKLA:  32, Your Honor.

12:54   4          MS. KENNEY:  32 of the search warrant or actual

         5  transcript?

12:54   6          THE COURT:  Search warrant.  No.  Strike that.

12:56   7          It would actually be on page 30 of the search

         8  warrant, not 32.  And it would be in Paragraph 28.

12:56   9          After the reading of Miranda rights in

       10  subsection (a), it reads that:

12:56  11          "Fong claimed he stopped using

       12             Instagram or social media sometime in

       13             January or February of 2020.  Fong used

       14             WhatsApp for work and the Signal

       15             application for communicating with

       16             friends he met online.  Fong said he

       17             used the Signal application because it

       18             offered end-to-end encryption and

       19             privacy.  Fong was initially hesitant to

       20             provide the names, even user names, of

       21             those he communicated with online,

       22             stating that he was having trouble

       23             recalling their names.

12:57  24          "Fong stated that he formed his online

       25             group on the Signal app, the

|        |    |                                            |
|--------|----|--------------------------------------------|
|        | 1  | Signal Group, that he was the leader of    |
|        | 2  | the group.  Fong stated two members of     |
|        | 3  | the Signal Group were Person 1 and         |
|        | 4  | Person 2."  (As read.)                      |
| 12:57  | 5  | "Fong stated Person 1 was a kid from       |
|        | 6  | Florida who was 15 or 16 of age.  Fong     |
|        | 7  | referred to groups like AK [sic] and       |
|        | 8  | ISIS as terrorists and stated he did not   |
|        | 9  | condone extremism.  Fong stated these      |
|        | 10 | groups have damaged Islam rather than      |
|        | 11 | unifying it.  And Fong denied supporting   |
|        | 12 | or believing in terrorist groups.          |
| 12:57  | 13 | "Fong explained than an 'FTO' was any      |
|        | 14 | group that the United States government    |
|        | 15 | or State Department designated as a        |
|        | 16 | terrorist organization."                    |
| 12:57  | 17 | In subsection (d) it states:               |
| 12:57  | 18 | "Fong initially denied that anyone,        |
|        | 19 | including Person 1 and Person 2,           |
|        | 20 | mentioned any terrorist groups.  Fong      |
|        | 21 | initially denied providing Person 1 or     |
|        | 22 | Person 2 with training other than          |
|        | 23 | religious guidance and firearm safety.     |
| 12:58  | 24 | "Fong initially denied discussing          |
|        | 25 | weapons or bombs with any members of any   |

|  | 1 | online group.  Fong initially denied |
|---|---|---|
|  | 2 | supporting any FTO, including Hamas. |
|  | 3 | Fong initially stated he did not know |
|  | 4 | Hamas was a designated FTO" -- |
| 12:58 | 5 | And that, of course, is a Foreign Terrorist |
|  | 6 | Organization.  Has to be certified or designated. |
| 12:58 | 7 | "Fong initially denied soliciting |
|  | 8 | anyone to donate to a terrorist |
|  | 9 | organization. |
| 12:58 | 10 | "Fong initially denied ever meeting |
|  | 11 | any -- in person any members from his |
|  | 12 | online groups." |
| 12:58 | 13 | Subsection (e): |
| 12:58 | 14 | "After being confronted with messages |
|  | 15 | found in his phone, Fong admitted |
|  | 16 | Person 1 and Person 2 told him that -- |
|  | 17 | that they wanted to join HTS in Syria. |
| 12:58 | 18 | "Fong admitted to providing |
|  | 19 | photographs from a munitions manual |
|  | 20 | regarding explosives and improvised |
|  | 21 | explosive devices." |
| 12:59 | 22 | -- which we all know are IEDs -- |
| 12:59 | 23 | "-- to the Signal Group, which |
|  | 24 | included Person Number 1 and Person |
|  | 25 | Number 2, even after he knew they both |

```
            1              wanted to join HTS.
12:59       2                 "Fong stated that he did not have --
            3              he should not've sent the information,
            4              but his intentions were not to hurt
            5              people."
12:59       6              Going on:
12:59       7                 "He admitted to Person and 1 and 2 he
            8              would likely use the information for war
            9              against the Russians and Syrian army in
           10              support of HTS.  He admitted, then, to
           11              knowing that Hamas was a designated FTO
           12              by the United States State Department.
12:59      13                 "He also stated he believed the LGBTQ
           14              community was contributing to the death
           15              of family structure in the west.  And
           16              stated his online statement that the
           17              LGBTQ community should be eradicated was
           18              only an angry outburst."  (As read.)
01:00      19              And then it goes on.
01:00      20              So this was after a confrontation or at least a
           21      submission.
01:00      22              MS. KENNEY:  Again, Your Honor, just 'cause I have
           23      the actual transcript of my client's interview pulled up and
           24      bookmarked, do we have any references?  'Cause, again, this
           25      goes back to my problem with the search warrant and the
```

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | characterization of the conversation.  Do we have any                |
|       | 2  | references to the actual transcript pages so I can at least          |
|       | 3  | look at where they think that he said all of this or did all         |
|       | 4  | of that?                                                             |
| 01:00 | 5  | THE COURT:  You know, I would appreciate that            |
|       | 6  | coming from all both of you.  In other words, I've got               |
|       | 7  | hundreds and hundreds of pages I've read now.                        |
| 01:00 | 8  | It appears to me that you gave a lot of                  |
|       | 9  | information to the magistrate judge.  You've tried to give a         |
|       | 10 | lot to Court.  We've tried to read that.                             |
| 01:00 | 11 | So I leave that, each, as your responsibility.           |
| 01:00 | 12 | MS. KENNEY:  Well, Your Honor, I would just              |
|       | 13 | request that the Court can actually read my client's                 |
|       | 14 | interview that is part of Exhibit B.                                 |
| 01:00 | 15 | THE COURT:  I think I've already read that,              |
|       | 16 | Counsel.                                                             |
| 01:00 | 17 | MS. KENNEY:  His actual interview with the police?       |
| 01:01 | 18 | THE COURT:  Wasn't that submitted to the Court?          |
| 01:01 | 19 | MR. TAKLA:  Your Honor, uh, with respect to the          |
|       | 20 | Exhibit B, that was declined by the magistrate judge.  She           |
|       | 21 | said it wasn't helpful, and then, uh, didn't file it.                |
| 01:01 | 22 | THE COURT:  I don't know what Exhibit B is,              |
|       | 23 | apparently.  I haven't read that.                                    |
| 01:01 | 24 | MS. KENNEY:  I thought it was filed.  At least           |
|       | 25 | that's what I saw in the court record.                               |

| | |
|---|---|
| 01:01 | 1 |
| | 2 |
| 01:01 | 3 |
| | 4 |
| 01:01 | 5 |
| 01:01 | 6 |
| 01:01 | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| 01:01 | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| 01:02 | 17 |
| | 18 |
| 01:02 | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 01:02 | 25 |

THE COURT:  Well, Exhibit B to something that I apparently don't have.

MS. KENNEY:  Anyways, Your Honor, should I continue?

THE COURT:  Please.

MS. KENNEY:  Okay.

THE COURT:  We need to take a break, though, and come back at some point.  We have another matter at 1:30.  So if that meets with your permission.  I have no other options except to be courteous to you, and I'll have you back at 3:00 or 3:30.

MS. KENNEY:  Um, when he was asked -- well, this was actually, I believe, listed, from what the Court just read -- that he did say that, um, terrorist damage Islam more than unify it.  And that's one of the reasons why he doesn't condone it.

And he stated in his interview -- interview, "I don't condone extremism at all."

Um, and when he was asked about why he was sharing certain things in his group, my client explained that he liked to -- he liked to talk about the historical aspects of, um, things his group -- in his Muslim group -- the history of the *mujahideen* -- I don't wanna pronounce -- *mujahideen* -- uh, mainly just out of historical interest.

And he shared, uh, weapons information because

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | it's a hobby and it's a self-defense thing.  He stated:      |
| 01:03 | 2  |     "I just -- I was just kind of like -- |
|       | 3  |     I mean, obviously for shooting, that's |
|       | 4  |     just -- that's kind of just a hobby-est |
|       | 5  |     sort of self-defense thing, you know, |
|       | 6  |     eventually, when you're like -- I     |
|       | 7  |     basically gave viewpoint, like,       |
|       | 8  |     eventually somebody would have to" -- |
| 01:03 | 9  | THE COURT:  Slower.  Slower.  We're going to lose            |
|       | 10 | the transcript, if you read quickly.                         |
| 01:03 | 11 | MS. KENNEY:  (Reading continued:)                            |
| 01:03 | 12 |     "Somebody -- have to defend your      |
|       | 13 |     family, you know, or eventually some  |
|       | 14 |     day.  I think it be good for Muslims to |
|       | 15 |     bear arms especially after Christ     |
|       | 16 |     Church, you know, that shooting."  (As |
|       | 17 |     read.)                                |
| 01:03 | 18 | That was on page 57 of his interview.                        |
| 01:03 | 19 | THE COURT:  I'm not arguing about Christ Church.             |
|       | 20 | You all know what the deep web is and quite frankly the web  |
|       | 21 | has 90 percent below the surface.  We see about              |
|       | 22 | 10 percent -- not in terms of volume -- but about 10 percent |
|       | 23 | of the web is above, which the public commonly looks at, and |
|       | 24 | Googled, or whatever.  About 90 percent of it's below.       |
| 01:04 | 25 | So, Counsel, this could've come -- I don't know if           |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | your client's adept at the deep web or not, but this         |
|       | 2  | could've come -- so I'm not -- I'm not saying that.  But      |
|       | 3  | everything I've seen about the Christ Church is much          |
|       | 4  | different than the Paris attacks, much different than Pearl  |
|       | 5  | getting beheaded, et cetera.                                 |
| 01:04 | 6  | MS. KENNEY:  Okay.  He --                                     |
| 01:04 | 7  | THE COURT:  I watch that stuff.  I have to.                   |
| 01:04 | 8  | MS. KENNEY:  I don't.                                         |
| 01:04 | 9  | THE COURT:  You don't wanna see the behead --                |
| 01:04 | 10 | MS. KENNEY:  I don't want that in my head.  Thank            |
|       | 11 | you.                                                         |
| 01:04 | 12 | Um, he says:                                                 |
| 01:04 | 13 | "I mean, just like in the event I do                         |
|       | 14 | buy a gun and actually go out and learn                      |
|       | 15 | to use it and stuff like that, mainly                        |
|       | 16 | for defense only." (As read.)                                |
| 01:04 | 17 | And then when he's asked later on in the interview          |
|       | 18 | about training -- you know, they were accusing him of        |
|       | 19 | wanting to, like, train terrorists, which he denied 'cause   |
|       | 20 | he's against all terrorism -- he says:                       |
| 01:05 | 21 | "I didn't feel obligated to help them,                       |
|       | 22 | you know, them wanting to go over.  For                      |
|       | 23 | the most part, all they mention was just                     |
|       | 24 | *hijera*, and that's kind of why.  But I                     |
|       | 25 | always wanted" --                                            |

| | | |
|---|---|---|
| 01:05 | 1 | THE COURT: Slower. Slower, Counsel. |
| 01:05 | 2 | *(Court reporter requests clarification for the* |
| | 3 | *record.)* |
| 01:05 | 4 | MS. KENNEY: H-I-J-E-R-A. |
| 01:05 | 5 | (Reading continued:) |
| 01:05 | 6 | "The reason why I ever talked to them |
| | 7 | about, you know, guns or self-defense or |
| | 8 | anything of that sort was with the |
| | 9 | attention [sic] -- intention that they |
| | 10 | stay here to use those skills as -- you |
| | 11 | know, as an American, you know, just a |
| | 12 | regular civilian." |
| 01:05 | 13 | And then, at some point, when Investigator Moore |
| | 14 | from Irvine was talking to him, my client said, |
| 01:06 | 15 | "A lot of things in text can be taken |
| | 16 | out of context. We were joking." |
| 01:06 | 17 | And then he mentions that, in reference to the |
| | 18 | *caliphate* -- again, it's the historical *caliphate*. I'm not |
| | 19 | talking about ISIS. They're not a *caliphate*. |
| 01:06 | 20 | And then, um, when one of -- and I believe this |
| | 21 | officer's present in the courtroom -- asked him about the |
| | 22 | statement, "You're here for the violence?" Mr. Fong said, |
| 01:06 | 23 | "In the event of war, um, I would take |
| | 24 | part in it to try and restore order. |
| 01:06 | 25 | Again -- and that would be in terms of, you know, |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

```
         1   the civil unrest issue.

01:06    2         Later on, in his interview, he's talking about,

         3   again, wanting to support the Palestinian people.  And when

         4   one of the officers that's in court asked him, you know,

         5   we're concerned that there's a plan out there, my client

         6   said, "I did not have a plan."  And he didn't -- wasn't

         7   trying to motivate them to do anything in -- with a plan.

         8   And there's -- as the Court knows, there's no evidence of

         9   that in this -- in this case.

01:07   10         My client also said that, "I think terrorism is

        11   not the answer."

01:07   12         I also wanna make a comment, Your Honor, in

        13   regards to the "dying as a martyr" comment.  That was

        14   completely taken out of context.  There's -- the text

        15   messages of where that's discussed, my client's talking with

        16   a government operative, and he talks about some girl that

        17   was trying to message him, and saying that he'd stopped

        18   talking to her because she thought they were incompatible.

        19   And she just messaged him again because her previous

        20   endeavors must not've worked out 'cause they stopped

        21   communicating.

01:08   22         And then my client said:

01:08   23             "I'm currently in the process of

        24             trying to scare her back off, to let her

        25             know if it didn't work then, it sure is
```

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | not going to work now.  I told her that                      |
|        | 2  | dying as a martyr sounds way better than                     |
|        | 3  | marrying in the West, in general, and                        |
|        | 4  | that my afterlife is worth way more than                     |
|        | 5  | any earthly marriage."                                       |
| 01:08  | 6  | So, Your Honor, he's saying this in the context              |
|        | 7  | of -- this girl reaches back out to him, after she's already |
|        | 8  | stopped communicating, and he's trying to scare her off, and |
|        | 9  | that that's what he told the girl.  So I hope the Court can   |
|        | 10 | see that that was completely taken out of context in regards |
|        | 11 | to what's in the actual text messages, not a search warrant. |
| 01:08  | 12 | I may be done, Your Honor.  I just need to...                 |
| 01:08  | 13 | THE COURT:  Take your time.  There's no problem.              |
| 01:08  | 14 | But, please, for both of you, be available at                 |
|        | 15 | 3:30, if we don't conclude.                                   |
| 01:09  | 16 | MS. KENNEY:  In regards to the statement that the             |
|        | 17 | government's trying to use -- that my client was here only    |
|        | 18 | to, uh, die, only for the violence -- that was made in the    |
|        | 19 | context of paranoia and government outreach, obviously        |
|        | 20 | during the pandemic, and protecting the Islam community, as   |
|        | 21 | a "prepper" -- um, civil unrest, sort of doomsday-type        |
|        | 22 | things.                                                       |
| 01:09  | 23 | Again, my client wasn't -- was never interested in           |
|        | 24 | being a terrorist, training terrorists, anything of that     |
|        | 25 | nature.  And I think the actual evidence, not the search     |

|        | 1  | warrant, supports that. |
|--------|----|-------------------------|
| 01:09  | 2  | My client was frustrated at one point with his |
|        | 3  | work, not being able to pray.  And at one point he was just |
|        | 4  | venting because he was over -- you know, he was overwhelmed |
|        | 5  | with frustration.  So when the government's trying to say, |
|        | 6  | like, "Oh, he wanted to kill his employers," he was saying |
|        | 7  | that in the context of being so frustrated because they had |
|        | 8  | him working such long days -- I believe, it was |
|        | 9  | ten-hour days -- and he wasn't able to pray like he is |
|        | 10 | supposed to be doing, um, I believe, three times during -- |
|        | 11 | or five times during the day. |
| 01:10  | 12 | Yeah, he just corrected me, Your Honor.  Thank |
|        | 13 | you. |
| 01:10  | 14 | It was -- it was frustrating to him.  In this |
|        | 15 | conversation of when he said this, he was driving home from |
|        | 16 | work completely frustrated. |
| 01:10  | 17 | Everybody in this room can probably admit to |
|        | 18 | saying something in gest or out of frustration that they |
|        | 19 | didn't necessarily intend to act upon.  You're just saying |
|        | 20 | things in frustration. |
| 01:11  | 21 | In regards to the "hurting the police officers," |
|        | 22 | Your Honor, that was -- that was said in the context of, |
|        | 23 | like, a defensive context in case marshal law was imposed. |
|        | 24 | There were people within the last year who sincerely thought |
|        | 25 | marshal law was going to be declared because of what was |

01:11 going on with the Presidential election, the, um, pandemic, this -- this isn't -- this wasn't uncommon.

01:11 He never wanted -- and said -- he never was gonna hunt down a cop and hurt the cop for the sake of hurting a cop. That's not in the evidence, Your Honor.

01:11 And then some term in regards to blowing up an Air Force Base. That was a statement that somebody else in the group -- who I believe was a government operative -- making that statement. My client didn't take it seriously, and then ended -- ended up making a joke about it, saying, "No need to blow them up. Just yank the nerds off their computers and they'll die of anxiety."

01:12 It was clearly not taken seriously by my client. And it's just hard because you can't see the tone or the intent in any text message. And I'm sure the Court would agree -- or everybody would agree with that. And, in this case, things are being taken out of context, Your Honor.

01:12 I believe that the conditions that Judge Scott set are completely restrictive. They're probably the most restrictive I've ever personally seen on a case. And especially in light of -- there was another individual who's charged with the riots at the capital. We all saw the footage of that. And he came through this Court. His name was Christian Secor. And he was in front of Judge Early for a detention hearing.

01:13  1          Judge Early detained him.  He got sent to

       2   Washington, DC.  And the defense attorney there successfully

       3   got him out on bond, on a $200,000 appearance bond, but he's

       4   on 24-hour lockdown at his home.

01:13  5          Your Honor, this is a person that was actually

       6   seen in the Capitol building.  He's charged with civil

       7   disorder, all of those difference charges that the people

       8   that are involved in this case in DC are being charged with.

       9   And this person resides in Costa Mesa.

01:13 10          Um, the restrictions that Judge Scott put on my

      11   client were an ankle monitor.  He -- you know, house arrest.

      12   He can't leave his house, except for certain reasons --

      13   obviously, to come to my office because there's a protective

      14   order.  And I have yet to be able to show him any discovery.

      15   And now the discovery in this case is climbing to 7,000

      16   pages, with numerous recordings and translations that are

      17   gonna need to be reviewed.

01:14 18          Your Honor, I don't think the government is -- has

      19   established that, if my client gets out, he's just gonna go

      20   off and start killing people.  I don't think it's there for

      21   the reasons and the specifics and the evidence I actually

      22   pointed out -- not referencing the search warrant.  The

      23   conditions would guarantee that he comes to court, behaves

      24   while he's out on bond, in his parents home -- that they are

      25   willing to put up for -- a $3,000 secured bond.

| | | |
|---|---|---|
| 01:14 | 1 | THE CLERK: Not 3,000. |
| 01:14 | 2 | MS. KENNEY: 300,000. |
| 01:14 | 3 | -- 300,000 secured bond, and be on ankle |
| | 4 | monitoring, not have access to the Internet. |
| 01:15 | 5 | It's the most restrictive, Your Honor. He needs |
| | 6 | to be able to help me prepare his defense. And with the |
| | 7 | current state of things, with the Santa Ana Jail and not |
| | 8 | being actually able to go through things -- I can't sit at a |
| | 9 | table with him -- um, I just don't think that he's a danger |
| | 10 | to the community, especially in light of him being in |
| | 11 | custody since May of last year. |
| 01:15 | 12 | He's completely distanced himself from the Islam |
| | 13 | religion, and his family's been completely supportive, |
| | 14 | Your Honor. |
| 01:15 | 15 | And in terms of the, you know, Bail Reform Act, I |
| | 16 | think that's what -- what is just and fair in this case. |
| 01:15 | 17 | THE COURT: I want to thank both of you. It's |
| | 18 | been quite a journey. And I especially want to thank each |
| | 19 | of you for your courtesy concerning some of the questions |
| | 20 | that the Court asked on the last occasion. |
| 01:16 | 21 | Some of the delay's been caused -- so, the |
| | 22 | transcripts were obtained at Ms. Kenney's request -- some of |
| | 23 | the delays have been caused because the Court asked |
| | 24 | questions concerning his military background. |
| | 25 | |

```
01:16   1                        COURT'S FINDINGS
01:16   2              THE COURT:  Let me begin with this for this record
        3    by stating that HTS is *Tahrir al-Sham*.  "Hamas," of course,
        4    you may be much more familiar with.  But like the *al-Nusra*
        5    front and others that operate in Syria and along the Iraqi
        6    border.  The designations can sometimes morph from "ISIS" to
        7    "ISIL."  And the designations, on many occasions by the
        8    United States is kept track of, of different groups involved
        9    in the Syria-Iraq area.
01:16  10              The beginning of this Court's journey is what
       11    appears to be the willingness to travel to Syria, without
       12    this Court seeing the implementation of that.  There is
       13    discussion about going in the future, two or three years in
       14    the future; and, therefore, Counsel on behalf of the
       15    government, I'd previously ruled against you in terms of the
       16    defendant being a flight danger.
01:17  17              The activity in terms of flight, although he
       18    possessed a passport, didn't lead to a situation where he
       19    purchased a ticket, was taking a war bride, had those
       20    connections with specificity overseas, such that he would
       21    fly into Istanbul, work himself south to Izmir, cross the
       22    60-mile border that was so open for so many years along the
       23    Iraq-Turkish border that the UN couldn't control.  I didn't
       24    see any of that kind of that past indicia.
01:18  25              I have quite a different finding, though, because
```

```
 1    I believe that, not only do you represent a danger,
 2    Mr. Fong, but an extraordinary danger.  I'm going to set my
 3    record very carefully in this matter.
 4              First of all, you should be extremely proud of
 5    your service in the United States Marine Corps.  But, as
 6    such, you represent that unique American who may've entered
 7    under patriotic desire on behalf of our country.  But any
 8    Marine is extraordinarily well-trained in combat.  If you
 9    recall your heritage, it's that you're an infantry person
10    first, no matter what MOS is designated for you.
11              You can be a cook and, unlike any other branch of
12    the service, you're still called upon to defend that
13    perimeter as a rifleman, so there's no specialization.  And
14    therefore, you're an excellent marksman.  You're trained in
15    bomb techniques.  You're trained in putting together an IED
16    or a bomb.  You represent that unique ability, quite
17    frankly, to turn that corner, and rightfully so, on behalf
18    of the country when it's called upon, from that of an
19    ordinary system [sic], into a person of extreme violence.
20    You're to be commended for your service.  By the same token,
21    you represent an extraordinary combination of combat skills
22    that the average American exercising their First Amendment
23    rights don't have.
24              The second thing is this redundancy and whether
25    there is an anomaly or not.  I don't believe it is.
```

01:18 — line 4
01:19 — line 11
01:20 — line 24

01:20  1        On February 6th, you enter into an Instagram
       2   social media group, chat room, *Baqiyah*, a number of members.
       3   I'm not too concerned about your language skills and commend
       4   you on being able to speak Russian.  But pursuant to this,
       5   there've been a number of meetings that have taken place.

01:20  6        I'm extraordinarily concerned when I hear what I
       7   call martyrdom*, jihad*.  I'm extraordinarily concerned when I
       8   have statements that you're willing to die as a martyr in
       9   Syria, regardless of what the group, whether it's al-Nusra,
      10   ISIL, ISIS, HTS.  And while these statements are being made,
      11   and although you say you're against killing innocent
      12   individuals, you well-understood both "AK," [sic] which is
      13   al-Qaeda, and ISIS are terrorist organizations dedicated to
      14   killing.

01:21 15        On February 17th, 2020, during the ^Signal
      16   application and messaging, you agreed with UCI Number 1 that
      17   there was much *haram* and *fitna* in America and Arab
      18   countries.

01:21 19        Disloyal statements can be made, and you can
      20   represent your First Amendment rights.  But on April 15th,
      21   during the conversation, you stated, quote:

01:21 22            "Dying as a martyr sounds way better
      23            than marrying in the West in general and
      24            that My afterlife is worth way more than
      25            any earthly marriage."

```
01:22    1              -- the beginning of a journey that this Court
         2   believes makes you extraordinarily dangerous.  And,
01:22    3                  "I pray to Allah every night that I
         4              become a shaheed instead of die
         5              peacefully."
01:22    6          And we both know what "shaheed" is.  And we both
         7   understand it very well, don't we?
01:22    8          You go on, on March 6th of 2020, to state and
         9   understand that al-Awlaki was a terrorist.  And we both know
        10   who al-Awlaki is, and we know he operates at the highest
        11   echelons, along with al-Baghdadi and the rest, at the very
        12   top of this pyramid structure.  And we understand his
        13   teachings.  And it's violent extremism, and death.  And
        14   there's no other explanation for it.
01:22   15          You go on to state that you must make jihad.  And
        16   we know that that's war.  You go on to state, on March 3rd,
        17   that with mujahideen Amerikeoon, the group chat, that you're
        18   going to send financial donations to Malhama Tactical.  And
        19   we both understand, but for my record, instead of belaboring
        20   this, page 15, Footnote 13, holy warriors.
01:23   21          MS. KENNEY:  Your Honor, is the transcript --
01:23   22          THE COURT:  Thank you, Counsel.  I did not
        23   interrupt you.  You will not interrupt me during my
        24   presentation.  Then you can come back and ask questions.  I
        25   want that same politeness.
```

| | | |
|---|---|---|
| 01:23 | 1 | Thank you.  I will make my record now, Counsel. |
| | 2 | And, |
| 01:23 | 3 | "I'd be down to put it all on the line |
| | 4 | to go help them train, but we shall |
| | 5 | see." |
| 01:24 | 6 | Now, you talk about joining the Soldiers of the |
| | 7 | Caucasus.  And depending upon which part, the Soldiers of |
| | 8 | the Caucasus we know are primarily Muslim, Tajik. |
| 01:24 | 9 | THE DEFENDANT:  Yes, Your Honor. |
| 01:24 | 10 | THE COURT:  You don't have to answer my question. |
| | 11 | I'm just telling you now.  And they operate up in The |
| | 12 | Northern Alliance, along the border.  So this isn't some |
| | 13 | Christian group.  This is connected again to *jaheed* [sic]. |
| 01:24 | 14 | And on March 8, 2020, you sent the *mujahideen* |
| | 15 | *Amerikeoon*, via the Signal application, the image and book |
| | 16 | *of mujahideen* fighters, describing it as a compendium and |
| | 17 | examples of attacks that take place and each commander's |
| | 18 | reasoning and philosophy. |
| 01:24 | 19 | Now, that might seem a very innocent signal to |
| | 20 | most people who aren't versed in this area.  But those |
| | 21 | tactics are *jihad*.  That is how to wage war on both the |
| | 22 | Russians and Americans, who are the outside enemy to |
| | 23 | al-Qaeda and ISIS, not the inner force, the outside force |
| | 24 | that al-Awlaki and al-Bagdadi swung from the initial |
| | 25 | al-Qaeda, to looking to outside, the foreign enemy, the |

```
       1   United States -- and the Russians before that.
01:25  2            And on March 24th, during the chat, you stated:
01:25  3                "To be honest, if I were to join any
       4            group in Syria, my choice would be the
       5            Soldiers of the Caucuses.  They are pure
       6            and lawfully fighting for Islam."
01:25  7            And you are further stated:
01:25  8                "Only HTS, Malhama, and the Soldiers
       9            of the Caucasus are on the right path
      10            because they fight against kafir."
01:26 11            I don't want you to speak to me.  But you and I
      12   know what "kafir" is.
01:26 13            And you planned to leave the military, which
      14   you're entitled to do -- because the U.S. Army are
      15   terrorists, and so are the Marines.
01:26 16            On April 17th, you go on to send a voice
      17   message -- once again, through the Signal application --
      18   stating you tried to find the Kavas [sic] group, but were
      19   unable to look because you believed it had been designated
      20   by the United States as a terrorist group.
01:26 21            So now I know that you're searching.  You aren't
      22   confined to just ATS [sic].  You're looking across the
      23   spectrum of terrorist groups for affiliation.
01:26 24            You have every right, if you believe, on page 18,
      25   as an American, to distrust the U.S. government.  But you go
```

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | on, on April 19th, to state:                         |
| 01:26 | 2  | "The *mujahideen* in America if I get to             |
|       | 3  | *Dar ul-Harb* first, we will be your guys.           |
|       | 4  | We'll probably try getting in with                   |
|       | 5  | *Khorasan* and working more with *Ajnad*,            |
|       | 6  | though they're both small and really                 |
|       | 7  | determined groups."                                  |
| 01:27 | 8  | Take a look at those groups.  They're                |
|       | 9  | extraordinarily violent.  Offshoots sometimes of ISIS and |
|       | 10 | al-Qaeda are the most violent.                       |
| 01:27 | 11 | So, once again, searching.                           |
| 01:27 | 12 | On April 21st, you go on to say that you thought     |
|       | 13 | the LK [sic] "conducted the 9/11 attacks against the |
|       | 14 | United States were loyal to" AK [sic].  And you state that, |
|       | 15 | "It's a stupid idea to die for HTS."                 |
| 01:27 | 16 | It doesn't appear that you're down for martyrdom;    |
|       | 17 | but your certainly down for training, which I'll get to in |
|       | 18 | just a moment.                                       |
| 01:28 | 19 | You go on to say that when you were a *kafir*, you   |
|       | 20 | wanted to travel to kill ISIS and other extremist groups. |
|       | 21 | And then you go on to state you're not opposed to killing |
|       | 22 | them, "They are the dogs of the west," and stated that |
|       | 23 | "ISIS," Syr- -- "Iranians, Syrians, Russians are all there |
|       | 24 | for control," in reference to Syria.                 |
| 01:28 | 25 | But on April 25th, during this meeting that, uh,     |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | Malhama Tactical was recruiting for you to be an instructor. |
|        | 2  | You state that you wanted to make and test a thermite bomb   |
|        | 3  | in the desert.                                               |
| 01:28  | 4  | Now, I'm moving from speech, which could be                  |
|        | 5  | construed or misconstrued as a First Amendment right, to     |
|        | 6  | action.                                                      |
| 01:28  | 7  | And on May 3rd there's a conversation. But                   |
|        | 8  | May 5th caught the Court's eye, on page 20,                  |
|        | 9  | subparagraph (q). You tell a UCI that Muslim brothers told   |
|        | 10 | you that it was a bad idea to travel to Syria.               |
| 01:29  | 11 | Now, for a while, I thought that I would possibly            |
|        | 12 | find that you were, in fact, a travel risk. But one of the   |
|        | 13 | things I went back through in the record, with these        |
|        | 14 | hundreds and hundreds of pages -- I was looking for          |
|        | 15 | something to validate that. I didn't find that. If I         |
|        | 16 | would've found that, I would've made a different ruling on   |
|        | 17 | flight.                                                      |
| 01:29  | 18 | But you go on to say that you and the                        |
|        | 19 | UCI-E-1 [sic] needed to move to a state where they can       |
|        | 20 | practice with weapons every weekend, and that you were bored |
|        | 21 | and wanted to kill people, like Person Number 1.             |
| 01:29  | 22 | You go on to state that "HTS fighter" had asked              |
|        | 23 | you to teach them to make bombs because the Turks already    |
|        | 24 | killed their bomb-maker.                                      |
| 01:30  | 25 | Now, why is that relevant to the Court?                      |

01:30   1           First of all, now I've moved from speech, to your

        2   capability from your combat training in the Marine Corps --

        3   whether you saw combat or not -- to now discuss bomb-making

        4   on more than one occasion and your desire to use those, not

        5   only as an instructor but to make them.

01:30   6           In and of itself, that would lead to the Court's

        7   decision and finding that you're extraordinarily dangerous.

01:30   8           Your May 18th Signal application then goes on by

        9   posting to Hamas, the *al-Qassam* brigade -- let me repeat

       10   that: The *al-Qassam* brigade -- which is a military wing of

       11   Hamas; this isn't even the fund-raising group -- that you're

       12   going to, uh, "find out more about crypto currency because

       13   it's the safest way to send money to help our brothers

       14   overseas."

01:31  15           And whether it's this country or another country,

       16   it's hard to find the peacefulness in your actions, when you

       17   state:

01:31  18               "It's very difficult to fight there

       19           because Israeli scum are in power and

       20           Israeli's weaponry are -- structured are

       21           very difficult."  (As read.)

01:31  22           So, from this Court's perspective, I don't just

       23   have a domestic view, whether you're killing Russians or

       24   innocent Syrians or soldiers of any country, you represent

       25   an extraordinary threat.

| | | |
|---|---|---|
| 01:31 | 1 | On March 17th you then start sending information |
| | 2 | about chemical weapons and improvised explosives to |
| | 3 | *mujahideen Amerikeoon*. |
| 01:31 | 4 | And this goes on in statements, that: |
| 01:32 | 5 | "Various chemicals, when combined, |
| | 6 | could cause breathing issues and |
| | 7 | chest" -- |
| 01:32 | 8 | And you know, in the Marine Corps, you've gone |
| | 9 | through that training. They actually put you in a trailer |
| | 10 | and expose you to chemical weapons. |
| 01:32 | 11 | By the way, you also know how to use them, if |
| | 12 | you've got basic Marine Corps training. |
| 01:32 | 13 | And you go on to state that -- the materials |
| | 14 | stated that: |
| 01:32 | 15 | "Various chemicals, when combined, |
| | 16 | could cause breathing issues and chest |
| | 17 | pain." |
| 01:32 | 18 | You certainly know that from the Marine Corps. |
| 01:32 | 19 | And, "contained recipes for making improvised |
| | 20 | explosive devises." |
| 01:32 | 21 | Quote: |
| 01:32 | 22 | "Please don't send yourself to Allah |
| | 23 | so soon from a dumb mistake," |
| 01:32 | 24 | -- meaning: Don't blow yourself up. From my |
| | 25 | impression: Go kill others. |

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
| 01:32 | 1  | Goes on. You "posted military tactical                    |
|       | 2  | instructions for entering a building to minimize losses   |
|       | 3  | and," quote:                                              |
| 01:33 | 4  | "Take it. Save it. Study it."                             |
| 01:33 | 5  | And you subsequently, in that group chat with             |
|       | 6  | members of *mujahideen*, you state, quote:                |
| 01:33 | 7  | "The ideal combat environment would be                    |
|       | 8  | forest and mountain, however, but we                      |
|       | 9  | don't always get to pick our battles."                    |
| 01:33 | 10 | There's a tactical environment. To the average            |
|       | 11 | civilian, means nothing. To anybody with a military       |
|       | 12 | background -- understand it very well.                     |
| 01:33 | 13 | On April 1st, 2020, you posted to *mujahideen* in         |
|       | 14 | America, once again, regarding the making of chemical     |
|       | 15 | weapons and improvised explosive devises, and this included |
|       | 16 | instructions on "how to make mortar scrap mines, nail     |
|       | 17 | grenades" --                                              |
| 01:33 | 18 | Unfortunately, the Court understands that very,           |
|       | 19 | very well.                                                |
| 01:34 | 20 | "-- sodium chlorate and sugar or aluminum                 |
|       | 21 | explosives" --                                            |
| 01:34 | 22 | Now, this isn't some farfetched recipe. This is           |
|       | 23 | right down the line with military training. This isn't    |
|       | 24 | fiction. This isn't a delusional person.                  |
| 01:34 | 25 | "Fertilizer explosives, nitric acid,                      |

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | improvised black power, potassium                    |
|       | 2  | nitrate, plastics explosive filler,                  |
|       | 3  | chemical fire bottles, sodium chlorate,              |
|       | 4  | recoilless launcher, grenade launcher,               |
|       | 5  | pipe hand grenades."                                 |
| 01:34 | 6  | Somebody in the military -- or not in the            |
|       | 7  | military, might think this is fiction.  But for anybody in |
|       | 8  | the military, you've got the rare combination of knowledge |
|       | 9  | and capability.                                      |
| 01:34 | 10 | "It stays in this chat with ours like                |
|       | 11 | a library so that if you ever need it                |
|       | 12 | [sic], you know where to look." (As                  |
|       | 13 | read.)                                               |
| 01:35 | 14 | And then you go on with more training on page 25.    |
|       | 15 | And this is the ambush of the Russians that proceeded the |
|       | 16 | United States.  Lots of film out there -- that the U.S. |
|       | 17 | uses, by the way -- both countries went through a    |
|       | 18 | significant and interesting journey.                 |
| 01:35 | 19 | And this is "offered" by a former Afghan officer.    |
|       | 20 | And that's the *mujahideen* tactics at the time in attacking |
|       | 21 | and killing Soviet soldiers before these same tactics were |
|       | 22 | used on Americans.                                   |
| 01:35 | 23 | You not only knew that, you express this interest    |
|       | 24 | in engaging in violence.  So it's not just your capability. |
|       | 25 | You send a private message that you had built a firearm and |

|       | 1  | advised to be careful purchasing certain firearms in |
|-------|----|---|
|       | 2  | California. |
| 01:35 | 3  | So internally, when I'm pouring through the |
|       | 4  | weekend of documents, and took the time today to reread a |
|       | 5  | number of other documents on the bench, I found out that |
|       | 6  | that's not only true, that what we have, in a sense, is a |
|       | 7  | non-serialized weapon in your possession.  So internally, |
|       | 8  | what you're saying isn't fiction or delusional, it's |
|       | 9  | matching what the police later find at your residence. |
| 01:36 | 10 | And you stated: |
| 01:36 | 11 | "We needed [sic] a civil war.  I think |
|       | 12 | most Americans are scumbags or cunts, |
|       | 13 | and this is exclusively [sic] to only |
|       | 14 | men."  (As read.) |
| 01:36 | 15 | And on February 13th: |
| 01:36 | 16 | "I have money saved up for equipment I |
|       | 17 | need because I planned on dying here |
|       | 18 | violently, initially.  Still not opposed |
|       | 19 | to it." |
| 01:36 | 20 | You either changed yourself in not willing to die |
|       | 21 | and just be a trainer or now you're down for the cause. |
|       | 22 | Now, you're seeking martyrdom. |
| 01:37 | 23 | In the interview, you initially lied to the FBI. |
|       | 24 | You had to be confronted.  But I stopped the last proceeding |
|       | 25 | to inquire about the capability that you possessed.  I was |

1   curious because I didn't have a clear picture from the

2   warrant.  I had a picture and I had a description, but I

3   wanted to verify that not only did you have that AR-15, but

4   you had it, what I call, "banana clipped."  And in the

5   Marine Corps we know what that is:  Two magazines taped

6   back-to-back so, in combat, you can shove the first

7   "20 round" in, flip that magazine, flip it upside down, and

8   we're ready to go with 20 more rounds.

01:37     9          Civilian world, they don't have an idea what I'm

10  saying, but in the Marine Corps, understand it very well.

01:38    11          And you stored this right next to your bed with

12  those -- and I said "20" -- I mean, 30-round magazines.  And

13  then you say and tell Fong [sic] that you "would not

14  hesitate to shoot a police officer or anyone that was coming

15  to get you."  And the capability is right beside your bed.

01:38    16          And you'd "kill a police officer on the spot" if

17  you see "the police officer just doing their job."

01:38    18          I understand that the government wants me to make

19  a double finding that you're a flight risk, but I also took

20  into account that any statements about leaving the country

21  were two and three years in advance; and that was, that you

22  might go to the Middle East -- it was equivocal -- in two to

23  three years.  You've got family ties here.  I believe that

24  all of your activities are either military bases here or

25  actions here within this country.

01:39   1           I find you an extraordinary risk beyond clear and

2   convincing, in fact, beyond a reasonable doubt, and that

3   there are no combinations at this time or conditions that

4   would reasonably address the danger you present.

01:39   5           That's a final determination.

01:39   6           Now, Counsel, let me talk to you about a trial

7   date.

01:39   8           A bail hearing is just that.  That holds a person

9   for a period of time, which means that your counsel is

10  concerned about access.  I have no problem with that.  That

11  access will provide -- be provided right next door for your

12  Counsel, Ms. Kenney.  So if she wants access, she can have

13  it.

01:40  14           I'm tired of this COVID, "We can't get to our" --

15  she has a constitutional right to consult with you, and the

16  Court will make certain that that occurs for both of you.

17  Did that with the Aryan Brotherhood, and we had lengthy

18  meetings next door.  And that would be a private

19  conversation at any time.

01:40  20           So, Ms. Kenney, that's open to you.

01:40  21           My question to both of you is, Are we going to

22  trial on the 25th?  If so, I'm calling for a jury.  If we're

23  not, then tell me now, and I will not call for a jury.  But

24  you two -- and this is an order -- get up and go talk to

25  each other quietly about what your needs are in light of my

|          | 1  | ruling.  Because the Court's ready on the 25th.  That's an |
|          | 2  | order.  Stand up and go have a conversation.  That's an |
|          | 3  | order. |
| 01:40    | 4  | Otherwise, I'm calling for a jury.  But if I do, |
|          | 5  | we're going to trial on the 25th. |
| 01:40    | 6  | *(Government and defense counsel confer.)* |
| 01:41    | 7  | THE COURT:  And defendant is ordered detained |
|          | 8  | pending trial.  No bail. |
| 01:41    | 9  | Once we set this date, Counsel, it's the "dead or |
|          | 10 | dying" rule.  That's the date we go on, so be careful. |
| 01:41    | 11 | MR. TAKLA:  Your Honor -- |
| 01:41    | 12 | THE COURT:  No.  Listen to me carefully:  I don't |
|          | 13 | care what date you both set to accommodate you.  I don't |
|          | 14 | care if it's the 25th of May or at a later time.  But once I |
|          | 15 | set that date, be very careful with that date because I |
|          | 16 | won't be moving it.  You won't be able to make a good-enough |
|          | 17 | record 'cause I'm going to provide all the access Counsel |
|          | 18 | needs. |
| 01:42    | 19 | Have that conversation. |
| 01:42    | 20 | MS. KENNEY:  That's what I'm confused -- |
| 01:42    | 21 | THE COURT:  Counsel, have that conversation now |
|          | 22 | and come up with a date, or I will hold it on the 25th. |
| 01:42    | 23 | *(Government and defense counsel further confer.)* |
| 01:44    | 24 | MR. TAKLA:  Your Honor, I think we've decided on |
|          | 25 | September 21. |

| | | |
|---|---|---|
| 01:44 | 1 | THE COURT:  September 21st.  Ms. Kenney, does that |
| | 2 | meet with your consent? |
| 01:44 | 3 | MS. KENNEY:  It does.  But I just wanna put on the |
| | 4 | record regarding the access to counsel -- |
| 01:44 | 5 | THE COURT:  Just a moment. |
| 01:44 | 6 | MS. KENNEY:  Can I at least -- |
| 01:44 | 7 | THE COURT:  Watch out.  You're in my court.  Now, |
| | 8 | I'm going to interrupt you 'cause you interrupted me one |
| | 9 | time.  So I'm just kidding ya. |
| 01:44 | 10 | I will provide you unlimited access.  I will |
| | 11 | provide you that access next door so you don't have any |
| | 12 | problem with the jail, if you don't have access. |
| 01:44 | 13 | MS. KENNEY:  When you say "next door," I don't |
| | 14 | know what you're -- |
| 01:44 | 15 | THE COURT:  The courtroom right next door so you |
| | 16 | have privacy. |
| 01:44 | 17 | MS. KENNEY:  Okay.  So -- |
| 01:44 | 18 | THE COURT:  I'll bring you to court. |
| 01:44 | 19 | MS. KENNEY:  So the courtroom next door where I |
| | 20 | can like set up my computer and sit with my client? |
| 01:44 | 21 | THE COURT:  Absolutely. |
| 01:44 | 22 | MS. KENNEY:  And that -- that would be just like |
| | 23 | during the Court hours? |
| 01:44 | 24 | THE COURT:  Yes. |
| 01:45 | 25 | MS. KENNEY:  All right.  And how would I schedule |

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | that?                                                                   |
| 01:45 | 2  | THE COURT:  Just call Kelly and tell us that you                       |
|       | 3  | need your client brought over.                                         |
| 01:45 | 4  | MS. KENNEY:  And my --                                                  |
| 01:45 | 5  | THE COURT:  And you -- remember when you said you                      |
|       | 6  | were a young lawyer, way back when -- you know, just a                 |
|       | 7  | few days ago.  I'm just kidding you.  We spent seven                   |
|       | 8  | consecutive weekends on the Aryan Brotherhood case, catching           |
|       | 9  | up with 50,000 documents that the FBI just discovered.                 |
| 01:45 | 10 | MS. KENNEY:  So is there access on the weekends,                       |
|       | 11 | if it's needed?                                                        |
| 01:45 | 12 | THE COURT:  If I need to.  If I can open up the                        |
|       | 13 | court.                                                                  |
| 01:45 | 14 | Now -- now I'm hesitant right now on the weekends                      |
|       | 15 | 'cause I don't want that additional time.  We should be able           |
|       | 16 | to do this during court hours.                                         |
| 01:45 | 17 | MS. KENNEY:  And would that include my paralegal                       |
|       | 18 | being able to meet with my client too to review things?                |
| 01:45 | 19 | THE COURT:  I'm not certain about that.  Let me                        |
|       | 20 | discuss that with you because I would want to talk with the            |
|       | 21 | marshal's first about that.  But I think so.  I think you              |
|       | 22 | need that kind of effort and aid.  But this isn't for your             |
|       | 23 | convenience.                                                           |
| 01:45 | 24 | *(Court and court clerk confer.)*                                      |
| 01:45 | 25 | THE COURT:  Oh, I'm not here September 21st.                           |

01:46  1          I'm overseas September 21.  Pick another day.

01:46  2          Thank you, Kelly.

01:46  3          MS. KENNEY:  When are you back, Your Honor?

01:46  4          THE COURT:  Not on the record, Counsel.  Just pick

       5  another day.

01:46  6          MS. KENNEY:  October 5th?

01:46  7          THE COURT:  Kelly?

01:46  8          THE CLERK:  That's fine.

01:46  9          THE COURT:  We can.  But be careful with that date

      10  only because, if I'm coming back from someplace in the

      11  world, you might be requesting a jury questionnaire -- I

      12  don't know -- at that time, which I might accede to because

      13  of the inflammatory nature of the charges with some jurors.

01:46 14          I'm going to accommodate that on a murder case we

      15  have coming up with Mr. Weichert and Mr. Wilke, for

      16  instance.  And if you want that, then I don't have that week

      17  before to sort that out with you.  And so if you're

      18  requesting that, I need a period of time where I can go

      19  through those questionnaires, along with you and counsel and

      20  take out those jurors for cause.  So October 5th's fine.

01:47 21          I'm just saying, if -- if you wanted a

      22  questionnaire, I might be amenable to that; and if I was,

      23  then we'd want time to work with the government -- just like

      24  we would on a death penalty case.  Like the AB or the

      25  Mexican Mafia cases, we went through those.  And, actually,

|  | 1 | we got a jury in one day.  But we spent a lot of time on |

<div></div>

```
         1   we got a jury in one day.  But we spent a lot of time on
         2   those questionnaires.  You knew who they were.
01:47    3          So to get a fair jury, you want to get rid of
         4   people who, for instance, have hypothetically heard about
         5   the Aryan Brotherhood and the racist undertones or the
         6   Mexican Mafia.  So we got rid of those blatant, you know,
         7   "for cause" right away.  It took about 300 jurors that we
         8   summoned, down to about 140.  Okay?
01:47    9          So October 5th's fine.  But then I'm not going to
        10   work with you on a questionnaire.
01:48   11          You got time for a story?  See, I'm old now.  I
        12   get to tell stories.
01:48   13          MR. TAKLA:  Of course, Your Honor.
01:48   14          THE COURT:  One of my trial judges over in
        15   depart -- when I was over in Department 5, supervising those
        16   courts -- that you appeared in for all those years -- got up
        17   on a death penalty case and he or she, so I don't designate
        18   who, decided they were going to be Mr. or Ms. Efficient.
        19   They were going to show all the judges down in the judge's
        20   room how quickly they do things.
01:48   21          MS. KENNEY:  You won't give the name?
01:48   22          THE COURT:  How quickly they could select a jury.
01:48   23          MS. KENNEY:  You won't give the name?
01:48   24          THE COURT:  I won't give the name.  No.
01:48   25          And, um, so all the judges gathered.  And normally
```

Case 8:20-cr-00146-DOC Document 107 Filed 07/25/21 Page 92 of 224 Page ID #:659
8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

81

1    we will go through a Witt-Witherspoon on a death penalty

2    case, and minimally one at a time, but, even if you wanted

3    to take a chance, five, because if somebody said something

4    in the audience with four jurors waiting and there was bias,

5    you could get rid of all of five.

01:48    6    Judge X decided to do about a hundred up in

7    Department 45 at the time -- or 44 or 40 -- I won't tell you

8    which department, the big one up there.  And they asked a

9    juror the following:

01:49    10    "Could you be fair?"

01:49    11    And the juror said, "I don't think so."

01:49    12    And the judge said, "Why?"

01:49    13    And the response was:  "Because anybody who

14    committed this act should be executed 'cause my sister was

15    raped and murdered."

01:49    16    Now, you go down and try to perfect a record of

17    fairness for the District Court -- I mean, the Circuit over

18    here.  How do you clean that up?

01:49    19    A hundred jurors needed to be sent home.  You see

20    what I mean?  That's why those questionnaires can be

21    extraordinarily invaluable.  Because here you may have some

22    things that both of you are very concerned about in terms of

23    fairness.  And a jury questionnaire hopefully will start by

24    sorting those out.

01:49    25    I'm even open to an individual Hovey or

|  | 1 | Witherspoon type of questioning.  We can do about 20 to 30 a |
|---|---|---|
|  | 2 | day, quite frankly.  Four or five days might be well-taken |
|  | 3 | to get a fair jury in this period of time.  That's the only |
|  | 4 | reason I was concerned about October 5th. |
| 01:50 | 5 | By the same token, I'm ready to go on May 25th, if |
|  | 6 | you want.  That's open to me. |
| 01:50 | 7 | So October? |
| 01:50 | 8 | MS. KENNEY:  Yes, Your Honor.  'Cause I've not -- |
|  | 9 | I do not have access right now. |
| 01:50 | 10 | THE COURT:  Okay. |
| 01:50 | 11 | October and -- time out.  Yes, you do.  You want |
|  | 12 | to go on the 25th, I'm ready to go. |
| 01:50 | 13 | Now, hold on.  I can order the marshals to bring |
|  | 14 | him over tomorrow.  And they are exuberant -- |
| 01:50 | 15 | (To U.S. Marshals:) Aren't you? |
| 01:50 | 16 | -- enthused to bring him over. |
| 01:50 | 17 | Look at how enthused they are. |
| 01:50 | 18 | MS. KENNEY:  I would be ineffective if I had to go |
|  | 19 | to trial on the date currently set. |
| 01:50 | 20 | THE COURT:  Time out.  I'm not forcing you into |
|  | 21 | any trial date.  I'm just not letting you set a record that |
|  | 22 | you can't get access.  Because you can in my court. |
| 01:50 | 23 | MS. KENNEY:  Okay. |
| 01:50 | 24 | THE COURT:  You can get access as early as |
|  | 25 | tomorrow. |

| | | |
|---|---|---|
| 01:51 | 1 | MS. KENNEY: Okay. |
| 01:51 | 2 | THE COURT: That's your choice going to the 5th. |
| | 3 | But I promise you -- just ask Cori Ferrentino ask Kate -- |
| | 4 | they sat here on weekends. |
| 01:51 | 5 | Now, I don't have to do that 'cause I think I can |
| | 6 | get you in on regular hours. Access is never gonna be a |
| | 7 | problem in my court. You have the right and I -- I think |
| | 8 | the paralegal will work out. I just wanna talk to you folks |
| | 9 | about how to set that up with the marshal's office. Okay? |
| 01:51 | 10 | MS. KENNEY: Okay. |
| 01:51 | 11 | THE COURT: Okay. |
| 01:51 | 12 | So what date do you want? |
| 01:51 | 13 | MR. TAKLA: October 12th, Your Honor? |
| 01:51 | 14 | THE CLERK: Hold on. |
| 01:51 | 15 | MS. KENNEY: Oh, not the 5th? |
| 01:51 | 16 | THE COURT: No. October 5th? |
| 01:51 | 17 | MS. KENNEY: I thought it was October 5th. |
| 01:51 | 18 | THE COURT: I'm just not going to work with you on |
| | 19 | a jury questionnaire the week before. I'm not here. |
| 01:51 | 20 | MR. TAKLA: That's why I proposed the 12th, |
| | 21 | Your Honor. But I'll go with what -- |
| 01:51 | 22 | THE COURT: Okay. |
| 01:51 | 23 | Matter's set for October 5th. |
| 01:52 | 24 | THE CLERK: Status conference? |
| 01:52 | 25 | THE COURT: I'm not going to have a status |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | conference.                                                |
| 01:52 | 2  |         THE CLERK:  No?                                     |
| 01:52 | 3  |         THE COURT:  I don't need a status conference.  No. |
|       | 4  | They're going to trial on that date.  Set this matter on   |
|       | 5  | October 5th for trial.  I don't need a status conference   |
|       | 6  | with you.  If there's a resolution, inform the Court.  But |
|       | 7  | we don't need to visit again.  That's the date.            |
| 01:52 | 8  |         Now, I would order a written Waiver of Excludable  |
|       | 9  | Time to protect the record.                                |
| 01:52 | 10 |         MR. TAKLA:  We can draft that, Your Honor.         |
| 01:52 | 11 |         THE COURT:  And I wish you the best.               |
| 01:52 | 12 |         MR. TAKLA:  Thank you, Your Honor.                 |
| 01:52 | 13 |         THE COURT:  We're in recess.                       |
| 01:52 | 14 |         But I'm going to sit here for the next matter.     |
| 01:52 | 15 |         *(Proceedings adjourned at 1:52 p.m.)*             |
| 01:52 | 16 |                         -oOo-                              |
| 01:52 | 17 |                                                            |
|       | 18 |                                                            |
|       | 19 |                                                            |
|       | 20 |                                                            |
|       | 21 |                                                            |
|       | 22 |                                                            |
|       | 23 |                                                            |
|       | 24 |                                                            |
|       | 25 |                                                            |

01:52  1                          -oOo-

01:52  2

01:52  3                        CERTIFICATE

01:52  4

01:52  5          I hereby certify that pursuant to Section 753,

       6     Title 28, United States Code, the foregoing is a true and

       7     correct transcript of the stenographically reported

       8     proceedings held telephone in the above-entitled matter and

       9     that the transcript page format is in conformance with the

      10     regulations of the Judicial Conference of the United States.

01:52 11

01:52 12     Date:  April 21, 2021

01:52 13

01:52 14
01:52
01:52 15                         /s/ Debbie Gale
01:52
01:52 16                         _____
                                 DEBBIE GALE, U.S. COURT REPORTER
                                 CSR NO. 9472, RPR, CCRR

01:52 17

01:52 18

01:52 19

      20

      21

      22

      23

      24

      25

EXHIBIT B

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 21 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.   21-50089 |
| Plaintiff-Appellee, | D.C. No. 8:20-cr-00146-DOC-1 Central District of California, Santa Ana |
| v. | |
| JASON FONG, AKA asian_ghazi, | ORDER |
| Defendant-Appellant. | |

Before:  PAEZ, BERZON, and FORREST, Circuit Judges.

This is an appeal from the district court's pre-trial detention order.  We have jurisdiction pursuant to 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291.  We have reviewed the district court's statement of reasons and the parties' supplemental briefing filed pursuant to our June 3, 2021 order.  We reverse and remand.

We previously remanded this case to allow the district court to explain why conditions of release – such as those imposed by the magistrate judge – would be inadequate to reasonably address the danger posed by appellant.  On remand, however, the district court simply reiterated its earlier findings regarding the danger appellant posed to the community and concluded that this danger "transcends the magistrate's restrictions."  This was inadequate. *See United States v. Wheeler*, 795 F.2d 893, 841 (9th Cir. 1986) (order) ("[A] district court's reasons for its [detention] decision must be adequately explained; conclusory statements

KWH/MOATT

are insufficient.").  The district court did not discuss the specific conditions of release imposed by the magistrate judge let alone explain why they were inadequate.  Accordingly, we reverse the district court's April 2, 2021, detention order.  On remand, the district court shall place appellant on pre-trial release subject to the conditions imposed by the magistrate judge in her February 26, 2021 order.

Nothing in this order shall be construed as preventing the district court from addressing any violation of pre-trial release.

The mandate shall issue forthwith.  *See* Fed. R. App. P. 41(b).

**REVERSED and REMANDED.**

KARREN KENNEY, CA. SBN 174872
KENNEY LEGAL DEFENSE
2900 BRISTOL STREET, SUITE C204
COSTA MESA, CA 92626
TELEPHONE: (855) 505-5588
E-MAIL: KARREN.KENNEY@GMAIL.COM

Attorney for Defendant *Jason Fong*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: SACR 20-00146-DOC |
| Plaintiff, | AFFIDAVIT OF KARREN M. KENNEY IN SUPPORT OF JUDGE DAVID. O. CARTER'S RECUSAL PURSUANT TO 28 U.S.C. § 144 |
| vs. | |
| JASON FONG, | |
| Defendant. | |

Defendant Jason Fong, by and through his attorney of record Karren Kenney, hereby submits this Affidavit in support of Jude David O. Carter's recusal from this case pursuant to 28 U.S.C. § 144.

1. I am retained as counsel for Defendant Jason Fong in case no. 20-CR-00146-DOC.

2. I have been admitted to practice in all the courts of California and specifically within the Central District of California.

3. If called as a witness in this case, I can certify all facts within this declaration are true and accurate to the best of my knowledge.

4. This case was assigned to Judge David O. Carter simultaneously with the filing of the one-Count information on October 6, 2020 charging Mr. Fong with providing material support in aid of a foreign terrorist organization.

5. I was retained to represent Jason Fong on November 18, 2020.

6. I requested a bail review hearing for Mr. Fong on February 23, 2021 on the basis of his extensive ties to the Central District of California and family support herein.

7. On February 26, 2021, Mr. Fong was granted bond and conditions of release by the Honorable Karen E. Scott.

8. The government appealed the magistrate's decision granting Mr. Fong conditions of release.

9. A hearing regarding Mr. Fong's bond was scheduled for April 2, 2021 before the Honorable David O. Carter.

10. Both myself and counsel for the government submitted myriad documents for the Court's consideration at the April 2, 2021 hearing.

11. Mr. Fong is a former Marine, discharged other than honorably in 2020 as a result of the charges in this case. He is alleged to have provided material support to foreign terrorist organizations in this case.

12. Judge David Carter is also a former Marine, honorably discharged in 1969 after fighting in the infamous battle of Khe Sanh, where he sustained wounds from grenade fire, a shot to the arm, and injuries from shrapnel. For his service and bravery he was awarded a Bronze Star and two Purple Hearts.

13. Even after separating from the military, Judge Carter has continued to be actively involved in counterterrorism efforts on behalf of the U.S.

government to the present day. His commendable service has brought him to war zones across the globe, including Afghanistan, Sri Lanka, Pakistan, and myriad other locations.

14. Judge Carter also lectures on terrorism and counterterrorism within the District.

15. At the April 2, 2021 hearing, the district court made several findings. While the court did not believe Mr. Fong presented a flight risk, the Court ultimately found that Mr. Fong presented a risk of danger, not just to a clear and convincing standard as required by 18 U.S.C. 3142(g), but "beyond a reasonable doubt."

16. Throughout the hearing, Judge Carter made several comments predicated on his extrajudicial knowledge about military training and operations, and his extensive experience in counterterrorism activities.

17. These comments evince a personal bias and/or prejudice against Mr. Fong, such that an objective observer of the bail hearing would understand Judge Carter relied on facts not in the evidence before him in assessing Mr. Fong's risk of danger to the community.

18. Undersigned counsel promptly filed a motion to recuse the district judge after the bail review hearing on the basis of the district court's comments.

19. The government opposed Judge Carter's recusal, and the matter was set for a hearing on August 23, 2021.

20. Rather than holding a hearing on the motion to recuse, the district court judge denied the recusal motion on August 27, 2021, and denied defense counsel an opportunity to file a reply to the government's response to the motion for recusal.

21. Counsel has a good faith basis to believe that Judge Carter's extrajudicial knowledge and conduct disqualify him from service as the presiding judge in this case. If Judge Carter is allowed to remain on the case, defense counsel has grave doubts that Mr. Fong will be able to adequately present a defense, and that Judge Carter's extrajudicial knowledge and conduct will infect any proceeding he presides over.

22. It is impossible to separate Judge Carter's lived experience as a former Marine and current consultant on counterterrorism operations from the conduct Mr. Fong is accused to have committed. Judge Carter has clearly pre-judged Mr. Fong's case and counsel has every reason to believe Mr. Fong's right to a fair trial has been compromised, and will continue to be compromised, should Judge Carter be allowed to remain the judge on the case.

23. Therefore, pursuant to 28 U.S.C. § 144, and upon a good faith belief that Judge Carter is far from impartial in a case of this nature, Mr. Fong respectfully requests Judge Carter be recused from further proceedings in this case.

DATED: September 14, 2021                    Respectfully submitted,


                                             /s/_____
                                             Karren Kenney
                                             Attorney for Jason Fong